# In The Matter Of:

*Jennifer Pennington and Josh Pennington vs.*
*Memorial Hospital of South Bend, Inc.*

---

*30(B)(6) of Panzica Building Corp. through Philip Panzica*
*October 17, 2019*

---

*Midwest Reporting, Inc.*
*1448 Lincoln Way East*
*South Bend, Indiana 46613*
*reporters@midwestreporting.net*
*574-288-4242*

Original File Panzica Philip.txt

Min-U-Script® with Word Index



EXHIBIT
D

1

1                    STATE OF INDIANA

2          IN THE ST. JOSEPH CIRCUIT COURT

3   JENNIFER PENNINGTON and        )
    JOSH PENNINGTON,               )
4                                  )
         Plaintiffs,               )
5                                  )
      -vs-                         )   Cause No.
6                                  )   71D06-1804-CT-000160
    MEMORIAL HOSPITAL OF SOUTH     )
7   BEND, INC., d/b/a BEACON       )
    HEALTH AND FITNESS,            )
8                                  )
         Defendant.                )
9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

10
              The 30(B)(6) Deposition of
11          PANZICA BUILDING CORPORATION
         Through Designee PHILIP E. PANZICA
12

13       Date:   Thursday, October 17, 2019

14       Time:   12:21 p.m.

15       Place:  May Oberfell Lorber
                 4100 Edison Lakes Parkway
16               Suite 100
                 Mishawaka, Indiana
17

18      Called as a witness by the Plaintiffs in

19      accordance with the Indiana Rules of Civil

20      Procedure, pursuant to Notice.

21
    Before Sharon L. Brady, Court Reporter
22  and Notary Public

23
              MIDWEST REPORTING, INC.
24             1448 Lincoln Way East
            South Bend, Indiana 46613
25                (574) 288-4242

2

```
 1   APPEARANCES:

 2       MR. DANIEL H. PFEIFER
               Pfeifer, Morgan & Stesiak
 3             53600 North Ironwood Drive
               South Bend, Indiana  46635
 4             dpfeifer@pilawyers.com

 5       On behalf of the Plaintiffs;

 6


 7       MR. D. ANDREW SPALDING
               May Oberfell Lorber
 8             4100 Edison Lakes Parkway
               Suite 100
 9             Mishawaka, Indiana  46545
               dspalding@MayLorber.com
10
         On behalf of Defendant Memorial Hospital of
11       South Bend, Inc., d/b/a Beacon Health and
         Fitness;
12

13

14       MR. WILLIAM E. KELLEY, JR.
               Drewry Simmons Vornehm, LLP
               736 Hanover Place
15             Suite 200
               Carmel, Indiana  46032
16             wkelley@dsvlaw.com

17       On behalf of Design Organization;

18


19       MR. DANNY MERRIL NEWMAN, JR.
               Reminger Co., LPA
20             2100 North Main Street, Suite 202
               Crown Point, Indiana  46307
21             dnewman@reminger.com

22       On behalf of Panzica II, A Joint Venture,
         and Panzica Construction Company;
23

24   (APPEARANCES CONTINUED:)

25
```

3

```
 1    APPEARANCES CONTINUED:

 2         MR. CHARLES S. SMITH
                Schultz & Pogue, LLP
 3              520 Indiana Avenue
                Indianapolis, Indiana  46202
 4              csmith@schultzpoguelaw.com

 5         On behalf of Panzica Building Corporation;

 6

 7         MS. BEVERLY J. MACK
                Huelat & Mack, P.C.
 8              286 West Johnson Road
                Suite G
 9              LaPorte, Indiana  46350
                bmack@hmkattorneys.com
10
           and
11
           MR. SCOTT A. RUKSAKIATI
12              Masini, Vickers, Ruksakiati
                & Hadsell, P.C.
13              150 South Wacker Drive
                24th Floor
14              Chicago, Illinois  60606
                sar@mvrhlaw.com
15
           On behalf of Spear Corporation;
16

17

           MARTIN J. GARDNER
18              Gardner & Rans, P.C.
                202 South Michigan Street
19              Suite 801
                South Bend, Indiana  46601
20              mgardner@gardnerandrans.com

21         On behalf of Panzica Building Corporation
           in a separate action;
22

23

24    (APPEARANCES CONTINUED:)

25
```

4

1    APPEARANCES CONTINUED:

2        MR. PATRICK D. CRANDELL
             Collins Einhorn Farrell, P.C.
3            4000 Town Center
             Suite 909
4            Southfield, Michigan  48075-1473
             patrick.crandell@ceflawyers.com
5
        On behalf of Citizens Insurance Company in a
6        separate action;

7

8
        MR. CHARLES B. DAUGHERTY
9            Tate Bowen Daugherty Funk & Spandau, LLC
             156 East Market Street
10           Suite 300
             Indianapolis, Indiana  46204
11           charles@tatebowen.com

12       By telephone on behalf of Robert Coghill and
         REC Consultants in a separate action.
13                         * * *
14

15

16

17

18

19

20

21

22

23

24

25

5

1                    I    N    D    E    X

2              The 30(B)(6) Deposition of
            PANZICA BUILDING CORPORATION
3          Through Designee PHILIP E. PANZICA

4    DIRECT EXAMINATION
     By Mr. Pfeifer ..............7
5
     CROSS-EXAMINATION
6    By Mr. Ruksakiati ..........94
     By Mr. Kelley ..............95
7    By Mr. Newman .............135
     By Mr. Spalding ...........136
8
     REDIRECT EXAMINATION
9    By Mr. Pfeifer ...........139

10   RECROSS-EXAMINATION
     By Mr. Ruksakiati .........147

11                         *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1              E    X    H    I    B    I    T    S

2  DEPOSITION EXHIBIT                                    PAGE

3  Exhibit 5    Binder containing documents Bates      13
                stamped 1 through 105, Panzica
4               Building Corporation's Response
                to Plaintiff's Fourth Request For
5               Production

6  Exhibit 6    Amended Notice of Deposition of        11
                Panzica Building Corporation
7

8  Exhibit 7    AIA Document B143 - 2014, Standard     13
                Form of Agreement Between
                Design-Builder and Architect
9

10 Exhibit 8    Standard Form of Agreement Between     13
                Owner and Design/Builder

11 Exhibit 9    E-mail chain, March 20 & 25, 2015,    107
                with attachments
12

13 Exhibit 10   E-mail, July 22, 2015, and           115
                attached diagram

14 Exhibit 11   Construction Documents SP0.0          119
                through SP4.2
15
                              * * *
16

17 (PREVIOUSLY MARKED:)

18 Exhibit 2    Documents for 30(B)(6) Deposition    142
                produced by Beacon, (Specifically
19              Tab C, Page 47, E-mail dated
                December 15, 2016)
20
                              * * *
21

22

23

24

25

7

PHILIP E. PANZICA,

2  called as a 30(B)(6) witness by the Plaintiffs,

3  having been first duly sworn, was examined and

4  testified as follows:

5  DIRECT EXAMINATION

6  BY MR. PFEIFER:

7  Q  Tell us your name, please.

8  A  Philip, one L, middle initial E., Panzica,

9     P-a-n-z-i-c-a.

10 Q  I'm Dan Pfeifer.  I think at some point in time

11    in your life and mine we have met.

12 A  Yes, sir.

13 Q  Have you ever had your deposition taken before?

14 A  This is the first time, sir.

15 Q  Okay.  I'm sure you're attorney's covered some of

16    the ground rules, but I just want to make sure

17    that we get them on the record so that we're all

18    on the same page.  Fair enough?

19 A  Fair.

20 Q  There is a court reporter seated to your right.

21    Her job is to take down every word that is

22    spoken.

23 A  Uh-huh.

24 Q  And that means a nod of the head up and down or

25    left and right doesn't work.  Okay?

8

1   A   Yes, sir.

2   Q   In everyday conversation, we use phrases like

3       uh-huh, huh-uh.  They mean the opposite.  They

4       could be easily misunderstood.

5           For purposes of today, to help her out, if

6       you could, just say yes or no.

7   A   I understand.

8   Q   In everyday conversation, people also speak on

9       top of each other.  And they understand

10      everything that's going on.  But that makes her

11      job difficult.

12          So, let me finish asking before you start

13      answering.  And I'll let you complete your answer

14      before I ask the next question.  Fair enough?

15  A   Yes, sir.

16  Q   If you need to take a break for any reason, tell

17      us, and we'll do so.  But if a question's been

18      asked, we just need you to answer the question

19      before we take a break.  Okay?

20  A   Understood.

21  Q   Finally, if you don't understand a question that

22      I or any of the other attorneys in here may ask,

23      please let us know, and we will rephrase the

24      question so you do understand it.  Okay?

25  A   Yes, sir.

9

1    Q    So, if you answer the question, we're going to

2         assume you understood what was being asked.

3    A    Okay.

4    Q    Is that fair?

5    A    Yes, sir.

6    Q    Okay.  Are you employed?

7    A    Yes.

8    Q    Where's that at?

9    A    Panzica Building Corporation.

10   Q    And what is your position there?

11   A    I'm president.

12   Q    How long have you held that position?

13   A    President, 15, 20 years.

14   Q    And how long have you been employed by Panzica

15        Building Corporation?

16   A    My employment started in 1977.  So, 42 years.

17   Q    It's a family business, correct?

18   A    Yes, sir.

19   Q    Okay.  What does Panzica Building Corporation do?

20   A    We are design-build contractors.

21   Q    Okay.  And tell me what design-build contracting

22        means.

23   A    We enter into contracts, negotiated contracts,

24        with our owners to deliver them a completed

25        project encompassing construction services,

10

```
1        architectural, engineering, hiring consultants as
2        necessary to complete the work.
3   Q    So, with the design-build concept, do I
4        understand that to mean your company designs the
5        intended product or project and then builds or
6        subs the work for the building?
7   A    You're correct, but partially correct.
8   Q    Okay.
9   A    Some projects, we are the architect.  Other
10       projects, we are the consultants to the
11       architect.
12  Q    Okay.  In this project, were you the architect or
13       a consultant to the architect?
14  A    We were the design-builder.  We hired the
15       architectural services.
16  Q    And the architectural services that were hired in
17       this case was whom?
18  A    Design Organization; Valparaiso, Indiana.
19  Q    Okay.  And what was the reason for hiring Design
20       as opposed to doing it internally?
21  A    The building type that we were engaged for, we do
22       not have experience in.  So, we brought in a firm
23       that is experienced and talented in that type of
24       work.
25  Q    What is it about the building type of this
```

11

```
 1        project that leads you to say your company didn't
 2        have the experience?
 3   A    There are many portions of the project that we
 4        have no experience in.  Number one, a fitness
 5        center.  Number 2, these fitness centers require
 6        a pretty in-depth locker area.  And the pool area
 7        is another major component of the project we had
 8        zero experience in.
 9   Q    In this case, there are two pools.  There's the
10        lap pool, and then there's the therapy pool?
11   A    There are three pools.
12   Q    Okay.  Three pools?
13   A    There is the -- what everyone refers to as the
14        lap pool, there is the therapy pool, and there is
15        a whirlpool.
16   Q    Okay.  And, so, if I understand what you're
17        saying, the reason for bringing in Design
18        Organization, in part, for architectural services
19        was because of the lack of experience that
20        Panzica Building had as it relates to the pools,
21        among other parts?
22   A    Yes.
23                         (Deposition Exhibit 6 marked
24                          for identification prior to
25                          beginning the deposition.)
```

1    BY MR. PFEIFER:

2    Q   Okay.  I'm gonna show to you what's been marked

3        for identification purposes as Exhibit 6.

4    A   Okay.

5    Q   First of all, have you seen that document before?

6    A   Yes, I have.

7    Q   And I assume that you've gone through that

8        document with your attorney in terms of

9        preparation for today.

10   A   Yes.

11   Q   I don't want to know anything that you and your

12       attorney talked about.  I just want to ask you

13       about documents that have been provided to me

14       that are responsive to the various topics on

15       Exhibit 6.  Fair enough?

16   A   Yes.

17   Q   Is it your understanding that you are here in

18       your capacity as a representative of Panzica

19       Building Corporation?

20   A   Yes, sir.

21   Q   Authorized to speak on behalf of Panzica Building

22       Corporation as it relates to the topics that are

23       set forth on Exhibit 6?

24   A   Yes, sir.

25   Q   Okay.  Tell me, if you would -- and, again, I

13

1    don't want to know what you and your attorney
2    talked about.
3        What did you do to prepare yourself to come
4    to talk about the various topics on Exhibit 6 for
5    Panzica Building Corporation?
6  A  I had cursory review of documents submitted.  I
7    did not review each and every document.  I tried
8    to hit the primary documents.  We are extremely
9    busy at this point in time, so it's been very
10   difficult.  But I've looked at, as best I can,
11   the documents and have a good overall
12   understanding of them.
13                           (Deposition Exhibits 5, 7, and
14                           8 marked for identification
15                           prior to beginning the
16                           deposition.)
17 BY MR. PFEIFER:
18 Q  Okay.  If you would, for a minute, take a look at
19   Plaintiff's exhibit 5, which is a binder
20   consisting of 105 pages.
21 A  Okay.
22 Q  Plaintiff's Exhibit 7 and Plaintiff's Exhibit 8.
23   And I just want to confirm, based upon the
24   representation of your counsel, that these
25   documents are the documents that you reviewed and

14

1    are relying upon for purposes of responding to

2    the topics that are set forth on Exhibit 6.  Fair

3    enough?

4  A  Fair enough.  May I look at them?

5  Q  Sure.

6  A  (Witness reviewing exhibits.)  Am I to look

7    through here?

8  Q  It --

9  A  I'll just peruse it real quick and see if it's --

10  Q  I will tell you it has been provided --

11  A  Yeah.

12  Q  -- to me by your attorney and he has made the

13    representation.  But I want to make sure you're

14    comfortable with that.

15  A  That's why I'm just kind of perusing through here

16    and seeing which documents are in here.

17        Okay.  All right.  I have a general

18    understanding of what's in there and here.  All

19    right.

20  Q  So, have you had a chance to review Exhibits 5,

21    7, and 8?

22  A  I looked at 5, looked at 7, 8.  And this is 5?

23  Q  Yes.

24  A  Yes.

25  Q  Okay.

15

1   A   I've flipped through them.  Yes, sir.

2   Q   So, I just want to make sure that Exhibits 5, 7,

3       and 8 are the documents that you've reviewed and

4       are relying upon for purposes of your testimony

5       here today as the representative of Panzica

6       Building Corporation pertaining to the topics

7       that are set forth on Exhibit 6.

8   A   Yes, sir.

9   Q   Okay.  You mentioned a couple of minutes ago

10      that -- when we were talking about the

11      design-build process, that in this particular

12      project, because of no experience with pools,

13      Design Organization was brought in to assist in

14      the architectural side of things, correct?

15  A   Yes.

16  Q   Okay.  Approximately when was the decision made

17      by Panzica to bring in Design Organization, Inc.,

18      for the architectural services?

19                    MR. NEWMAN:  Objection.  Form.

20              I heard the magic word, Panzica.  Are

21              you talking about Panzica Building

22              Corporation?

23                    MR. PFEIFER:  That's who he's

24              here on behalf of.

25                    MR. NEWMAN:  Well, you just --

16

```
 1                    I'm clarifying because there's

 2                    three --

 3                         MR. PFEIFER:  I thought I said

 4                    Panzica Building Corp.

 5                         MR. NEWMAN:  You said Panzica

 6                    just now.  And there are three

 7                    Panzica entities that are parties

 8                    defendant this case.

 9                         So, are you referring to

10                    Panzica Building?

11   BY MR. PFEIFER:

12   Q  Mr. Panzica, if I refer to Panzica today, can we

13      have an understanding I'm talking about Panzica

14      Building Corporation?

15   A  That's fair.

16   Q  Okay.  No other Panzica organizations, just

17      Panzica Building Corporation?

18   A  That's what we're here for today.

19   Q  Okay.  Now, my question, I think, was,

20      approximately when was the decision made by

21      Panzica to elicit the services of Design

22      Organization for architectural purposes on this

23      project?

24   A  Initially, Beacon wished to interview

25      design-builders for a corporate administrative
```

1    office building they wished to build.  Our firm

2    was invited.  We felt that we had experience in

3    office.  But cost control was of importance to

4    them.  This was a substantial-size project, and

5    we felt that we would have a better chance of

6    receiving the project if we had additional

7    support.

8         We have shoestring cousins, we'll call them,

9    out of Cleveland, Panzica Construction out of

10   technically Mayfield, Ohio, which is a suburb of

11   Cleveland, that we had partnered with on other

12   projects.  And we also had relation and new

13   principals of Design Organization, who had

14   substantial experience in offices and being in

15   the Chicago market.

16        So, we put together a team of Panzica South

17   Bend, Panzica Building Corp, Panzica Cleveland --

18   we'll refer to them as Panzica Cleveland -- and

19   Design Organization.  We were successful in the

20   interviews.  We were hired for the project of an

21   administrative office building.  We got through

22   the initial design development phase.  Budgets

23   were put on the table.  And the hospital decided

24   to abandon the project.

25        We then received a phone call from Beacon

18

1    requesting us to get involved in this fitness

2    center.  We contacted DO and asked them -- it was

3    really earlier on.  We asked them, "Do you have

4    experience in fitness centers and pools?"

5         "Yes.  We've done YMCAs.  We've done other

6    fitness centers.  We've done pools.  Yes.  We can

7    support on that project."

8         So, with the knowledge that we have Panzica

9    Cleveland strong in cost accounting and

10   estimating and Design Organization with

11   experience in pools, we accepted the position of

12   being the design-builder for the fitness center.

13 Q  Okay.  So, if I understand what you're saying,

14   the decision to bring Design Org in for the pool

15   aspect was a decision that was made at the

16   beginning of the process?

17 A  Very beginning.  In fact, after the interview --

18   we had a very successful interview.  The next

19   morning, Mr. Costello called us and said that

20   they wished to work with us; our fees were the

21   strongest of the fees presented; however, that he

22   had multiple projects coming, and that if we were

23   interested in re-assessing our fees, that he

24   would welcome us to be on all three projects.

25        So, at that -- that was at the point we

19

```
 1        contacted DO and said -- we said, "I want you to
 2        be involved in this admin building.  I would like
 3        to see you gentlemen be involved in a fitness
 4        center and an ambulatory care facility.  Do you
 5        have experience?"
 6             That question was asked to DO.  They said,
 7        "Yeah.  We have experience in ambulatory.  We've
 8        done hospital work.  And we've done fitness
 9        centers with pools and YMCAs."  So, we felt we
10        had a team that was well versed and capable of
11        handling all three projects.
12   Q    So, there was a trilogy of projects?
13   A    Yes, sir.
14   Q    Not just the project that we're here about today,
15        the health center?
16   A    Yes.
17   Q    Okay.  Did all three projects go forward,
18        ultimately?
19   A    Yes.
20   Q    Okay.
21                        MR. SMITH:  Administrative?
22                        THE WITNESS:  Huh?
23                        MR. SMITH:  Administrative?
24                        THE WITNESS:  Yes.  Not --
25             not -- yes.  All three projects have
```

1                          been undertaken.

2    BY MR. PFEIFER:

3    Q    Ultimately.  Maybe not at the same time.  But,

4         ultimately, all three projects --

5    A    Yes.

6    Q    -- were undertaken?

7    A    Right.  And the -- the ambulatory was the same

8         team.  The office is without DO or without

9         Cleveland.

10   Q    Okay.

11   A    Because the project was reduced in size.

12   Q    Okay.

13   A    Well within our capabilities.

14   Q    Help me understand.  Because there's Panzica

15        Building Corporation, Panzica Construction

16        Company, and Panzica II, A Joint Venture.

17   A    Okay.

18   Q    When you say Panzica Cleveland, are you referring

19        to Panzica Construction Company or Panzica II, A

20        Joint venture, or neither of them?

21   A    When I made the comment that we'll refer to

22        Panzica Cleveland as Panzica Cleveland, I'm

23        referring to Panzica Construction Company.

24   Q    Okay.

25   A    The joint venture is the two firms coming

21

```
 1        together in a contract to work as a single
 2        entity.
 3    Q   For the health center or the trilogy of projects
 4        that Beacon was talking about?
 5    A   Yes.
 6    Q   Okay.  Who at Design Organization did you
 7        initially speak to when it came to considering
 8        the project involving the health facility?
 9    A   Jeffrey Wolf.
10    Q   Had you dealt with Jeff Wolf before?
11    A   Jeffrey -- no.  Jeff Wolf was a classmate from
12        architecture school.
13    Q   Okay.
14    A   That I've had a long relationship with.
15    Q   Had you dealt with Design Organization before?
16    A   Obviously, we've talked to them many times over
17        the years but had not engaged into a contract
18        with them.
19    Q   Maybe not -- it probably wasn't the best question
20        on my part.  Let me rephrase it.
21    A   Okay.
22    Q   Had you partnered with Design Organization on a
23        project before this project?
24    A   We have talked to Design Organization, but this
25        was the first project we ever contracted with
```

22

1       them.

2   Q   Okay.  Going back to this project and going back

3       to Panzica Building Corporation, which I'm now

4       gonna call Panzica, okay?

5   A   (Nods head.)

6   Q   When you spoke to Design Organization about this

7       project, what were the general conversations that

8       you had with them about the pools that were a

9       part of this project?

10  A   I'm not quite sure what the direction of your

11      question is.  These projects are very

12      complicated.  I don't think we've had a direct

13      conversation honing in on just talking about a

14      pool.

15  Q   Okay.  In your initial conversations with Design

16      Org, there was discussion of some type about the

17      fact that this project included three pools,

18      correct?

19  A   Yes.  At the point -- so, we had a -- okay.

20      Let's talk about -- we started with the initial

21      admin building.

22  Q   Right.

23  A   Okay.  So, there's discussions and issues going

24      on with that project.  Then, when that was put

25      aside, deferred, then there became discussions

1     about the hospital asking us, "Would you like to

2     get involved and get -- let's get rolling on the

3     fitness center." Then, at that point, we start a

4     project. And, so, then there starts to be

5     discussion about the project.

6 Q  What the project's going to include?

7 A  Yes, sir.

8 Q  Which, among other things, was three pools?

9 A  We did not know that until we had meetings with

10     the client to start ferreting out what their

11     space program would be and what elements would be

12     included into a fitness center.

13 Q  Okay. And as it relates to the decision to

14     include Design Organization in this project,

15     what, if any, impact or effect did the pools

16     being in this project have on including Design

17     Org in the project, if any?

18 A  Again, I'm not quite sure what the meaning of

19     your question is.

20 Q  Let me rephrase it then. If this health building

21     that you were invited to participate in with

22     Beacon did not include pools, would you have

23     reached out to Design Org for their assistance in

24     architectural services?

25 A  Yes.

24

1  Q  Why?

2  A  Because there were other components of the

3     project they had experience that we did not, such

4     as a cardio area, a sports performance area.

5     Just the issue of lockers alone, a locker room

6     alone, has its own idiosyncrasies that having

7     experience going in helps you.

8  Q  Okay.  So, in your conversations with Design Org,

9     when it was known that there were going to be

10    three pools in this project, what did they

11    represent to you that their experience was in

12    terms of providing architectural services for the

13    pool, pools, aspect of the project?

14 A  I believe I've answered that question earlier,

15    Dan, by explaining that we had a conversation;

16    "Do you have experience in this building type,"

17    okay?  "Which will be a fitness center, may have

18    pools, cardio, lockers, et cetera."

19         "Yes.  We've done YMCAs.  We've done other

20    fitness centers.  We've done pools."

21 Q  Okay.

22 A  That's the conversation.  I'm good enough with

23    that.  I know Mr. Wolf for many years.  He's a

24    first class gentleman, very talented man.

25 Q  And I'm not trying to suggest otherwise.  I'm

25

```
 1        just trying to understand the extent of the
 2        conversations that took place as it relates to
 3        your understanding as to Design Org's experience
 4        with pools.  That's the whole --
 5             And if I understand what you're saying, Jeff
 6        Wolf said to you, "We have plenty of experience.
 7        Here's examples."  And knowing Jeff Wolf as
 8        you've known him for many, many years, from your
 9        perspective, that was good enough for you?
10    A   Yes, sir.
11    Q   Okay.  I'm gonna start to go through with you
12        Exhibit 5.
13    A   Okay.
14    Q   The page numbers have been marked at the bottom.
15    A   Okay.
16    Q   If you hear the phrase "Bates number," that's
17        what those numbers are at the lower right-hand
18        corner of the page.
19    A   Okay.
20    Q   If you are looking at a particular page, to
21        assist all of us so we know what you're talking
22        about and to assist the court reporter, if you
23        could, refer to that Bates number so that when we
24        go back in the future to read this transcript
25        we're gonna know what page you were looking at.
```

26

1   Fair enough?

2 A Understood.

3 Q Okay.  Let's go to Page 3.

4 A (Witness Complying.)

5 Q And I believe, to help you out, Pages 3 through 8

6   pertain to notes that were taken at a meeting

7   that took place on April 11th of 2013.

8 A Yes.

9 Q Take a look at them and -- is that correct?

10 A Yes.

11 Q Okay.  First of all, who took the notes?

12 A These are my notes.

13 Q Okay.  Would Pages 3 through 8, your notes from

14   the meeting of April 11th, 2013 -- would those

15   notes have been the notes that you took from the

16   initial meeting with Beacon about the health

17   project?

18 A This was an initial meeting; or call it a

19   reconnaissance meeting, a research meeting.

20 Q Okay.

21 A Akron General Hospital in Ohio is the leader in

22   these types of facilities.

23 Q Really?

24 A They're the ones that came up with this concept.

25   And it's not --

27

1   Q   The concept being what?

2   A   The concept, hospital-based health.

3   Q   Okay.

4   A   The hospitals are not charged with just treating

5       your acute problems.  Their charge to the

6       community is to help in wellness of the

7       community.  So, this is a new paradigm at that

8       time of, well, if we want to keep the community

9       healthy, we need to build a fitness center and

10      have outreaches to improve people's health.

11  Q   Okay.

12  A   So, we traveled with hospital representatives.

13      Mr. Wolf was not at this meeting.  And we

14      traveled with basically representatives of Beacon

15      to meet with Akron General, who had done initial

16      consulting to the hospital, to tell them what

17      they could build, how big it should be, what

18      elements should be in the building.

19          So, we toured their facilities.  And there

20      was a great deal of discussion of what a

21      hospital-based fitness center is.  It is not a

22      commercial gym.

23  Q   Okay.  So, if I understand the April '13 notes,

24      that would be from a meeting that took place in

25      Akron, Ohio?

28

```
 1   A   Yes.

 2   Q   At Akron General Hospital?

 3   A   Yes.

 4   Q   Present at that meeting was yourself, obviously.

 5       What page are you on?

 6   A   Page 08 has the attendance list.

 7   Q   Okay.  Dr. Lavalee, is that a physician from

 8       Beacon?

 9   A   Dr. Lavalee --

10   Q   Lavalee.

11   A   -- is their sports medicine physician.

12   Q   Brock Haut?

13   A   Brock was -- heads up their physical therapy

14       office.

15   Q   Beacon's?

16   A   Beacon's physical therapy office.

17   Q   Johan Kuitse?

18   A   I can't recall her role.  I believe she was part

19       of the PT staff.

20   Q   Okay.

21   A   I'm not sure.

22   Q   Sarah Stefling, it says PT?

23   A   Yes.

24   Q   For Beacon?

25   A   Yes.
```

29

```
 1   Q   Okay.  And then there is Conyers, Tavan Conyers,
 2       from Bariatric?
 3   A   Yes.  They thought -- that's a bariatric clinic
 4       where they provide support and counseling and
 5       medical advice to bariatric patients.  And, at
 6       the time, that was -- they considered that they
 7       may put that element in this building.
 8   Q   And then Asleson from the YMCA?
 9   A   Dan was the director of the YMCA in South Bend.
10       And there was discussion that there would be a
11       health fitness center and there would also be a
12       YMCA.  There would be two operations, but there
13       would be some synergy between the operations.
14   Q   Okay.  And then the other two individuals, it
15       looks like Douglas Ribley and Matt Edwards.
16           Those would've been individuals from Akron
17       General Hospital?
18   A   Yes.
19   Q   Okay.  And if I understand your notes on Page 8,
20       at the top, the meeting was on April 11th of 2013
21       from 7:00 a.m. until 9:30 p.m.?
22   A   (Nods head.)  Much -- a little shorter than this
23       meeting, possibly.
24   Q   Hopefully.
25   A   That included travel.
```

30

1  Q  Okay.

2  A  And during the travel, you're talking.

3  Q  Sure.

4  A  You're comparing -- talking about what their

5     thoughts are and so forth.

6  Q  And it's 280 miles to Akron, about three and a

7     half hours, depending upon how you're driving?

8  A  Yeah.

9  Q  Correct?

10 A  Yes, sir.

11 Q  Okay.  To help me understand, there's been some

12    dialogue earlier in our questioning about

13    incorporating Design Organization, Jeff Wolf,

14    into these projects that Beacon had been

15    discussing with you, correct?

16 A  Yes.

17 Q  By the time you had this meeting on April 11th of

18    2013, had there already been discussion with

19    Design Organization?  Or did the discussion with

20    Design Organization occur after April 11th of

21    '13?

22 A  I cannot answer that directly, Dan.  I can't --

23    from recollection, I can't recall.

24 Q  Okay.

25 A  I tend to believe that possibly DO was aware of

31

```
 1        this meeting; possibly didn't have time.  I can't
 2        answer that directly.  So, I'll just leave it at
 3        the null state.
 4    Q   Fair enough.  And you have referred to Design
 5        Organization as DO.
 6            If I use the phrase "DO," can we have an
 7        understanding that's who I'm talking about?
 8    A   Yes, sir.
 9    Q   Okay.  Then, going back to Exhibit or -- yeah,
10        Exhibit 5, if I understand then, the next series
11        of documents are Pages 9 through 11.
12            And that pertains to a meeting of May 1st
13        of, 2013?
14    A   Yes.
15    Q   Okay.  And it appears at that meeting Jeff Wolf
16        from DO was present, correct?
17    A   Yes.
18    Q   Now, there is a notation of Philip Panzica,
19        yourself, Lead Architect, and then Jeff Wolf,
20        Architect, on Page 9?
21    A   Yes.
22    Q   What's the reason for the distinction?
23    A   At that time, there was discussion that there
24        would be a collaboration.  As we got into it
25        later on in the discussions, prior to entering
```

32

1    into a contract, Mr. Wolf and I had a discussion.

2    And he said, "We want to be the architects.  We

3    don't want to be the draftsmen."

4        And I said, "That's fair.  The project's

5    large enough.  You're the architect.  You handle

6    the architectural work."

7  Q  Okay.  For a non-architectural person like

8    myself, can you help me understand the difference

9    between the architecture component and the

10    draftsman component?

11  A  Okay.  On these types of projects, commercial

12    projects, large projects, the leader is generally

13    a licensed registered architect.

14  Q  Okay.

15  A  In the State of Indiana and most states, if you

16    call yourself an architect, you are a registered

17    architect.  There's no such thing as an

18    unregistered architect.  No different than

19    there's lawyers that aren't barred.

20        So, somebody on the architectural team has

21    to be the leader.  And then they become

22    responsible.  They place their seal on the

23    drawings.  And they're stating that all the work

24    in those documents is under their guide, under

25    their direction, and they're standing by it and

33

1       they're responsible for it.  So, he, DO, became

2       the architect for the project.

3  Q  I seem to recall -- and I don't have the document

4       in front of you.  And you may or may not know the

5       answer to this.

6           But I seem to recall, in the myriad of

7       documents that I've looked at, that on plans that

8       were submitted to the State of Indiana,

9       architectural plans, there is the stamp of Jeff

10      Wolf as opposed to Phil Panzica.  Are you aware

11      of that?

12  A  Yes.  I am aware of that.  And it goes a little

13      deeper than that.

14  Q  Okay.  Then take me deeper.

15  A  In a project, there are multiple sections of

16      documents.

17  Q  Okay.

18  A  You have a civil set that pertains specifically

19      to site engineering, storm drainage, utilities,

20      parking, landscaping, et cetera, outside of the

21      building.

22  Q  Okay.

23  A  The necessary utilities to support the building.

24      Then, from 5 foot outside of the building on in

25      is the architect's.  So, under the architect's

34

1      drawings, there will be the architectural portion

2      of the drawings.  There will be the structural

3      series of drawings.  And they may be signed by

4      the architect or they may be sealed by the

5      engineer that was a consultant.  Or someone in

6      DO's office who is a structural engineer may seal

7      that portion of the documents, stating, "I'm the

8      engineer responsible for those drawings for the

9      structural frame."

10          Then there will be another section of

11     drawings for plumbing that deals with just sewer,

12     water supply, anything relating to piping.  And

13     that is sealed by that particular engineer.

14          On this project, Phil Panzica was the

15     architect of record for just the plumbing portion

16     of the drawings of the building.  Then there's

17     mechanical.  What is mechanical?  That's HVAC,

18     ventilation, et cetera, for the building.  And

19     there was a mechanical engineer.  And that was, I

20     believe, Bill Hromada from Millies Engineering

21     out of Munster, Indiana, that has experience in

22     these types of facilities.

23          Then the last section of drawings is the

24     electrical, which may or may not include IT,

25     communication, door controls, and all that.  That

35

1    was integrated delivery where Martell Electric

2    and their electrical engineer, John Martell, were

3    responsible.  And they sealed those portions of

4    the drawings.

5        So, our firm was responsible as well.  Our

6    firm was responsible for the civil and for the

7    plumbing.  That's it.  DO was responsible for the

8    architectural, the structural, the mechanical.

9  Q  Are there a set of drawings that have to be filed

10    with the state, stamped by an engineer or an

11    architect, for the pools?

12  A  A plan review is -- a plan review form is filled

13    out identifying the project, the owners, the size

14    of the building, construction type, construction

15    use, the -- the use of the building.  And that is

16    sealed by the project architect.

17        And the cover sheet has to also be submitted

18    with the seal from the civil engineer, from the

19    structural engineer, mechanical.  So, this cover

20    sheet is printed multiple times; and people take

21    responsibility for their portion of the work.

22    And that's submitted to the state for review.

23    They don't approve it.  They release it, just

24    saying, "You've submitted.  You're good.  Go."

25  Q  And by releasing it, you're talking about they

36

1     release it for construction or for --

2  A  Yeah.  They release it for local permitting.  But

3     they don't render an opinion as to whether it

4     meets all the codes and so forth.  They just

5     release it.

6  Q  Okay.  So, as it relates to the drawings or the

7     plans -- and right now I really want to just hone

8     in on the lap pool which is the subject of this

9     litigation.

10  A  Okay.

11  Q  As it relates to that pool, do I understand that

12     the plans or the drawings for that pool would've

13     been submitted to the state in the manner that

14     you've just testified and not approved by the

15     state but just released by the state?

16  A  You're -- yes, sir.  And I failed to include

17     another portion of these documents were a series

18     of drawings specific to pool engineering, okay?

19     Engineering of the pool.  And that was sealed by

20     the engineer of Spear Corporation.  And they

21     hired a consultant to do that for them.

22  Q  Okay.  So, with respect to the plans for the lap

23     pool, you have Spear's engineer, DO's

24     architect --

25  A  Right.

37

1    Q   -- and Panzica Building's architect, you, who

2        have all put their stamp on these plans submitted

3        to the state, which allows the state to release

4        for the project?  Am I --

5                        MR. SMITH:   I guess I'd --

6    A   No.   No.

7    BY MR. PFEIFER:

8    Q   Okay.

9    A   No.  That's incorrect.  That's incorrect.

10   Q   That's what I'm trying to --

11   A   Yeah.

12   Q   -- understand.

13   A   Design Organization is the architect of the

14       project, okay?

15   Q   Okay.

16   A   In doing their work, they design -- just like the

17       building, they design the -- what the building's

18       gonna be, how tall the walls are, where they wish

19       to have columns.  They may show, shall we say, a

20       12-inch-wide flange column.

21           They then take their work and give it to a

22       structural engineer.  Whether he be in their

23       office or whether he be an outside consultant,

24       they hand the architectural plans to a structural

25       engineer.  The structural engineer's

38

1    responsibility is to look at the architect's

2    drawings and look at the loads imposed on it by

3    code and design the structural framing to support

4    it.

5        So, they may -- so, when DO shows a 12-inch

6    column, the engineer's responsibility is to

7    verify a 12-inch column is adequate.  And they

8    also verify, "Do I need a W12 by 40," meaning the

9    beam weight.  The piece of steel weighs 40 pounds

10   a foot.  Or do they need a W64, which weighs --

11   there's many increments of a wide flange, whether

12   they need a W6 or 12-by-64.

13       They may come back and say, "You only need a

14   10-inch column.  They may come back and say, "You

15   need a 14-inch column."  That's just an example.

16   So, the engineer's job is to study the drawings

17   and design and engineer the frame to support the

18   structure that's being proposed.

19  Q  Okay.

20  A  By the architectural drawings.

21  Q  Okay.  And as it relates to the pools --

22  A  Yes, sir.

23  Q  -- are there -- I thought I understood that there

24     are plans that are submitted to the state, not

25     approved, but released.

39

1  A  Yes, sir.

2  Q  Who signed off on those plans?

3  A  Again, going back, the civil set was sealed by

4     Panzica's office.

5  Q  Okay.

6  A  For civil work.

7  Q  All right.

8  A  All of the architectural drawings, which would be

9     floor plans, elevations, sections, details, door

10    schedules, all of the necessary -- a finish

11    schedule, is it carpet, is it tile, that is all

12    done by DO.

13 Q  Okay.  All right.

14 A  Then there is the structural engineer, the sealed

15    drawings.

16 Q  Okay.

17 A  There is the plumbing and electrical and

18    mechanical.

19 Q  All right.

20 A  And the pool.  The pool engineer.

21 Q  The pool engineering in this case was done by --

22 A  Spear Corporation was hired to be the integrated

23    project delivery for that portion of the work,

24    for the pool.

25 Q  Integrated project delivery?

40

1   A   Yes.

2   Q   What do you mean?

3   A   What that means is that when you -- integrated

4       delivery means you -- instead of the architect or

5       engineer engineering the electrical system and

6       then putting it out for bid, you go to a talented

7       firm and you go, "Give me a budget, and then you

8       will be the electrical contractor for this

9       project.  And you will be responsible to take the

10      architect's plans, lay out all the lighting,

11      electrical services, riser diagrams.  You will be

12      responsible to seal them, and you will construct

13      it.  And you will maintain your budget."

14          And, so, that's called integrated delivery,

15      that they're part of the design process as well

16      as the construction process.

17  Q   And at least from Panzica's perspective, Panzica

18      Building Corporation, that was the role of Spear

19      in this case as it relates to the pool, the lap

20      pool?

21  A   Yes.  They were hired for engineering and

22      construction of the pool.

23  Q   Okay.  Were they hired by Panzica or DO?

24  A   They were hired by the joint venture, Panzica JV

25      II.

41

1   Q   Okay.

2   A   They were issued a purchase order.

3   Q   So, Panzica II, A Joint Venture, is that between

4       DO and Panzica Building Corporation?

5   A   Ask the question again.

6   Q   One of the entities in this particular case that

7       has been identified is Panzica II, A Joint

8       Venture.

9   A   Yes.  For construction of the building.  So, a

10      purchase order was issued from the joint venture

11      to Spear.

12  Q   Who are the parties to Panzica II, A Joint

13      Venture?  Who are the entities?

14  A   That is Panzica Construction Cleveland and

15      Panzica Building Corporation South Bend.

16  Q   Okay.

17  A   Those two firms joined together, Panzica JV II.

18  Q   Okay.  And that was the entity responsible for --

19      well, was that the entity responsible for hiring

20      Spear?

21  A   Spear was issued a purchase order.  That's how

22      their contract is.

23  Q   All right.

24  A   I can't recall in specifics.  But many times when

25      we do this, we'll say to the vendor, "Vendor, we

42

1    anticipate having you do this work.  If something

2    happens where the project is deferred, killed,

3    died, you will be paid for your engineering

4    services.  But you will do the engineering

5    services and then you will be issued a

6    construction contract."  And they work under that

7    guise.

8  Q  And that's how Spear --

9  A  Yes.

10  Q  -- worked in this case?

11  A  I believe so.  Yeah.  So, they went out and got

12    the engineering done and so forth with the

13    reliance that if the project was deferred they

14    would be paid for their engineering and time

15    spent on the project, but they would receive --

16    once the project is ready to go, they would

17    receive a purchase order and they're basically

18    building the pool.

19  Q  Okay.  All right.  I started talking about Pages

20    9 through at least 12 of Exhibit 5.

21  A  12?  Where is -- oh.  12 would not be included.

22  Q  Okay.

23  A  It would only be to 11.

24  Q  So, 9 through 11 are the minutes of the meeting

25    of May 1st of 2013?

43

1   A   Yes.

2   Q   Okay.

3   A   That was the initial meeting with the project

4       team to start discussion of what this project may

5       or may not be.

6   Q   Okay.  Help me understand then, with respect to

7       Exhibit 5, Bates Page 12 --

8   A   Yes.

9   Q   -- what is that?

10  A   That would be an early design development

11      drawing.  And this was -- projects don't go in a

12      straight line.  Imagine yourself building a new

13      office building for your firm.  You start out

14      with ideas.  And you say, "I want this and this

15      and this and this."

16          And as the project evolves, you start

17      realizing there's other needs or, "I don't need

18      this anymore," like you don't need a big law

19      library anymore because it's all digital.  So,

20      the project is altered.

21          So, this drawing was an early schematic

22      design, early design development.  And if you

23      look at this, the green area was gonna be the

24      YMCA.

25  Q   Okay.

44

| 1 | A | That was gonna be their component, and they would |
| 2 | | be like their own operation.  But there would be |
| 3 | | synergies of cross use of the facilities. |
| 4 | Q | Which ultimately did not happen? |
| 5 | A | Yes. |
| 6 | Q | Okay. |
| 7 | A | The hospital and YMCA decided, for reasons beyond |
| 8 | | our knowledge, that it would not work. |
| 9 | Q | Okay.  But what I do want to look at on Page |
| 10 | | 12 -- |
| 11 | A | Okay. |
| 12 | Q | -- is the part of the plans that have the lap |
| 13 | | pool. |
| 14 | A | Yes, sir. |
| 15 | Q | And I'm gonna give you a red pen.  And on Page |
| 16 | | 12 -- or you have a red pen. |
| 17 | A | I never go without one. |
| 18 | Q | Would you circle the lap pool if it is on these |
| 19 | | plans which are on Page 12? |
| 20 | A | (Witness Complying.)  That's not a circle.  It's |
| 21 | | a rectangle. |
| 22 | Q | Or put a -- |
| 23 | A | But I figured I would make it a little more |
| 24 | | accurate. |
| 25 | Q | Put a rectangular box -- |

45

1   A   Yes.

2   Q   -- around the pool, which you've done.

3   A   Thank you.

4   Q   Okay.  Now -- and I understand what you're

5       saying; that these are plans that are in the

6       infancy of the project.  That was my word, not

7       yours.  Correct?

8   A   Yes, sir.

9   Q   But what I'm trying to understand is, looking at

10      these plans, there does not appear to be the ramp

11      and the stairs on the lap pool which ultimately

12      were a part of the project; is that correct?

13  A   You're correct.

14  Q   Okay.  So, now what I want to do is focus in on

15      your understanding and knowledge of how we got

16      from what you've just put the rectangular box

17      around --

18  A   Uh-huh.

19  Q   -- the infant drawing of the lap pool, to where

20      we ultimately ended with the ramp and the

21      stairs.

22  A   Okay.  When you develop a project, as I stated

23      earlier about you building a new law firm, the

24      client doesn't completely know all the details.

25      So, you start in at 50,000 feet.  It's like

46

1    riding in an airplane.  You're looking down, and
2    you see a dot.  And you go, "That's the fitness
3    center."  Then the plane starts getting lower.
4    Well, it's got several components to it.
5        So, this particular plan is a very early
6    plan.  There's some general discussion of, "Well,
7    we're gonna want a multi-use pool."  Although it
8    says "Lap Pool," it's a multi-use,
9    multi-functioning pool.  "We want a therapy
10   pool."
11       "Beacon, what's your -- what's a therapy
12   pool?"
13       "We'll get into that later.  We want a
14   whirlpool."
15       So, these are what we call place markers.
16   So, we start in the planning, and it starts
17   showing -- we start in with a space program,
18   which is in here.  I see further on you do have
19   the space program here, if you go back to Bates
20   Page 16.
21  Q  Okay.
22  A  What is the date on that?  May 31st.  This was
23   developed by DO.  They started with a white piece
24   of paper.  This is their template.  This is how
25   they set up the space program.

47

1        What is a space program?  It starts

2    identifying the functional spaces they wish to

3    have in the building.  And we group it in like

4    uses, okay?

5  Q  Okay.

6  A  So, you'll see the header of Sports Performance,

7    Fitness and Strength.  So, there's very --

8    there's numerous elements within the fitness

9    area, that area.

10        You have a clinic, Sports Medicine and

11    Physical Therapy and Acupuncture.  And it was

12    dealt with as a single group.  So, you list all

13    the spaces necessary for that type of function.

14    Some of these functions are not what the client

15    directs.  Some of these functions are based upon

16    what architects use for references, building type

17    studies.

18        So, you go back in and you go, "Well, it's a

19    medical clinic.  I need clean storage of

20    laundered things, and I need soiled laundry

21    areas.  Those are a requirement."  The client

22    won't tell you that, but you put it on the

23    playing board.  You will need it.

24  Q  Certain essentials?

25  A  Right.

48

1   Q  The client tells you what they want, and you or

2      DO know that there are certain essentials that

3      automatically go with what the client wants.  And

4      you're adding them even though the client doesn't

5      say, "I want this, this, or this --"

6   A  Yes.

7   Q  -- because the client doesn't know what the

8      essentials are?

9   A  Never had a client ask us for a mechanical room.

10     All jobs end up having a mechanical room.

11  Q  Okay.  All right.  So, I understand the process.

12  A  Okay.

13  Q  And I understand -- again, my words -- it's

14     evolving.

15  A  So, we're getting to how we evolved to the

16     current plan.

17  Q  Right.

18  A  So, this was a place marker, that now you put

19     this in front of the client and they start

20     studying it.  And this -- if you looked at the

21     final plan and this plan, they kind of look

22     similar.  Their kind of orientation space is

23     about the same; very similar primary circulation,

24     but a lot of things moved.

25  Q  Okay.

49

1   A   So, as we worked through it.  And when you have

2       these meetings with a client, generally, a

3       project of this scope, you don't sit down and go

4       "Well, today we're gonna have a meeting specific

5       to the pool."

6   Q   Okay.

7   A   It's a rolling series of meetings.  "Let's talk

8       about cardio."  Bop, bop, bop.  "Let's talk about

9       the pool area."  The initial discussions were on

10      the pool, whether it be -- first of all, it was a

11      multi-functional pool.

12          They wanted to be able to take groups of

13      people in there, 20, 30 people, and do aquatic

14      exercises.  You take the load off people's -- the

15      weight of them is in water.  It's buoyant.  And,

16      so, they do exercises that helps them with their

17      knees, their hips, whatever.

18          But they'll have an instructor on the pool

19      edge showing them what exercise they want to do.

20      And you'll have 20, 30 people lined up doing

21      these exercises in the water.

22  Q   Okay.  Let me interrupt you one second.  I just

23      want to make sure we're talking about the same

24      thing.

25          When you say a multi-functional pool, is

50

```
 1       that synonymous with what we've been calling the
 2       lap pool?
 3   A   Yes.
 4   Q   Okay.
 5   A   That's the term that's been given to it.  It's
 6       just easier to say lap pool than --
 7   Q   Fair enough.  I just --
 8   A   And one of the functions is for lap swimming.
 9   Q   Okay.  I just wanted to make sure we were not
10       talking about one of the other pools.
11   A   Other three?  Yes, sir.
12   Q   Okay.  So, continue, if you would, with the
13       process.
14   A   So, some of the discussion in Akron came back to
15       the table on this particular pool.  Akron had a
16       six-lane pool.  And then they got approached by
17       local swim teams, swim clubs, high schools, "Can
18       we use your pool?"  And they ended up doing that.
19       They allowed, I think, a swim team, a local
20       community swim team, to use their pool.
21           Well, every day, the pool's tied up from,
22       you know, 3 o'clock to 5 o'clock for that swim
23       team.  And that impacts the membership, that they
24       can't use it at that time.  And Beacon decided
25       they wished not to have the pool committed to
```

51

 1     other outside users.

 2  Q  Okay.

 3  A  They wanted the pool to be dedicated and always

 4     accessible for the members.

 5  Q  Only?

 6  A  Only.

 7  Q  Okay.

 8  A  So, it was decided that it would be a four --

 9     their current lane facility was four lanes.  They

10     felt this facility -- a four-lane pool was

11     adequate.

12  Q  Okay.  And there's a four-lane pool that is in

13     the initial plan, Page 12.

14  A  So, then, this was -- this particular plan showed

15     a six-lane pool.

16  Q  Okay.

17  A  So, now, in the next version of planning, it

18     probably got reduced down to a four-lane pool.

19  Q  And the width of the lane, I assume, is pretty

20     constant in terms of what the width is, ex-number

21     of feet?

22  A  There's multiple standards to look at for pool

23     design.  If you were designing a collegiate

24     competitive pool, that may be different.  This is

25     a recreational pool.

52

1          Guidelines, I can't recall it exactly, Dan.

2     But it might be as narrow as a 7-foot lane; might

3     be as fat as an 8, 8-and-a-half-foot lane.

4  Q  Okay.

5  A  I believe these are 7-foot-6, center line, center

6     line of the lane.

7  Q  When you went to Akron General Hospital and they

8     shared with you how their usage of the pool

9     included outside community members' use of the

10    pool --

11 A  Uh-huh.

12 Q  -- was there anything about the Akron General

13    Hospital pool that had with it a ramp and a set

14    of stairs which ultimately were included in the

15    pool at Beacon?

16 A  My memory doesn't serve me well on that detail.

17    I believe they did have some sort of entry, zero

18    entry.  But I would have to verify that before I

19    can tell you positively, absolutely, yes.

20 Q  So, you're continuing with the discussion of the

21    multi-functional aspect of this pool.

22         Beacon did not want to necessarily open it

23    up to the community; just wanted its use to be

24    for members only?

25 A  Always available for the members.

53

1  Q  Okay.  And didn't necessarily need a six-lane
2     pool; but, instead, wanted ultimately a four-lane
3     pool?
4  A  Yes.
5  Q  Help me understand how we got from the
6     rectangular pool that doesn't have a ramp and
7     stairway in it, in the plans, to what ultimately
8     was constructed; a pool that had the ramp and the
9     stairs.
10 A  Okay.  In one of the meetings, there was a
11    discussion of the pool.  And we go back to the
12    issue of they wanted this to be a fitness center
13    for health.  There's also this component that we
14    haven't talked about of what Akron General does.
15       The Akron model, what they do is they've
16    come up -- they came up with this.  You have a
17    fitness center.  You have a sports medicine
18    doctor who deals with sports injuries and
19    strained muscles and so forth.  You have a
20    physical therapy element that deals with, "I will
21    get your muscles back in condition or help you
22    get that joint working again after you sprained
23    it."
24       And Akron General even goes so far as having
25    an Emergency Department with a medical office

54

1    building attached to these.  Why?  It's a synergy

2    of how these people work together.

3          So, you get injured.  You go to the sports

4    medicine doctor or some other doctor.  And they

5    say, "You need physical therapy."  So, they send

6    you to the Beacon Physical Therapy at the Health

7    and Fitness Center.

8          So, they look at your injury and they say,

9    "You should be exer -- for therapy, I want you to

10   get on this treadmill, and I want you to set it

11   at this elevation and this dial setting.  And you

12   will do this for so many reps.  And then you're

13   gonna do this spinning bike."

14         "And out there in our fitness center is the

15   same equipment.  So, I'm gonna give you a

16   temporary membership card.  And you will come

17   here for the next eight weeks.  I want to see you

18   three, four days a week in that gym.  And we want

19   you to work out.  And if you heed help, you can

20   walk over here.  And we'll see what it is you're

21   doing and help you out."

22         After you get done with your eight weeks,

23   you enjoyed going to that fitness center.  So,

24   what do you do?  You join the club.  Now you work

25   out there regularly.

55

1          Two years later, you strain your knee again.

2     You go back to the sports medicine, back into

3     physical therapy.  It's a synergy.  It's an entry

4     point into the medical system.  So, that's what

5     this was set up for.

6  Q  And you mentioned part of the synergy was an

7     Emergency Room?

8  A  Well, that was -- they didn't do that.  So, where

9     I'm going for, you asked how we got this

10    discussion about the pool.

11 Q  Okay.

12 A  So, the clear understanding is, is that they have

13    coming into this facility people with different

14    abilities.  Some people are in a wheelchair.

15    Some people are walking pretty gingerly with a

16    cane.  And there's others that are young, fit,

17    athletic people that just happened to strain

18    their muscle.

19         So, the discussion was how do we -- how does

20    Beacon make the pool accessible to all

21    mobilities, that everybody and anybody can use

22    that pool, it's a therapy, it's for exercising

23    and therapy?

24         So, obviously, the biggest discussion was --

25    and what they have at Leighton is they have a

56

1       bosun's chair, a hoist.  And the discussion was,

2       is that getting somebody, whether they be a

3       normal person, a bariatric person, somebody in a

4       wheelchair, getting them into that bosun's chair,

5       swinging it out over the water, and lowering them

6       down is not a good -- not a good approach.

7            You become a spectacle.  You're sitting in

8       this little bosun's chair, swinging on a steel

9       cable, wondering if it's gonna snap and you're

10      gonna fall on the floor or go into the water.

11      So, it's not a very member-oriented, customer

12      service approach of getting you into the pool.

13           So, what are the other options?  Well, zero

14      entry.  And that's what the trend is, zero entry,

15      that we have a ramp that's handicap, ADA grade,

16      that goes -- you can walk down into the pool.

17      Anybody can use it.

18           Someone in a wheelchair, they buy special

19      wheel -- they have two wheelchairs that are all

20      plastic.  They have no grease on them.  The water

21      lubricates the hub and the wheel.  And they can

22      have you sit in the wheelchair and roll you down

23      gently into the water and let you acclimate as

24      you go into the water.  If you are a little

25      ginger on your knee and you need a cane, you've

57

1    got a handrail that you can hold on to and slowly

2    walk into the pool.

3        We also discussed vertical ladders.  Not

4    everybody likes to climb a vertical wall.  The

5    steps are recessed into the wall, and you have to

6    hold on and go straight down.

7        So, the stairs were created, which are

8    normal stairs, like walking up any stair; a

9    normal step, not a steep step, and with railings.

10   So, an average person can walk down them.

11   Somebody that's ambulatory but a little bit

12   challenged could walk into the pool, climb --

13   walk down the stairs instead of turning around

14   backwards and trying to climb vertically down a

15   ladder into the pool.

16       You're not gonna get people, older people

17   and people with mobility issues, diving into a

18   pool or jumping in.  They need to walk in or

19   climb in, climb down stairs.  So, that was

20   customer satis -- for customers, for members.

21       And this approach of entry into the pool

22   provides access to almost everybody who is

23   capable of being in a pool.  You can walk it.

24   You can roll down it.  You can lumber down it.

25   You can walk down the stairs.  Everybody can get

58

```
 1        into the pool without difficulty and without
 2        being a spectacle.
 3   Q    The Akron model that you've been talking about
 4        that apparently was a -- at least where you went
 5        initially to view their product --
 6   A    Yes.
 7   Q    -- you don't remember one way or the other
 8        whether the Akron model had the ramp and the
 9        stairs similar to what ultimately was the end
10        product for Beacon; is that correct?
11   A    Yes.  I cannot recollect.  It was -- when did we
12        go there?  '13.  Six years back.
13   Q    Okay.
14   A    I do have photographs of the facility, and I
15        could always go back and look at those photos of
16        that pool area and answer that question directly.
17   Q    Photographs of Akron's facility?
18   A    Yes.
19   Q    Would you produce those photos to your attorney
20        so he can produce them to me to answer that
21        question?
22   A    You want to see all the photos or just the pool
23        area?
24   Q    I'm just concerned about the pool area.
25   A    Yes, sir.
```

59

1  Q  I don't need all the photos.

2  A  We'll get that taken care of.

3                    MR. PFEIFER:  Okay.  I assume

4              that's okay, Charlie.

5                    MR. SMITH:  I'm sorry?

6                    MR. PFEIFER:  I assume that's

7              okay.

8                    MR. SMITH:  Yeah.

9                    MR. PFEIFER:  Okay.

10                    MR. SMITH:  Presuming you can

11              locate them.

12                    THE WITNESS:  (Nods head.)

13                    MR. SMITH:  Okay.

14  BY MR. PFEIFER:

15  Q  If you know, was there any model that Panzica

16     looked to of other hospitals or other

17     multi-functional pools throughout the country

18     that had the ramp and the stairs similar to what

19     were a part of the final pool design?

20  A  Zero entry pools are not uncommon.  They're

21     handled many different ways.  We -- when we enter

22     into projects such as these, large projects, in

23     our industry there are many resources.  One of

24     the resources are -- multiple companies have

25     them -- book companies.  And it's generally

60

1    called building type studies.

2        So, an architect that does a certain amount

3    of -- like if they're in a larger community, such

4    as New York, and they do a certain building type

5    consistently, they sometimes will write a book

6    talking about recommendations, what should be

7    included, and so forth.  So, many times

8    architects will purchase these books and use them

9    as a reference.

10        So, we do have a reference book.  We have

11    several that we've got.  And one of the reference

12    books that I have, so that we can be aware of

13    what we should make sure is going into this

14    project, that the architects and engineers are

15    not missing things, you read those books and make

16    sure you get your bases covered.  And I do recall

17    that book talked specifically about zero entry

18    into the pools.

19 Q  And the name of the building type studies book

20    that you are referring to?

21 A  I can't give you the exact name of the book.

22    It's a spiral-bound book.  And it doesn't have

23    diagrams in it, but it does have written

24    literature about zero entry ramps into pools.

25 Q  Okay.  Would you or Panzica have relied upon that

61

1      spiral-bound building type studies book that had

2      discussion about zero entry pools for purposes of

3      producing the final design for the lap pool at

4      Beacon?

5   A  No.  This book is used as a general reference to

6      give us an idea of where we're going, just as I'm

7      sure you have books pertaining to certain types

8      of litigation that tell you certain guidelines of

9      steps you should take to make sure they get done.

10     It might not be the end-all of what you do, but

11     it gives you a general guideline.  And you just

12     check it and verify that you've got it covered.

13  Q  Okay.  So, how did we get to the end product

14     where there is a zero entry pool that was

15     designed for Beacon?

16  A  So, we would have meetings.  Mr. Wolf would

17     attend those meetings.  And, so, then we'd have a

18     discussion of, "Well, you're not gonna do --

19     we're not gonna do a bosun's chair.  So, we wish

20     to have a zero entry and we wish to have a

21     stair."

22          So, then he goes back and edits and produces

23     drawings that show what is being discussed.  And

24     then that is shared with the client.  We don't

25     send a plan over just focusing on just the pool.

62

1       We have meetings.  And there's multiple

2       discussions about, "Make this area bigger.  Make

3       this area smaller.  Add this function.  Take out

4       that function."

5           So, the plan is added in; and then there's

6       another version.  And this editing of the pool is

7       just one of many edits in those documents.

8   Q   So, if I understand what you're saying, as the

9       lap pool design process is evolving into the

10      final product, which included the zero entry

11      aspect, DO, Jeff Wolf, is producing the plans,

12      modifying the plans, to meet Beacon's ultimate

13      satisfactions?

14  A   Yes.

15  Q   Okay.  So, once the plans are completed and the

16      customer, in this case Beacon, signs off on the

17      plans of the lap pool -- I'm not concerned about

18      everything else, but the lap pool -- then, if I

19      understand, Panzica II, either before then or

20      after then, had contracted with Spear Corporation

21      to come up with some plans for the construction

22      of the pool?

23                  MR. SPALDING:  Objection.

24              Form.

25                  MR. RUKSAKIATI:  Yeah.  I'll

63

```
 1                      join in that objection.
 2   BY MR. PFEIFER:
 3   Q  Am I understanding it correctly or am I missing
 4      something?
 5   A  I -- it's vague.
 6   Q  Okay.  When did Spear become involved in the
 7      project?
 8   A  Architectural practice and the way AIA contracts
 9      are set up define a project into four distinct
10      and separate phases.  People get hung up and
11      confused about this.  Every project is four
12      phases.
13   Q  I will try not to get confused and hung up.
14   A  Okay.  The schematic design.  Scheme.  That's the
15      key word; scheme.  The second phase is design
16      development.  Key word, development of the
17      design.  The third phase is construction
18      documents.  That's the engineering and
19      preparation of construction documents.  And the
20      fourth phase is the construction phase where the
21      building is actually constructed.
22          Each and every of the four divisions, you
23      make decisions and you approve at the end of that
24      phase what is in those documents.  And in the
25      next phase, you build upon that planning and
```

64

1      those ideas to get it to the next level.

2          You don't decide in schematic design that

3      you're gonna have a one-story building and when

4      you're in the construction documents decide you

5      want a three-story building.  It's a totally

6      different project now.  You back up the bus and

7      go all the way back to one, okay?

8          So, when did Spear get involved?  In

9      schematic design, we create a space program,

10     which is in here.  You create a bubble diagram,

11     which is a floor plan which -- imagine this plan

12     being nothing more than a series of bubbles,

13     shall we say bubbles, where we show the

14     relationship and the approximate size and how

15     they might be related.  And then you have an

16     estimate of probable cost.

17         How can you estimate it?  You go out to

18     industry standards and look.  Well, they're

19     building -- they built one of these facilities in

20     California.  They built one in Kentucky.  What

21     are they running?  They're running 180 bucks to

22     $200 a foot.

23         So, you tell the client, "Here's your space

24     program, here's a bubble diagram showing the

25     orientation of the spaces, and here's a budget.

65

1      It's gonna be an X-million-dollar budget."

2          And the client looks at it and says, "Has

3      the spaces we wish.  Kind of looks like a nice

4      start to the planning.  The budget's within our

5      capability.  Let's go to Phase 2."

6          So, now we start -- so, now DO takes a white

7      piece of paper and they start developing the

8      floor plan showing doors, columns, walls,

9      fenestration, which are windows.  They start

10     creating exterior elevations, the initial

11     perspective views of what it may look like.

12         Now the construction team has something we

13     can estimate.  We can now calculate how many --

14     the air in the building is free.  But what costs

15     is how much wall surface do we have on the

16     exterior, how many square feet of glass, how many

17     lineal feet of foundation, how many square feet

18     of floor slab.  So, we can now start estimating.

19     Is it 100 percent accurate?  No.  But it's a lot

20     better than where you were.

21         So, at the end of design development, we

22     have a floor plan, elevations, renderings, door

23     schedules.  Mechanicals is laid out in one line,

24     saying, "Here's the mechanical unit.  Here's the

25     duct run."  And they have now an estimate of cost

66

1          that's based upon -- that's been taken off.

2               So, the client now has to assess it.  They

3          can -- that's enough information.  They can

4          literally go to their bank or a financier and

5          say, "We want a loan on this package, and here's

6          the performance," et cetera.  So, the client at

7          some point then signs off and says, "Go to

8          construction documents."

9     Q    That's 3?

10    A    And now we're in Phase 3, yes.  So, now you bring

11         in all the -- so, the architect has defined how

12         tall the building's gonna be and what the spans

13         are gonna have to be and so forth.

14              Now the engineer's brought in to start

15         engineering the steel frame to support the

16         building.  The mechanical engineer's brought in

17         to start calculating the loads on the -- the

18         environmental load on the building, the people

19         load, ventilation loads.  They can start sizing

20         the systems and laying it out.

21              The plumbing can start laying out piping and

22         sewer lines.  The electrician can now start

23         figuring out how he's gonna light it and where

24         the switches are gonna be and power panels,

25         et cetera.

1           So, the team is now having to be integrated.

2      And everybody's got to be working together,

3      talking together; "Hey, you got a beam in the way

4      of my duct."

5           "Well, move your duct."

6           "No.  You move your beam."  Okay?

7           And, so, we come to the end and we have a

8      set of construction documents.  In our

9      design-build process, we then take those

10     documents and we prepare bid scopes.

11          And, so, we say, "Concrete trade, you're

12     gonna take off the concrete.  And your work is

13     only for the interior -- the foundations and

14     interior slab.  I got another concrete trade

15     doing all the site curbing and site slabs."

16          So, you define what it is they're bidding.

17     So, we collect all these bids.  We get the lowest

18     and best bids lined up.  Then we go to the owner

19     and go, "Here's the final cost.  Here's the stack

20     of bids.  Here's what it boils down to.  Here's

21     the cost of the project.  Would you like to study

22     the proposals?"

23          "No.  We're good with it.  Let's go."

24          So, then they authorize us to go into

25     construction doc -- into construction.  And then

68

1    building permits are acquired and we start

2    construction.

3  Q  That's Phase 4?

4  A  That's Phase 4.  Yes, sir.  So, when did Spear

5    come in?  A long way to go, isn't it?  Spear was

6    brought in in the design development phase.  How

7    did they get brought in?  Well, we were coming to

8    the point we had to get realistic budgets on

9    building these three bodies of water.

10    So, you don't go to the local Sergio's Pool

11    and Spa and ask them to bid a pool of this size.

12    It's well beyond their capabilities.  They're a

13    good company.  Don't get me wrong.  But it's

14    beyond their capabilities.

15    We researched who does this type of work,

16    and we identified at least three firms that do

17    nothing but commercial pools.  One firm, I think,

18    was up in Wisconsin.  I think there was another

19    firm in Ohio or Pennsylvania.  And we found Spear

20    in Indianapolis.

21    So, we send them initial drawings and say,

22    "Give us a budget on the cost to completely build

23    this pool; foundations, walls, the tile, the lane

24    lines, everything, the pumping, the piping."

25    They can see where the mechanical -- so, we had

69

1  three budgets from three different companies.

2    Of the three companies, Spear was the most

3  responsive, the most interested, responding to

4  calls and e-mails quickly.  And they had a

5  competitive number.  So, we used Spear's budget

6  in the design development phase.

7 Q Okay.

8 A So, that was their first introduction to the

9  project.

10 Q So, going through these four phases that you've

11  just been talking about for the last several

12  minutes, if I understand what you've already said

13  so far in your deposition, Phase 1, the scheme,

14  Panzica and DO would both have been involved in

15  Phase 1?

16 A DO was hired as the architect.  So, DO prepared

17  the space program.  They sent it to our office.

18  We review it, comparing to our notes, going, "Got

19  it.  Got it.  Got it.  No.  You missed -- add

20  this.  Hey, Jeff, we got a phone call.  Dice the

21  YMCA out of the project.  Take it out of there."

22  So, they edit it.

23    When it got to go to the point of starting

24  the schematic plan, DO's office was the firm that

25  put the white piece of paper on the table and

70

1      started drawing the schematic plan.

2  Q  Okay.

3  A  Then they give us the plan.  We look at it, go,

4      "Okay.  Good."  We're -- we're responsible to

5      deliver to the client what they're asking for.

6      So, we verify what all of our consultants are

7      doing.  And he's one of the consultants.  So, we

8      look at their work and we make comments and notes

9      and tell him to adjust and move on, or we just

10      tell him it's fine.

11  Q  Okay.  When the decision was made to hire Spear

12      at the third phase --

13  A  Uh-huh.

14  Q  -- if I understand what you're saying, you talked

15      about three different companies that you looked

16      into; one of which was Spear, one was in

17      Wisconsin, and then a third one?

18  A  Right.  And they provided budgets.

19  Q  What, if any, investigation was undertaken to

20      determine the experience that Spear had with zero

21      entry pools?

22  A  There was never that discussion.

23  Q  Okay.

24  A  The discussion was, "Have you done --" they're a

25      commercial pool contractor.  And that's just a

71

1       nuance of a pool.

2   Q   Okay.  So, if I understand what you just said,

3       zero entry pool is a nuance of a commercial pool?

4   A   Sure.  Every pool's different.  Every design,

5       every pool's different.  It's just a slightly

6       different design, but it still has water and tile

7       and so forth.

8                   MR. PFEIFER:  Okay.  We've been

9                   going a little bit.  And I'm seeing

10                  some nodding heads for some

11                  overly-filled bladders probably.  So,

12                  let's take a break.

13                      (A break was taken at this

14                      time.)

15  BY MR. PFEIFER:

16  Q   So, right before we took the break, I think we

17      were talking about when Spear came into the

18      project in terms of the four phases and when DO

19      was involved in the project.  Correct?

20  A   Yeah.

21  Q   Okay.

22  A   Yes.

23  Q   Just, I guess, a couple of housekeeping matters,

24      Exhibit 7 is a document that you relied upon for

25      purposes of your deposition, your 30(B)(6)

72

1       deposition today, correct?

2   A   Yes.

3   Q   Would you, just for the record, identify what

4       Exhibit 7 is?

5   A   It's AIA Document B143, 2017 (Sic) edition.  And

6       it's referred to as a Standard Form of Agreement

7       Between Design-Builder and Architect.

8                       MR. SMITH:  I'm sorry.  2017 or

9               '14?

10                      THE WITNESS:  Oh, what did I

11              say?  '17?

12                      MR. SMITH:  Yeah.

13                      THE WITNESS:  I'm sorry.  '14.

14              '14.  I'm sorry.

15  BY MR. PFEIFER:

16  Q   All right.  So, I think you answered.  But I just

17      want to make sure that the record is clear.  Tell

18      me what Exhibit 7 is.

19  A   Exhibit 7 is AIA Document B143, 2014 edition.

20      It's a Standard Form of Agreement Between

21      Design-Builder and Architect.

22  Q   And this is an agreement that was executed

23      between Panzica Building Corporation and Design

24      Organization?

25  A   Yes, sir.  We engaged Design Organization to be

73

```
 1        the project architect.
 2   Q  For this project, the health building for Beacon,
 3        Beacon Health, correct?
 4   A  Yes.  It says on the cover page, "For the
 5        following project," and it lists Beacon Health
 6        and Lifestyle Center.
 7   Q  Okay.  And that includes the lap pool that we've
 8        been talking about throughout this deposition?
 9   A  Yes.
10   Q  Okay.  Then, if you would, take a look at Exhibit
11        8.
12   A  (Witness Complying.)
13   Q  And, if you would, tell me what Exhibit 8 is.
14   A  This is the overall contract for Standard Form of
15        Agreement Between Owner, who is Beacon, and
16        Design/Builder, who is Panzica Building
17        Corporation.  And the project is --
18   Q  If we could just stop one second, I didn't get a
19        copy.  Is there an extra?
20                    MR. RUKSAKIATI:  Here.  8, you
21              want, right?
22                    MR. PFEIFER:  Yeah.
23                    MR. RUKSAKIATI:  Yeah.  Take
24              it.
25                    MR. PFEIFER:  Thank you.
```

74

1              THE WITNESS:  And it's for the

2              proposed new Health and Lifestyle

3              Center.

4    BY MR. PFEIFER:

5    Q   So, Exhibit 8 is the contract between Panzica and

6        Beacon for the construction of the Health and

7        Lifestyle Center?

8    A   For the total project of design and build.

9        Getting a designer and building it.

10   Q   Okay.

11   A   Single-source responsibility.

12   Q   Okay.  So, if I understand the process, by the

13       time Spear Corporation is brought in to the

14       process during the Phase 3, I think you said, the

15       zero entry pool plans had already been completed,

16       correct?

17   A   I don't believe so.  I believe the -- well, let

18       me think here.  This is January.  I'd have to go

19       back and look at the documents and see where we

20       were in the process of when this was signed.

21       This was signed on the 22nd of January.

22   Q   By "this," you're talking about Exhibit what?

23   A   Exhibit 8.

24   Q   Okay.

25   A   And this document was February.  So, this

75

1    document came first.

2  Q  Okay. By "this document," it's Exhibit 8?

3  A  I'm sorry. Exhibit 8. Then followed

4    approximately a month later --

5  Q  By Exhibit 7?

6  A  -- by Exhibit 7.

7  Q  And I think I understand, conceptually, the

8    process and how there may be some modifications

9    that take place whether you're in Phase 1, 2, 3,

10    or 4.

11      But the further along you are in the

12    process, the less significant the modifications

13    can be. Is that a fair statement?

14  A  Yes.

15  Q  Okay. Having built a house, I know that while

16    construction's going on there's some modification

17    that can take place here and there.

18      And I'm sure building a house is far more

19    simple than building a project like the Health

20    and Lifestyle Center. Correct?

21  A  Yes.

22  Q  Can you tell me when it was in the four phases

23    that you talked about that the final plans for

24    the design of the zero entry pool that was

25    actually constructed occurred?

76

1    A    I believe that would've been established in the

2         design development phase.

3    Q    Okay.  And I'm not gonna hold you to specifics in

4         terms of dates.

5              But, as I understand, this project started

6         with the trip to Akron General Hospital in April

7         of '13 --

8    A    Right.

9    Q    -- and concluded with the opening in November of

10        '16, correct?

11   A    Generally, yes.

12   Q    Okay.  Going through the four phases, can you

13        give me an approximate timeline during that

14        window as to when we are in each of the four

15        phases?

16   A    If we look at the travel to Akron as being the

17        initial start, Exhibit Number 8, which is

18        Standard Form of Agreement, this is the Part 2

19        agreement.  And this would've been entered into

20        prior to starting the construction documents.

21        So, between the Akron travel and, call it,

22        January 21st, that was the schematic and design

23        development phases.

24   Q    Okay.

25   A    We are now entering into construction document

77

1      phase, heading toward construction.

2  Q   And heading into the construction document phase

3      would've been approximately when?

4  A   I'd say February 6th.

5  Q   Of?

6  A   2015.

7  Q   Okay.  And then the construction takes place, and

8      construction was at least completed to the point

9      where the project was turned over to Beacon in

10     November of '16?

11 A   Yes.  I believe so.

12 Q   In fact, if you take a look at Page 105 of

13     Exhibit 5, that, if I understand it, are the

14     minutes of the meeting or the agenda for the

15     meeting of November 3rd of 2016.

16         It talked about, in Paragraph 5, the opening

17     dates, the soft opening, opening to members,

18     correct?

19 A   Uh-huh.

20                      MR. SMITH:  Is that yes?

21 A   I'm sorry.  Ask the question again.  I was

22     reading.  I apologize.

23 BY MR. PFEIFER:

24 Q   Oh, that's all right.  Page 105 is the meeting

25     agenda of November 3rd of 2016, correct?

78

1  A  Yes, sir.

2  Q  And in Paragraph 5 of that document, there is the

3     agenda item of the soft opening for the health

4     and fitness facility would be November 9th; open

5     to the members November 10th?

6  A  Yes, sir.

7  Q  Do you recall whether those were the actual dates

8     that were followed?  Or were those dates off by a

9     day or two?

10 A  I can't answer that directly without a calendar

11    and going back and looking.  But that was the

12    general area of what was anticipated.  They --

13    when was this meeting?  November 3rd.

14        So, that's what was talked about in the

15    meeting.  What the staff and field operations did

16    might have varied a day or two.  I don't know.

17 Q  Okay.

18 A  Soft openings are -- you unlock the doors.  And

19    if they wander in, let them in.

20 Q  Okay.  Paragraph 6 of the meeting agenda, Page

21    105, talks about turn-over, correct?

22 A  Yes.

23 Q  From a building and construction concept, tell me

24    what turn-over means.

25 A  Turn-over means we become re -- we're responsible

1    for the project.  And turn-over is the point

2    where you officially say, "We are no longer

3    paying the utilities.  Here's the keys.  You're

4    securing the building.  It's your

5    responsibility."

6  Q  Okay.  In the building construction field, does

7    turn-over include the owner of the building, in

8    this case Beacon, accepting the building in the

9    condition that it is in?

10  A  Generally --

11                MR. SPALDING:  Objection.

12         Form.

13  BY MR. PFEIFER:

14  Q  You can answer.

15  A  Turn-over may be a single event.  Turnover may go

16    over a series of steps.  But that is the -- when

17    the owner -- when you do turn-over, you still may

18    be in the building, as this states, doing punch

19    list work, maybe waiting for some specialty

20    materials to come in.

21      But it's generally in -- at that point, you

22    have at least a temporary C of O, certificate of

23    occupancy, or a final C of O, certificate of

24    occupancy.  And you're now opening the building

25    to the -- you're giving it off to the owner to

80

1       allow them to decide when they want to open the
2       building to the public.
3    Q  And the C of O is what?
4    A  The certificate of occupancy that's provided by
5       the municipality, walking through the building
6       with the building inspector, mechanical,
7       electrical, plumbing inspectors, the fire
8       department, the civil engineer of the city.  And
9       they sign off and go, "It meets the city's
10      standards and codes," as far as they see.  And
11      they allow you -- it's safe for the community to
12      now enter into the facility.
13   Q  And even though the building was turned over to
14      Beacon, there obviously, according to Page 105,
15      were punch list items that still needed to be
16      addressed; is that fair?
17   A  This meeting note says, "Punchlist:  We have
18      completed a punch list for the trades to
19      complete.  We wish to have that work completed
20      prior to Wednesday," which would probably have
21      been the following -- "We will coordinate with
22      Beacon Staff so as not to delay their work and
23      training."
24   Q  So, do I understand the punch list was completed
25      before the grand opening?

81

1    A    Yes.

2    Q    Okay.

3    A    We want to be out of there.  We don't want

4         ladders in the building anymore.

5    Q    Okay.  Now I'd like to focus in on Panzica

6         Building's knowledge of the events that

7         transpired as it relates to the southern wall of

8         the pool which separates the lap lanes from the

9         zero entry, the ramp and the stairs.

10   A    Okay.

11   Q    Okay?

12   A    (Nods head.)

13   Q    First of all, did you become aware of Dr.

14        Pennington's injury?

15   A    Yes.

16   Q    How did you become aware of it?

17   A    After the -- the event, we were contacted and

18        requested to review the situation.

19   Q    Tell me what your review of the situation

20        included.

21   A    Our review of the situation included convening

22        and talking with Design Organization and with

23        Spear.

24   Q    What were the topics of the conversation with

25        Design Org and Spear?

82

1    A    The topic of the discussion was there was an

2         event.

3    Q    Okay.

4    A    And that we were being directed to look at means

5         of mitigating this from happening a second time.

6    Q    And what were the options that were available to

7         mitigate to avoid having the event happen a

8         second time?

9    A    The discussion was that Spear came back and said,

10        "We can --" and I believe they presented a small

11        plan that we run a lap lane -- a lap line, a line

12        marker, the full length of the pool, on the

13        inside face of the south wall of the pool,

14        continuous; or that there be a line that goes

15        from end of stair wall to end of ramp wall.  The

16        other option was to put a pad on the ends, the

17        free ends, of the wall.

18   Q    Was there any discussion with Spear or Design Org

19        as to why a lap line running the entire length of

20        the south lane was not a part of the original

21        plan?

22   A    Not to my recollection.

23   Q    Was there ever any discussion as to why a

24        wall-to-wall line, the wall at the end of the

25        ramp connecting to the wall at the end of the

83

1     stairway, was not a part of the original plan?

2  A  You're asking if that was a discussion?

3  Q  Yes.

4  A  Not to my recollection.

5  Q  Was there ever a discussion as to why padding on

6     the free ends of the wall was not a part of the

7     original plan?

8  A  Not to my recollection.

9  Q  On behalf of Panzica Building Corporation, did

10    you ever ask DO or Spear why a lap line the

11    entire length was not included?

12 A  I don't recall a specific conversation as such.

13    There's an issue.  We need to resolve it.  That's

14    the focus of the discussion.

15 Q  Was there a general conversation about the -- on

16    behalf of Panzica Building as to why a lap line

17    the entire length of the south lane was not

18    included?

19 A  Again, at that point, we were being asked to look

20    at a situation and mitigate the possibility of it

21    happening again.  So, that was the focus of the

22    discussions; how do we solve this problem --

23 Q  Okay.

24 A  -- that it may not happen again.

25 Q  Let me take you ahead.  Once the problem is

84

1    solved, at least from Panzica's perspective, was

2    there ever any discussion with Spear Corporation

3    or DO as to why a lap line the entire length of

4    the south lane was not included in the original

5    design?

6  A  Again, not to my recollection.  In our business,

7    when you complete a project, there's always, at

8    the end, some issue.  "We lack this," or, "This

9    item wasn't provided," or, "We need a bollard to

10   protect this gas meter."

11      You don't sit and argue and point fingers.

12   You say, "Let's get it resolved."  You resolve it

13   and move on.  You don't look at it as if it's

14   gonna be a federal case.

15      So, that was the general discussion.  It was

16   handled as we do all follow-up items on a

17   project.  This was not considered a significant

18   or major problem.  Somebody hit their head.

19   Okay.  They hit their head.  Let's mitigate it

20   that if someone does hit their head they don't

21   get hurt.

22      We're not aware that anyone was sent to the

23   hospital.  We're not aware that anybody went to

24   the doctor.  We're not aware that anybody was

25   unconscious and had to be drug out of the pool.

85

1       That would be a totally different conversation.

2           The conversation was, "Somebody bumped their

3       head.  How can we protect somebody from getting

4       hurt?"  And that was the discussion.  Okay.

5       We'll come up with with a resolution of how to

6       resolve that so that it doesn't happen in the

7       future again.

8   Q   So, if I understand what you just said, from what

9       you understood, the situation involving

10      Dr. Pennington was a bump on the head?

11  A   Yes, sir.

12  Q   Would you have handled the situation any

13      differently had you been told that her injury was

14      more serious than a bump on the head?

15  A   Yes, sir.

16  Q   What would you have done differently?

17  A   Well, we would've had those types of meetings and

18      had that discussion.  "How did this get here?

19      What's going on?  How did this accident occur?"

20          We were advised somebody bumped their head.

21      We -- we want resolution of how we can mitigate

22      that from happening and having someone get hurt

23      severely.  So, that was the approach.

24  Q   I understand you're saying that was the approach.

25      But my question is, the approach -- what I'm

86

```
 1       hearing you say is the approach you took was

 2       based upon, "Dr. Pennington bumped her head,"

 3       correct?

 4   A   Yes, sir.

 5   Q   And my --

 6   A   No.  "Somebody bumped their head."

 7   Q   Okay.  Well, can we assume for the sake of

 8       discussion that the somebody that bumped her head

 9       was Dr. Pennington?

10   A   Okay.

11   Q   Fair enough?

12   A   Yes, sir.

13   Q   Okay.  You told me that you would've taken a

14       different approach had there been information

15       provided to you that the injury was more serious

16       than a bump on the head, correct?

17   A   Yes.

18   Q   What I'm trying to find out from you is, had you

19       been advised that the injury was more serious

20       than a bump on the head, what would you have done

21       differently?

22                       MR. SMITH:  I'm gonna object to

23               the extent it calls for speculation.

24               You can answer.

25
```

1    BY MR. PFEIFER:

2    Q   You can go ahead.

3    A   What we would have done differently if someone

4        would've been injured severely?  Well, the first

5        order of business, Dan, would've been to first of

6        all do what would we did.  The client said there

7        was an issue.

8    Q   Okay.

9    A   So, you now assess what's the condition, how did

10       it happen, what might be elements that can be

11       added to mitigate this problem in the future, and

12       then afterwards sort out and start spearing

13       everybody.  Excuse the pun.  Yeah.  I didn't mean

14       it towards Spear.

15                     MS. MACK:   That's okay.

16   A   But you understand what I'm saying.  You start --

17       all the knives come out, and you start fighting.

18   BY MR. PFEIFER:

19   Q   So, if I understand what you're saying, what you

20       actually did, you would've done that regardless

21       of whether you were told it was a bump on the

22       head or a serious injury, correct?

23   A   Ask the question again.

24   Q   If I understand what you just said, the steps

25       that were taken to mitigate the issue would've

88

1    been taken whether it was a bump on the head or

2    whether it was a serious injury.

3         But if you had known it was a serious

4    injury, then there would have been more of this

5    spear throwing?

6  A  Followup of how did we get here, what's going on.

7  Q  Okay.

8  A  But, as I stated earlier, when you complete

9    projects of these scopes and size, there is

10   always, "Hey, we need this," or, "Someone was

11   walking down the corridor, and it was slippery on

12   the floor."

13        Okay.  Why was it slippery on the floor?

14   You start analyzing why did it -- why was it

15   slippery?  Well, they just mopped the floor.

16   Well, okay.  Don't mop the floor when there's

17   people in the building.

18  Q  So, that follow-up step of the spear throwing,

19   using your phrase, not mine, that, if I

20   understand your testimony, was never done in this

21   case because there was a belief that the injury

22   was a bump on the head?

23  A  Yes.

24  Q  Okay.  Have you ever been provided any

25   information that would indicate to you the injury

89

```
 1        to Dr. Pennington was more than a bump on the
 2        head?
 3                        MR. SMITH:  To the extent --
 4   BY MR. PFEIFER:
 5   Q    Other than through your -- I don't want to know
 6        what your attorney has told you.
 7   A    Not until we received notice of a suit being
 8        filed.
 9   Q    Okay.  Did anyone from Beacon ever tell you that
10        the injury to Dr. Pennington was more than a bump
11        on the head?
12   A    No, sir.
13   Q    From your perspective as the design-builder, who
14        do you believe should have designed the free ends
15        of the wall with a pad on the top, if anybody?
16                        MR. SMITH:  Object to the form.
17                        MS. MACK:  Objection.
18                        MR. RUKSAKIATI:  Objection.
19                   Form.  And lacks foundation.
20                        MR. KELLEY:  Join.
21                        MR. PFEIFER:  Did we get
22                   consensus?
23                        MS. MACK:  Join.
24                        MR. PFEIFER:  Okay.  I just
25                   want a consensus before he answers.
```

90

1                         MS. MACK:  Right.

2   BY MR. PFEIFER:

3   Q  You can answer.

4   A  Do I answer?

5                         MR. SMITH:  You can answer.

6   A  Ask the question again, please.

7                         MR. PFEIFER:  Sorry.

8                           (A portion of the record was

9                           read back by the court

10                          reporter.)

11                        MS. MACK:  Assumes facts not in

12                  evidence and opinions not in

13                  evidence.  Objection.  Sorry.

14                        MR. SMITH:  Join.

15                        MR. KELLEY:  Join.

16                        MR. RUKSAKIATI:  Join.

17                        THE WITNESS:  Do I answer?

18                        MR. SMITH:  Yes.

19  BY MR. PFEIFER:

20  Q  Please.

21  A  We had -- as Panzica Building Corporation South

22     Bend, we had no experience or had never designed

23     a pool.  So, we brought in to the project a firm

24     that has experience in pools.  And it's

25     reasonable to expect that they had the experience

91

1       and they would've taken care of these details.

2            Secondly, a firm was brought in who is a

3       specialist in commercial pools to final engineer

4       the pool.  And I would expect that their

5       experience and knowledge of how many pools,

6       probably hundreds of pools they built, that they

7       would be looking at the pool and making

8       recommendations of, "Something else needs to be

9       done," et cetera.

10   Q   And those entities that you're talking about are

11      Design Organization and Spear?

12   A   Yes, sir.

13   Q   Did Panzica Building rely upon Design

14      Organization and Spear for purposes of addressing

15      any and all safety issues that might exist

16      regarding the construction of the pool?

17   A   Again, those firms were engaged for their

18      knowledge and expertise beyond what we were

19      capable of.  So, I would've expected that they

20      would've been at a higher level of thinking and

21      handled all these details.  There's literally

22      thousands of details to create this pool.

23   Q   And I appreciate what you said.  I just want to

24      make sure that you answered the question.  So,

25      let me ask it again.

92

1            Did Panzica rely upon Spear and Design

2      Organization for purposes of addressing any and

3      all safety issues pertaining to the design and

4      construction of the lap pool at Beacon Health and

5      Fitness?

6  A   Yes, sir.

7  Q   If either Design Organization or Spear

8      Corporation had recommended padding on the free

9      wall -- excuse me -- free ends of the walls on

10     the south end of the pool, would that padding

11     have been included in the construction?

12                     MR. RUKSAKIATI:  Objection to

13            form.

14                     MR. KELLEY:  Join.

15  BY MR. PFEIFER:

16  Q   Go ahead.  You can answer.

17  A   If that was the direction and suggestion by the

18     consultants, yes.

19  Q   Same question with respect to if Spear

20     Corporation or Design Org recommended a

21     wall-to-wall line between the free ends of the

22     wall on the south end of the pool.  Would that

23     recommendation have been followed?

24                     MR. RUKSAKIATI:  Objection.

25            Form.

93

1                         MR. KELLEY:  Join.

2                         MR. SMITH:  You can answer.

3    A  Yes.

4    BY MR. PFEIFER:

5    Q  And if Spear Corporation and/or Design Org had

6       recommended a lap line the entire length of the

7       south end of the pool, would that recommendation

8       have been followed?

9                         MR. RUKSAKIATI:  Objection.

10                  Form.

11                        MR. KELLEY:  Join.

12                        MR. SMITH:  You can answer.

13   A  Yes.

14                        MR. PFEIFER:  I'll pass the

15                  witness for right now in the interest

16                  of allowing others -- and I'm

17                  gonna -- we don't need to take a

18                  break.  I'm gonna step out of the

19                  room for my call.

20                        MR. SMITH:  What time was your

21                  appointment?

22                        MR. PFEIFER:  That's what

23                  I'm -- maybe I'm an hour ahead.  I'm

24                  still gonna pass.

25                        MR. RUKSAKIATI:  I have a

94

| | |
|---|---|
| 1 | couple clarification questions. |
| 2 | CROSS-EXAMINATION |
| 3 | BY MR. RUKSAKIATI: |
| 4 | Q  Mr. Panzica, my name's Scott Ruksakiati.  I'm one |
| 5 | of the attorneys representing Spear. |
| 6 | A  Okay. |
| 7 | Q  You testified that Spear's involvement with the |
| 8 | Beacon Health Facility project occurred during |
| 9 | the design development phase; is that true? |
| 10 | A  The initial discussion starting in with them, |
| 11 | yes. |
| 12 | Q  Okay.  And I ask that because there were -- there |
| 13 | were questions following your answer about that |
| 14 | topic that referred to Spear becoming involved in |
| 15 | Phase 3.  It's actually Phase 2, correct? |
| 16 | A  Spear was asked in the design development phase |
| 17 | for budgeting of the pool system.  It wasn't |
| 18 | designed.  "Here's the pool.  Here's the pool |
| 19 | equipment room.  What would be a reasonable |
| 20 | budget for construction of these two pools?"  And |
| 21 | they and two other firms were requested to |
| 22 | prepare a written quotation for that system. |
| 23 | Q  Just so I'm clear, the design development phase |
| 24 | is Phase 2, correct? |
| 25 | A  Yes, sir. |

95

1   Q   But by the time that Spear was approached to ask

2       them for a budget, had the concept of a

3       zero-depth entry, multi-functional pool -- had

4       that already been decided by the owner as that's

5       what they want for this particular facility?

6   A   I would have to review --

7                        MR. SPALDING:   Excuse me.

8                   Objection.   Form.

9   BY MR. RUKSAKIATI:

10  Q   Go ahead.

11  A   I would have to review the final design

12      development document, but I -- I think it's fair

13      to say that I think that the -- the general

14      design and layout of the pool had been

15      established at that point.

16                       MR. RUKSAKIATI:   Okay.   That's

17                  all I have.   Thank you.

18                     CROSS-EXAMINATION

19  BY MR. KELLEY:

20  Q   Good afternoon, Mr. Panzica.   My name's Will

21      Kelley.   I'm the attorney for Design

22      Organization, who we've also referred to as DO

23      throughout the deposition so far.

24          Do you have Exhibit 7 in front of you, which

25      was the contract with Design Organization?

96

1  A  Yes.  This one.

2  Q  Now, were you involved in the preparation of this

3     particular contract?

4  A  Yes.

5  Q  And if you look at the very last page of the

6     contract, is that your signature at the end?

7  A  Yes.

8  Q  So, suffice to say you're familiar with the terms

9     of Exhibit 7 as it relates to this project; is

10    that fair?

11 A  Yes, sir.

12 Q  Now, Panzica Building Corporation was the

13    design-builder for the entire project.  That's

14    how you described your role, right?

15 A  Yes.  Construction manager, managing all the

16    elements of the project.

17 Q  So, as between Panzica Building Corporation and

18    the owner, Panzica Building Corporation would've

19    held all the design responsibility for the

20    project as between those entities.  Is that a

21    fair statement?

22              MR. SMITH:  I'm gonna object to

23              the form.  You can answer.

24 A  No.  We are responsible to take over management

25    duties to go out and hire all these entities

97

1       necessary, whether they be the architect, the

2       consultants, the subcontractors, et cetera, to

3       assemble a completed project that met their

4       requirements.

5   BY MR. KELLEY:

6   Q   And one of the consultants you hired was DO for

7       architectural services; is that correct?

8   A   Yes, sir.

9   Q   What other consultants on the design did Panzica

10      Building Corporation hire directly?

11  A   I believe the structural engineer, which was

12      Frost Engineers, were hired.  Mar -- Mart -- now

13      we're talking about design and final engineering

14      in the construction document phase.  So, Martell

15      was a firm that was brought in.  Frost

16      Engineering was brought in.  Spear Corporation

17      was brought in for integrated delivery.  A

18      landscape architect, Sitescapes, was hired.  We

19      hired soil borings, the soil engineer.  I'm sure

20      we had surveying in there.  I think that's the

21      primary ones.  There might have been some other

22      minor players.

23  Q   And those consultants or groups of consultants

24      that you just identified would've been in

25      contract directly with Panzica Building

98

1      Corporation on this project; is that right?

2   A  Yes, sir.

3   Q  They would not be consultants to Design

4      Organization, correct?

5   A  They would -- they were hired to support Design

6      Organization, collaborate and work with them

7      directly to complete the work that Design

8      Organization is giving the overall design for.

9   Q  But do you understand my question?  Who held the

10     contract with those consultants?

11                    MR. RUKSAKIATI:  Object to

12             form.

13  A  I believe Panzica Building Corp -- well, either

14     Panzica Building Corporation or the joint

15     venture.

16  BY MR. KELLEY:

17  Q  Thank you.  So, if you go to Exhibit 7 and you

18     look at Page 2, down at the bottom, Section 1.3

19     is called "Architects Portion of the Project."

20     Do you see that section?

21  A  Yes, sir.

22  Q  And the first sentence says, "Collaboration

23     of/with Panzica Architecture Group and Design

24     Organization, to prepare a Schematic Design for a

25     55,000 square foot Health and Fitness Center,

99

1     4,300 square foot Sports Medicine Suite and 4,300

2     Physical Therapy Suite." Do you see that?

3  A  Yes, sir.

4  Q  Okay. When it refers to Panzica Architecture

5     Group, who is that referring to?

6  A  That refers to our office. We have an

7     architecture group under the umbrella within the

8     company. They're not segregated. They don't act

9     as their own business. They don't market

10    themselves individually. They support the total

11    team, just as we have Panzica Construction Group.

12    So, we sometimes use those terminologies to

13    define what groups in our office are going to be

14    working directly.

15  Q  So, then, the next section under Section 1.3

16    reads, "Upon authorization from the owner and

17    Design Builder, Design Organization continues to

18    develop the design in preparation of refined

19    floor plans, exterior elevations, typical east to

20    west and north to south building sections,

21    typical wall sections, interior elevations of

22    restrooms, locker rooms, main corridors, control

23    counters, pool and studio rooms, reflected

24    ceiling plan, material finish plan, door and

25    frame schedule and outline spec with coordination

100

1       of structural, mechanical, plumbing, electric,

2       pool and civil design by others."  Did I read

3       that accurately?

4  A  Yes.

5  Q  And was this intended to define the scope of

6       work, in general terms, as to what Design

7       Organization would be doing on the project?

8  A  Yes.  And I'd like to clarify that DO was

9       responsible for the general layout of the pool

10      and listening in on meetings and providing the

11      overall design of the pool; how big is the basin,

12      where the stairs are, et cetera.

13          Notice when we say that they are to work and

14      coordinate with structural, which is an

15      engineering operation; mechanical, which is an

16      engineering operation supporting the architect;

17      plumbing, which supports what the architect --

18      the plumbing engineer doesn't decide to put the

19      toilet in the middle of the cardio area.  So, he

20      looks at the plans and says, "I will plumb what's

21      shown on the plan."

22          Same issue here.  The electrical engineer,

23      who's Martell, who designed the electrical system

24      and lighting systems to support the design.

25      General lighting layout was provided by DO, and

1    they affected it and engineered it and selected

2    the final fixture and engineered the circuits.

3         Pool.  And that was -- DO was not

4    responsible for designing the foundations of the

5    pool and the piping of the pool and the size of

6    the pumps and so forth.  Another firm would be

7    doing the engineering.

8         So, all these groups that are listed here

9    are all engineering services that support the

10   architect's work.

11 Q So, I want to be clear on clarifying that.  Is it

12   your testimony that Design Organization -- part

13   of their scope of work was to design the layout

14   of the pool as it existed for the project?

15 A Yes.  They started with a white piece of paper

16   and did the schematic plan.  They -- they started

17   with a white piece of paper and did all the

18   design development.  All those documents were

19   laid out by Design Organization and detailed by

20   Design Organization.

21 Q And you have records in your project file that

22   show Design Organization designed the layout of

23   the pool as you just described?

24 A Design Organization sat in on the meetings, as we

25   all did.  And they took what was talked about in

102

```
 1        the meetings and put it into plans.  Yes, sir.
 2   Q    And you've produced all of that in discovery?
 3                        MR. SMITH:  If you know.
 4   A    I don't -- I'm sorry?
 5                        MR. SMITH:  If you know.
 6   A    If I -- if --
 7   BY MR. KELLEY:
 8   Q    Do you understand my question?  You're saying
 9        that Design Organization actually designed the
10        layout of the pool.  And my question -- and then
11        you said there are documents that would reflect
12        that.
13            And my question is, have you produced those
14        in discovery?
15   A    I'm not sure that all documents you're talking
16        about have been produced.
17   Q    So, I'm gonna make a request to your counsel that
18        those be supplemented and produced; any documents
19        that you're referring to here that show any
20        design by Design Org as to the layout of the
21        pool.  Okay?
22   A    Okay.
23   Q    Now, I'd like to move -- within Exhibit 7, I want
24        to move over to the bottom of Page 4, Section
25        1.5.2.  Do you see that?
```

103

1    A   Yes, sir.

2    Q   Okay.  And it starts out with, "The

3        Design-Builder will retain the following

4        consultants and contractors."

5            And in this context, you understand that

6        Panzica Building Corporation is the

7        design-builder, correct?

8    A   Yes.

9    Q   So, then, if you move to Page 5, there's a list

10       of consultants here.

11           And the first one is "Cost Estimating -

12       Panzica Construction Corporation."  Do you see

13       that?

14   A   Yes, sir.

15   Q   Is that an example of a consultant that Panzica

16       Building Corporation would've hired for this

17       project?

18   A   That is Panzica Construction Cleveland.  And that

19       was -- one of their primary roles was cost

20       estimating.

21   Q   And because Panzica Building Corporation is

22       identifying this as a consultant that it's

23       hiring, these are not consultants that Design

24       Organization was going to be hiring for the

25       project, right?

104

1  A  Yes.

2  Q  Okay.  And if we look down that list there, it

3     says, "Pool Design - To Be Determined."  Do you

4     see that?

5  A  Yes.

6  Q  Did you have discussions with Design Organization

7     about the fact that Section 1.5.2 says that

8     Panzica Building Corporation was going to hire a

9     consultant for pool design?

10 A  Pool design, if you notice, most of the -- all of

11    these items are special -- okay.  Estimating is a

12    specialty.  Mechanical and plumbing is an

13    engineering function.  Electrical is an

14    engineering function.  Civil design is an

15    engineering function.  Pool design, that's an

16    engineering function.

17        In other words, the pool designer doesn't

18    lay out where the pool is going to be in the

19    building and how deep it's going to be and how

20    you're gonna enter and exit the pool.  The

21    architect does that.

22        The pool design is the engineering of the

23    foundation walls of restricting and holding the

24    water in the basin, what size pumps, how many

25    water changes an hour are necessary in that pool,

1      what kind of filtration, where the pumps are

2      placed, how they're detailed, how they're

3      connected, and what's the lineup of equipment,

4      chemistry, et cetera, lots of detail.

5           That was outside of their scope of work.

6      The pool designer, just as any engineer, is to

7      take what the architect is requesting for a pool

8      and engineer it to function as a pool.

9  Q   We've talked several times about trying to pin

10     down what phase Spear was brought into the

11     project.

12          And I think, based on your testimony a

13     minute ago, we kind of narrowed it down to

14     somewhere in Phase 2, design development,

15     correct?

16 A   In design development -- what I stated was, in

17     design development, documents were distributed to

18     three different pool contractor companies.  And

19     Spear was one of the three.  And that was in the

20     design development phase.

21 Q   Did you have discussions with anyone at Spear

22     about their role in designing the pool?

23 A   Yes.

24 Q   Who at Spear did you have discussions with?

25 A   Sam Blake was the primary point of contact.

106

1  Q  Now, you described Spear's role early in your

2     deposition testimony as being what you described

3     as integrated project --

4  A  Delivery.

5  Q  -- delivery.  Did I use that term correctly?

6  A  Yes, sir.

7  Q  And you said that Spear was part of both the

8     design process and the construction process.  Is

9     that accurate?

10 A  Design engineering.  They were not involved with

11    deciding how deep the pool is, how many lap lanes

12    are in the pool, et cetera.  Their role was to

13    look at what was presented to them and tell us

14    how much to engineer the basin, the piping, the

15    filtration, all the equipment, and to be

16    responsible and install it.  Their responsibility

17    was to be from the gutter line on in and all the

18    equipment connected to it.

19 Q  Did you -- and you being Panzica Building

20    Corporation -- have a contract directly with

21    Spear relating to its pool engineering services?

22 A  I believe we had correspondence directly.  Yes,

23    sir.

24 Q  No.  I think my question, though, is, did you

25    have a contract with Spear for pool engineering

1      services?

2   A   The purchase order -- I would again have to go

3      back to the records.  I do know that a purchase

4      order was issued to Spear Pool for this work.

5      They would not go out and hire engineers and

6      spend time and money doing work without some

7      assurances of a contract.

8          And we've done this many times with these

9      types of delivery projects where you'll go to a

10     vendor and engage them and say, "Look, you do

11     this front-end engineering work.  When we get the

12     contract, you'll be hired as the pool designer at

13     or below this value here.  If the project is

14     deferred, killed, stopped, we will pay you for

15     the services you've expended to that date."  So,

16     there was that understanding with them, I

17     believe.

18                     MR. KELLEY:  Let's mark that as

19                an exhibit.  I don't know if I have

20                enough copies for everyone.

21                     (Deposition Exhibit 9 marked

22                     for identification.)

23   BY MR. KELLEY:

24   Q   Mr. Panzica, I'm gonna have several questions.

25     But you let me know when you're done reviewing

1      that, okay?

2  A   Okay.

3  Q   Take all the time you need to.

4  A   (Witness reviewing exhibit.)  Okay.

5  Q   Mr. Panzica, I'll represent to you this is a

6      document that's been produced in discovery by

7      Spear Corporation.

8          And the front page is an e-mail -- well,

9      it's an e-mail chain, actually, between yourself

10     and Sam Blake.  Do you know who Sam Blake is?

11 A   He's their representative for the front end of

12     the project.

13 Q   From Spear Corporation?

14 A   From Spear Corporation.

15 Q   Okay.  And if you look at the bottom of Page 1,

16     your e-mail to Mr. Blake is dated March 20th,

17     2015.  And it discusses a request for a proposal

18     or scope of services from Spear.  I'm not trying

19     to mischaracterize it, but I'm trying to pin down

20     the date.

21         This March 20th, 2015, time period, would

22     this have been on the early side of your

23     communications with Spear or would this have been

24     somewhere in the middle?

25         Can you kind of frame that for me in terms

109

1       of when this communication would've occurred as

2       to when you reached out to Spear and the other

3       two pool consultants?

4   A   This was after we had had discussions with all

5       three firms, the three firms submitted budgets,

6       and we put those -- the Spear budget into our

7       design development budget.  And then we were

8       going to rely upon Spear.  So, we were now beyond

9       that point and now going to Spear for the

10      integrated delivery.

11  Q   And at the top of Page 1, the e-mail to you from

12      Mr. Blake says, "Please see attached scope of

13      services for pool design."

14  A   Right.

15  Q   And then there is a document attached that has a

16      Spear Corporation letterhead and goes on for the

17      remainder of the exhibit.  Do you recall

18      receiving this?

19  A   Yes, I do.  And I recall having discussions with

20      Sam Blake concerning engineering services.  We

21      had sought out companies, firms, that specialize

22      in pool design.  They don't design buildings.

23      They don't design structures.  They design pools,

24      commercial pools.

25          And I recall the discussion with Mr. Blake

110

1    saying, "We can help you with that."  I said,

2    "Well, why don't I just hire one of these

3    consultants?"

4        And his explanation to me was that they've

5    done a lot of pools and they've gone in and fixed

6    a lot of pools designed by consultants.  And I

7    remember his comments.  "The consultants are 15

8    years behind on where the technology is.  And we

9    have to go in and fix the pools because they

10    don't function properly; filtration systems and

11    so forth."

12        And we're a strong believer of that.

13    Mechanical, electrical design, we lean very

14    heavily on the subcontractors who have

15    engineering staff on board.  Why?  Because

16    they're the people that actually have to execute

17    it in the field and they know what's going on,

18    versus an engineer that sits in an office and

19    never sees the light of day and he's focusing on

20    just doing the same thing they've done for 20, 30

21    years.  "This is all the way -- this is the way

22    we do it."

23        We like to have people that are actually in

24    the field that have to do the warranty follow-up

25    and figure out that piece of equipment doesn't

111

```
 1        work, piece of junk, we won't use it anymore.
 2             So, that was his comments to us.  He said,
 3        "Why don't you work with our firm?  Why don't you
 4        let us do the design-build?  We'll design the
 5        plumbing system.  It'll be done right.  You won't
 6        have problems.  We work -- these consultants,
 7        no."  So, that's why we said, "Fine.  Give us a
 8        proposal."
 9    Q   So, this proposal is directed to you at Panzica
10        Building Corporation?
11    A   Yes, sir.
12    Q   Did you accept this proposal?
13    A   I believe we did.  I'd have to go back in the
14        records and find it, but I believe that we most
15        likely accepted this.  I do have -- I would have
16        to go back.  I notice here we made the comment,
17        "We have a structural engineer on-board who will
18        design the concrete pool structures."
19             So, I can't recall all that discussion.  I
20        know the engineers that did the building for us
21        was Frost Engineering out of Mishawaka, Indiana.
22        And, so, I'm sure there was a discussion back
23        with Spear as to whether they handle the
24        foundation, basin design, or whether we have a
25        third party do that.
```

112

1    Q    And are you aware of any modifications or

2         different versions of this proposal that may have

3         gone back and forth between Panzica and Spear as

4         to its proposed services?

5    A    I'm not aware at this moment, no.

6    Q    So, as far as you're concerned, you believe that

7         this proposal in Exhibit 9 accurately describes

8         the scope of services that Spear Corporation

9         would've performed --

10                            (Brief Interruption.

11                            Telephone beeping.)

12   A    I would say no, it does not.

13   BY MR. KELLEY:

14   Q    Hang on a second.  Hang on just one second.  I

15        kind of trailed off the question.  That's okay.

16        I know.  Sorry.

17                            MS. MACK:  Are you getting him

18                       back on the phone?

19                            (A discussion was held off

20                            the record.)

21                            MR. KELLEY:  I'd like to

22                       re-ask.  But can you read back what

23                       we had before that?

24                            (The last question was read

25                            back by the court reporter.)

1    BY MR. KELLEY:

2    Q    "For the design of the pool" would be the end of

3         that question.  So, now, that's the conclusion.

4    A    And I would answer that no.

5    Q    What specifically do you think is inaccurate in

6         this proposal as to the scope of services that

7         Spear did perform?

8    A    In my e-mail, we state that the structural

9         engineer, the building structural engineer, is

10        on-board on the concrete pool structure.

11        However, Spear provided the foun -- the concrete

12        design of the basin, the structural design of it.

13            So, my quick perusal of this doesn't

14        indicate that they include that in here.

15        Possibly they do.  I haven't -- I haven't had

16        time to read through all these line items and

17        recall my memory.  We have four pages of

18        documents here.

19            So, I don't see in -- if they included

20        structural design.  So, that's why I'm saying I

21        don't believe it's fully accurate.

22   Q    Other than structural design, do you have any

23        other reason to believe that anything else in

24        this scope in the proposal does not accurately

25        describe the services that Spear would've

114

1     performed in design?

2                         MR. RUKSAKIATI:  Objection.

3                    Lacks foundation.

4  A  Under "Aquatic Elements, Pool Layouts and

5     Dimensions," I would assume that they're taking

6     what was initially designed and further

7     developing what is the exact dimension of the

8     gutter, where is the dimension of this basin, and

9     so forth, and detailing that out, yes.

10 BY MR. KELLEY:

11 Q  Are you aware of any changes that Spear

12    Corporation may have done to the layout

13    dimensions of the pool as part of its design

14    process?

15 A  I would say yes in the sense that they refined --

16    you know, worked out the details and refined it

17    and put final dimensions on it that may not have

18    been completely shown on the architectural work.

19    So, yes, they had a role in fine tuning and

20    laying it out to meet all needs.

21 Q  And would that have included, for example, the

22    area between the zero entry ramp and the lap

23    portion of the lap pool?

24                         MR. RUKSAKIATI:  Objection to

25                    form.  Vague.

115

1  A  Would you please ask the question again?

2                        MR. KELLEY:  Can you read that

3              back?

4                            (The last question was read

5                            back by the court reporter.)

6  A  I'm sure, in their review, they studied those

7     areas because they had to make sure that there's

8     water movement, circulation, that that water

9     isn't stagnant.

10                        MR. KELLEY:  Would you mark

11             this as 10?

12                           (Deposition Exhibit 10 marked

13                           for identification.)

14  BY MR. KELLEY:

15  Q  Mr. Panzica, you've been handed what's been

16     marked as Exhibit Number 10, which I'll represent

17     to you is a document that's been produced in

18     discovery by Design Organization.  And it's two

19     pages and has been Bates numbered in the bottom

20     right-hand corner as Design Org 646 and 647.

21         Have you seen this e-mail and attachment

22     before?

23  A  I saw this e-mail about four years ago.  Yes,

24     sir.

25  Q  Your name, in fact, is at the top of the e-mail?

116

1    A    Yes, sir.

2    Q    Is that right?

3    A    Yes, sir.

4    Q    And it's dated July 22nd, 2015.  And it appears

5         to be from you to Beacon Health; is that right?

6    A    Yes.

7    Q    And you address it to Alan Loyd.  And you say,

8         "We enclose initial input from Spear Pool on the

9         pool area."  Do you see that?

10   A    Okay.

11   Q    And then there is an attachment to the e-mail,

12        which is the large sheet stapled to the e-mail.

13        Do you see that?

14   A    Yes.

15   Q    Okay.  Can you tell me what input you received

16        from Spear Pool that you were passing on

17        regarding the pool area?

18   A    I can't answer that from this doc -- from these

19        documents.

20   Q    What other documents or information would you

21        need to understand what information Spear had

22        provided to you that you were passing on?

23   A    Well, the document is a portion of the

24        architectural plans.  And I'm not quite sure on

25        the reference of "Enclose initial input from

117

1    Spear Pool on the pool area," as to what the

2    directives were from Spear to our office to DO or

3    simultaneous to DO and our office when either Sam

4    or Spear had made comments or input.

5        But this was a meeting, obviously, being

6    requested to be set up.  And we didn't -- we gave

7    a general list of what the overall discussions

8    would be, including layout, depths, gutters,

9    entry details, floor and wall finishes, deck

10   finish, pump room and equipment.

11       In those discussions, you get down into the

12   weeds of a lot more detail.  But that's a general

13   overview of what the discussion will be.

14                    MR. PFEIFER:  Will, I don't

15                know -- if you take a look at Page 58

16                of his notes, I think that's the

17                minutes of that meeting that he's

18                referring to, just if it speeds

19                things up.

20                    MR. KELLEY:  I appreciate that.

21                    MR. PFEIFER:  You're welcome.

22   BY MR. KELLEY:

23   Q  So, Mr. Panzica, as Plaintiffs' counsel has

24   pointed out, in Exhibit Number -- 5?  Is that

25   what the binder is?

118

1                       MR. PFEIFER:  Yes.

2    BY MR. KELLEY:

3    Q  Exhibit 5, Page 58, there is a set of meeting

4       minutes dated July 27th, 2015.

5           Can you identify whether those meeting

6       minutes are from the meeting that is referenced

7       as being needed in Exhibit Number 10?

8    A  Wednesday, the 22nd of July, requested a meeting.

9       And, obviously, we had a meeting on the 27th,

10      five days later.  And we had the meeting with the

11      people that were in this e-mail, which was

12      Mr. Alan Loyd, Sam Blake, Jeff Wolf.  Emily

13      Sheahen is an interior designer at Design

14      Organization.  She did not -- I don't see that

15      she attended the meeting.

16          So, the meeting was attended by Bob Davis,

17      who is a person -- one of the field -- I think

18      field operations for Spear or a general manager.

19      I can't recall.  Sam Blake, Jeff Wolf from DO,

20      myself, and Alan Loyd.

21   Q  And the handwriting in these meetings minutes, is

22      that yours?

23   A  These are my meeting minutes.  Yes, sir.

24   Q  Do you know -- looking back at Exhibit 10 for a

25      moment, do you know if the layout of the pool

119

1     that is shown in Exhibit 10 accurately depicts

2     the final version of that layout as it was

3     included in the construction documents?

4  A  The general layout is accurate.  I believe the

5     only change that I see is that the stairs were

6     moved to page north and the start of the ramp was

7     moved to page south for constructability, that we

8     had a clean structural rectangle and not these

9     inner corners to begin with.  Every corner costs

10    money.  But that is the general pool layout.

11    Yes, sir.

12                    MR. KELLEY:  Let's do this.

13                      (Deposition Exhibit 11 marked

14                       for identification.)

15                    MR. PFEIFER:  Is that 11?

16                    MR. KELLEY:   11.

17 BY MR. KELLEY:

18 Q  So, Mr. Panzica, I've now handed you what's been

19    marked as Exhibit Number 11, which I'll represent

20    to you is not the full set of construction

21    documents for the Beacon project but are sheets

22    from the construction set that start with SP0.0

23    and run through SP4.2.

24         And, so, my first question is, can you

25    identify Exhibit 11 as being the four

120

1      construction documents for the pool on this

2      project?

3                          MR. RUKSAKIATI:  Let me just

4                  object to the exhibit to the extent

5                  that the sheet index shows there's

6                  supposed to be an SP1.1.  And I don't

7                  see one, unless it's out of order and

8                  I missed it.

9                          MR. PFEIFER:  1.1's missing.

10                          MR. RUKSAKIATI:  So, just to

11                  the extent that there's a document

12                  missing, I object to the

13                  characterization of this as the

14                  complete pool plan.

15                          MR. KELLEY:  So noted.  I'm not

16                  sure if that was a copying error or

17                  if this is the way we had it.  But

18                  we'll flush that out.  That's fine.

19     BY MR. KELLEY:

20     Q  I'm not trying to trip you up.  It's a fair

21     objection.  It may not be a complete set attached

22     to this e-mail.

23          But my point is, can you identify these

24     generally as being the construction documents

25     showing the final layout of the pool for the

121

```
 1      project?
 2   A  I would have to say that it's a fair
 3      representation.  I can't answer that it's the
 4      final set.  I'd have to go back and see -- it
 5      says -- some of the pages say Construction
 6      Documents, Construction Documents, on about the
 7      fourth box -- one, two, three, four, five -- five
 8      boxes up.  Then you go back further.  It says 100
 9      percent completion date.
10          So, some of these pages are not consistently
11      labeled "Construction Documents."  And,
12      generally, in the architectural world, we set up
13      these borders.  And when you fill in these
14      blanks, it trickles through to all the pages,
15      typically.  Now, how they do it, I don't know.
16      But that's how our office handles it.
17   Q  Yeah.  That's --
18   A  But I would say they're pretty close to being the
19      final construction documents if not a checked set
20      of the final docs.
21   Q  And there's a stamp at the bottom of the first
22      page by an engineer by the name of Robert
23      Coghill?
24   A  Yes, sir.
25   Q  Do you know who Robert Coghill is?
```

122

1    A    I did not know Mr. Coghill, but we did get to

2         know him in working on the project and

3         coordination of various items in the project.

4              One area, for instance, where Spear has

5         brought their expertise to the table, if you look

6         back on Exhibit Number 10, on the drawing, look

7         at the page, "South end of the pool."  There's a

8         large deck area.

9              If you now reference Page -- Exhibit 11 and

10        look at the south end of the pool, you'll see a

11        rectangle there.  And in the lower left of that

12        rectangle, there's, looks like, two doors.  And

13        that's exactly what they are.  They're horizontal

14        floor plates.  What that represents is that's the

15        surge tank.

16              So, when you have a guttered pool, you

17        get -- 50 people jump in the pool, you're

18        displacing a lot of water.  That water's got to

19        go to somewhere.  You overfill the pool.  So,

20        that surge tank handles that excess water now

21        that's being displaced by 50 people.

22              And as people get out of the pool, the water

23        flows from that tank back into the pool to

24        maintain a constant level of water in the pool.

25        So, that definitely is showing the expertise and

123

1      the input of Spear on the project.

2          And I recall discussions with Mr. Coghill

3      about that foundation with the page south, the

4      south wall of the pool room, about structural

5      issues; that we didn't want our foundations

6      impacting his surge tank and we didn't want his

7      surge tank impacting our foundations.  The pool

8      room is its own individual room.

9                     MR. PFEIFER:  You're looking

10                    at -- you're pointing to Exhibit

11                    11 --

12                    THE WITNESS:  Yes.

13                    MR. PFEIFER:  -- while you're

14                    testifying?  I just -- I can see

15                    you're pointing.  I just want to make

16                    sure that the record reflects what

17                    you're pointing to.

18     BY MR. KELLEY:

19     Q  Now, before I handed you Exhibit 11, you were

20        looking at Exhibit 10.  And you referenced that

21        one change that you observed from Exhibit 10 to

22        the final design was that the ramp had been

23        extended to page south, I think is how you

24        described it, and the stairs had been extended to

25        page north, as you described it, to form a

124

1      perfect rectangle.  Is that how you described it?

2   A  Yes, sir.

3   Q  And if you look at Exhibit 11, does that depict

4      your recollection of that issue then as to the

5      movement of the stairs and the ramp to page

6      north, page south, respectively --

7   A  Yes.

8   Q  -- to form a perfect rectangle?

9   A  Yes.  And that was a constructability issue.

10  Q  Can you describe that for me?  What do you mean

11     by it's a constructability issue?

12  A  You improve construction.  You're already buying

13     that amount of wall.  Move it out.  Make the pool

14     square.  It's a cleaner structural frame.  It

15     makes construction easier; makes engineering it

16     easier.  It makes a better job.

17  Q  And who would've been responsible for proposing

18     or raising that constructability issue?

19  A  That may have been a comment either from Spear

20     Corporation, who builds the pools; it might have

21     been a general discussion from our office on

22     questioning it.  Whenever we see inside corners,

23     we always look at what are we gaining with an

24     inside corner.

25  Q  And, obviously, there's been a modification from

125

1        Exhibit 10 to Exhibit 11 to get to a different

2        layout of the pool shown on Exhibit 11 on that

3        issue, correct?

4    A   An adjustment to the pool layout, yes.

5    Q   So, who would have made that adjustment to the

6        pool layout between Exhibit 10 and Exhibit 11?

7    A   As I stated previously, I can't recall who

8        directly made that recommendation.  But I can

9        probably pretty well guess it was a

10       constructability issue from Spear or possibly

11       from our office to -- you're already buying the

12       same amount of wall.  Move the wall to the

13       outside.  Make the pool construction simpler and

14       straighter, more reliable.

15   Q   No.  And I understand that.  But once that

16       decision is made, based on a constructability

17       issue, and the decision is made to make it into a

18       perfect rectangle, do you recall who then made

19       the actual changes to the pool layout to make

20       that change on the drawings?

21   A   Design Organization, if they agreed with the

22       direction and the recommendation, they would've

23       then changed their drawings to reflect that.

24   Q   Are you speculating or do you know that they

25       actually made those changes?

126

1    A    Again, in meetings -- and they're part of the

2         design team.  They're the architect of the

3         project.  And recommendations are being made to

4         them.  As the architect of record, they either

5         accept the recommendation and move it or they

6         argue that, no, that's not acceptable for this

7         reason, this reason, and this reason, and it

8         stands and everyone says, "Okay."

9              So, at the end of the day, they're given the

10        decision.  If they agree with it, they do it.  If

11        they don't agree with it, they don't do it.

12   Q    So, that's a general comment about their role in

13        the project.

14             But my question is, do you have a specific

15        recollection about who made the changes to the

16        drawings between Exhibit 10 and Exhibit 11?

17   A    I would say that the project architect adjusted

18        his drawings to accommodate the recommendation --

19   Q    Now --

20   A    -- that they agreed with.

21   Q    Now, Exhibit 11 has further details in the pool

22        shown that don't show up on Exhibit 10.  Would

23        you agree with me on that?

24   A    Would you point out specifically what issues

25        you're talking about?

127

1    Q    Sure.  So, there are lane dividers shown on

2         Exhibit 11 that aren't shown on Exhibit 10,

3         right?

4    A    Okay.  Hold on.  So, on Exhibit 10 -- yes.

5         Exhibit 10 only shows the lane lines.  That's the

6         center line of the lane.  Exhibit 11 shows the

7         lane lines, and it shows the lane ropes.

8    Q    Lane ropes is the same term I was trying to

9         convey when I said lane dividers.

10            But lane ropes are shown on Exhibit 11 but

11        are not shown on Exhibit 10, correct?

12   A    Yes, sir.

13   Q    And there are squiggly lines on Exhibit 11 at the

14        north and south end of the pools.

15            Would those represent the flags that hang

16        above the top of the pool?

17   A    Yes, sir.

18   Q    And that shows up on Exhibit 11 but is not on

19        Exhibit 10, right?

20   A    Yes, sir.

21   Q    Do you know who added those details to the pool

22        layout that are shown on Exhibit 11 that do not

23        exist on Exhibit 10?

24   A    I cannot answer that without going back and

25        looking at all the documents.

128

1  Q  You don't know one way or the other as we sit
2     here today?
3  A  As I said, I can't answer that question without
4     going back and looking at all of the documents.
5  Q  You testified earlier in response to some general
6     questions about what it meant to stamp certain
7     plans for construction.  Do you recall that
8     discussion, generally?
9  A  Yes, sir.
10 Q  Okay.  And these pool plans, these SP sheets, are
11    stamped by Robert Coghill on several sheets.
12    They're stamped by a Paul Brumleve on other
13    sheets.
14        Are you aware of any pool plan construction
15    documents that were stamped by Jeff Wolf or
16    Design Organization --
17 A  If you were to go through the project documents
18    under the architectural division, there's
19    probably floor plans, building sections, finish
20    plans and so forth, that show the pool and
21    provide information for the pool.  And those
22    would've been sealed, professional license seal
23    placed on the drawings by Mr. Wolf from Design
24    Organization.
25        -- then you have another group of drawings

129

1    that further develops that work.  And that's this

2    packet here.  Then there's probably another layer

3    of drawings, which is the electrical, which

4    provided electrical services, all this pool

5    equipment, the lighting, the grounding of the

6    pools, and so forth.

7        The connection of water, the water --

8    there's a water line that comes through the

9    building, dumps water into this system, just a

10   single pipe connection.  And then there's a large

11   sump pit that collects all the outwash from the

12   rinsing of the filtration and heads right out to

13   the sewer.

14                    MR. PFEIFER:  You just referred

15           to "this packet."

16                    THE WITNESS:  Okay.

17                    MR. PFEIFER:  You're talking

18           about Exhibit 11?

19                    THE WITNESS:  Yeah.  So, I'm

20           referring to -- yes.  He asked if

21           this was the only document for the

22           pool.  There's multiple layers that

23           help build that pool.

24                    MR. PFEIFER:  I understand.

25           But when you said, "This packet," you

130

```
 1                    had in your hand and were referring
 2                    to Exhibit 11?
 3                         MR. SMITH:  He's just trying to
 4                    clarify it for the court reporter.
 5                         THE WITNESS:  I'm trying to
 6                    clarify -- okay.  I see.  Yes, Dan.
 7                         MR. PFEIFER:  Okay.
 8                         THE WITNESS:  So, this is one
 9                    of the packages that provided
10                    information on how to build a pool.
11  BY MR. KELLEY:
12  Q  Mr. Panzica, in relation to the construction of
13     the pool, were there shop drawings prepared by
14     the pool contractor or any of the suppliers for
15     portions of the pool?
16  A  Yes.
17  Q  And in your experience as an architect, having --
18     well, let me back up.  Strike that.
19         I'm not sure we established this.  Are you a
20     registered architect in the State of Indiana?
21  A  Yes, sir.
22  Q  How long have you been registered?
23  A  Since 1979.
24  Q  And you remain in good standing as a registered
25     architect today?
```

131

1    A  Yes, sir.

2    Q  So, as a registered architect in the State of

3       Indiana with 40 years of experience, when shop

4       drawings come through from a supplier or someone

5       involved, who typically reviews those shop

6       drawings in the construction process?

7    A  Typically, the architect will review shop

8       drawings.  The general contractor -- well, first,

9       the general contractor reviews the shop drawings.

10      The architect reviews the shop drawings.  And

11      then they're returned back to the sub trade who

12      presented them.

13   Q  And specific to the components of the pool, do

14      you recall there being shop drawings submitted on

15      this project?

16   A  Multiple.

17   Q  And do you recall on the design side who reviewed

18      those shop drawings?

19   A  I'm sure the shop drawings went to Design

20      Organization.  I know that our firm -- one packet

21      of documents on the pool pertained specifically

22      to all the finishes in the pool; the tiles, the

23      plaster, the -- the lane lines.  And all that

24      detail was submitted.

25          Most of that was esthetic issues.  That

132

1     packet was primarily esthetic issues that our

2     firm worked directly with Beacon Health to assure

3     that the final finishes and the colors and so

4     forth is what they requested.

5  Q  And when you, being Panzica, would review shop

6     drawings, would you normally stamp those shop

7     drawings, indicating that you had done your

8     review?

9  A  Yes, sir.

10 Q  And does your stamp include the Panzica name and

11    logo on that stamp?

12 A  We have a standard release for -- that we've

13    reviewed the documents.

14 Q  And if Design Organization, similarly, would have

15    reviewed shop drawings, you would expect that

16    they also would stamp those shop drawings with

17    their stamp, correct?

18 A  Yes, sir.

19 Q  So, if there are shop drawings that do not

20    include Design Organization's stamp, is it fair

21    to assume that they did not review those

22    particular shop drawings?

23                    MR. SMITH:  Objection.  Calls

24           for speculation.

25                    MR. NEWMAN:  Join.

133

```
 1                    MR. PFEIFER:  Me, too.
 2    A  I can't say that categorically.  No, sir.
 3    BY MR. KELLEY:
 4    Q  But if Panzica stamps the shop drawings with
 5       their stamp and their seal, that indicates that
 6       Panzica has done the review of the shop drawings
 7       themselves; is that accurate?
 8    A  No.  Not fully accurate.
 9    Q  How is that not accurate then?
10    A  Design Organization is an architectural firm
11       that's a production house.  They have many
12       different jobs.  And what generally will happen
13       is, as the project progresses, their staff is
14       less and less involved and turn-over times become
15       longer and longer to get shop drawings back.
16            So, many times, on noncritical items, like I
17       see you're holding some shop drawings on all the
18       pool railings, that's a review of looking at the
19       drawings and looking back at the rail drawings
20       and making sure that, yes, it's stainless steel;
21       yes, it's the correct dimension; yes, we've got
22       to make -- if there's a construction issue, we're
23       gonna have to deal with.
24            So, we'll go ahead and review shop drawings,
25       such has that one with railings and so forth, to
```

```
 1       expedite the work, to make sure it's in
 2       compliance with Design Organization and the plan.
 3   Q   Okay.   I don't think that was completely
 4       responsive to the question that I asked you.
 5            The question is, if you stamp the shop
 6       drawings and it's got a Panzica seal on it, is it
 7       safe to assume that Panzica has reviewed those
 8       shop drawings?
 9   A   Yes.
10   Q   Okay.   Thank you.
11                    MR. SMITH:   Can we take a short
12              break?
13                    MR. KELLEY:   You know,
14              actually, we can take a break.   I'm
15              ready to pass the witness.   So, no
16              further questions.
17                    MR. PFEIFER:   Are you guys
18              gonna have questions?
19                    MR. NEWMAN:   Oh, yeah.
20                    MR. PFEIFER:   Okay.   I have my
21              phone conference.   I have no problem
22              continuing.   But I do have a couple
23              follow-up questions that I didn't
24              ask, and I don't want to be deprived
25              of that opportunity.
```

135

1                          MR. NEWMAN:  You're gonna go do

2                  your conference?

3                          MR. PFEIFER:  Yeah.

4                          (A break was taken at this

5                          time.)

6                          (Deposition resumed with all

7                          parties present with the

8                          exception of Attorney Daniel

9                          Pfeifer.)

10                         MR. NEWMAN:  Let's continue.

11                     CROSS-EXAMINATION

12   BY MR. NEWMAN:

13   Q  Mr. Panzica, my name is Dan Newman.  I represent

14      Panzica II, A Joint Venture, as well as Panzica

15      Construction in this case.  I just have a few

16      questions for you.

17   A  Okay.

18   Q  You personally were involved with the formation

19      of the joint venture and signed one of the joint

20      venture contract documents; is that correct?

21   A  Yes.  The details were resolved with Thomas

22      Panzica and Mark Panzica of Cleveland, Tom

23      Panzica of South Bend.  And they made me aware of

24      what was being done.  Yes.

25   Q  And you are aware that for this particular

136

```
 1      project Panzica Construction did not have any
 2      design or architectural services obligations or
 3      responsibilities for this project, correct?
 4   A  Yes.
 5                          (Attorney Daniel Pfeifer
 6                           returned at this time.)
 7   BY MR. NEWMAN:
 8   Q  And that obviously included a pool, correct?
 9   A  Yes.
10   Q  Similarly, Panzica II, A Joint Venture, did not
11      have any design or architectural services
12      obligations or responsibilities with respect to
13      this project, correct?
14   A  I would use the term design oversight.  Yes.
15                  MR. NEWMAN:  Design oversight.
16              Okay.  Thank you.  No further
17              questions.
18                  CROSS-EXAMINATION
19   BY MR. SPALDING:
20   Q  Mr. Panzica, my name is Andy Spalding.  I
21      represent Beacon in this matter along with
22      Wendell Walsh.
23          Beacon and Panzica Building Corporation
24      entered into the agreement represented as Exhibit
25      8.  You have that in front of you, the Standard
```

137

1       Form of Agreement Between Owner and

2       Design/Builder; is that correct?

3    A  Yes.

4    Q  And Beacon is referred to -- Beacon Health System

5       is referred to as owner?

6    A  Yes.

7    Q  Panzica Building Corp as the design, slash,

8       builder?

9           And I only ask that question just to

10      establish who's who.  Is that correct?

11   A  Yes.

12   Q  Okay.  Beacon, as the owner, did not serve as the

13      architect of this project in any way, did it?

14   A  No.

15   Q  Specifically, of the pool?

16   A  No.

17   Q  Did not serve as the architect or the designer of

18      the pool in any form or fashion?

19   A  They provided us guidelines and directives of

20      what they expected the pool to be.  It was

21      designed by Design Organization.

22   Q  And Beacon --

23   A  They took that information and solved the problem

24      and put it into the drawings.

25   Q  And Beacon gave a concept --

138

1   A   Yes.

2   Q   -- of what it wanted?  It wanted a pool?

3   A   Yes, sir.

4   Q   And with the ability to get in and out of it?

5   A   Yes, sir.

6   Q   Okay.  But left the rest to --

7   A   Design --

8   Q   -- the designers and the architects?

9   A   Yes, sir.

10  Q   And appropriately relied upon them to design that

11      pool and meet all the relevant safety needs

12      relevant to that pool or related to that pool?

13  A   Yes.

14                      MR. SPALDING:  Okay.  Thank

15                  you.

16                      THE WITNESS:  Yep.

17                      MR. SPALDING:  Those are all

18                  the questions I have.

19                      MR. RUKSAKIATI:  Actually,

20                  before you go, I've got a couple

21                  questions.

22                      MS. MACK:  Do you have one

23                  second?  Just one second out there

24                  really quick?  Sorry.

25                      MR. RUKSAKIATI:  Sorry.

139

1            MR. PFEIFER:  Can I go ahead?

2            MS. MACK:  Yeah.  Go ahead.

3            MR. PFEIFER:  Because I can

4         maybe get done before my conference

5         call.

6               (Attorney Beverly Mack and

7               Attorney Scott Ruksakiati left

8               the room a this time.)

9            REDIRECT EXAMINATION

10  BY MR. PFEIFER:

11  Q   From your perspective as the design-builder,

12      Panzica, was the placement of pads on the free

13      ends of the walls necessary for the safety of the

14      swimmers?

15            MR. SMITH:  I'm gonna object to

16         the form.  Calls for expert

17         testimony.  You can answer.

18               (Attorney Beverly Mack and

19               Attorney Scott Ruksakiati

20               returned at this time.)

21  BY MR. PFEIFER:

22  Q   You can answer.

23  A   It is not code mandated.

24  Q   That's not my question.

25  A   I wish to clarify.

1  Q  Oh, I'm sorry.

2  A  It's not code mandated.  But after an event that

3      somebody did bump into the wall, it was discussed

4      that maybe there ought to be some protection to

5      mitigate any future injuries.

6  Q  So, do I understand your response to be, from

7      Panzica Building Corporation's perspective, the

8      placement of pads on the free ends of the wall

9      was necessary for the safety of the swimmers?

10               MR. SMITH:  Same objection.

11  A  No.

12  BY MR. PFEIFER:

13  Q  You say it wasn't?

14  A  I will say no.

15  Q  Why?

16  A  It wasn't code mandated.

17  Q  So --

18  A  And there may be other options of providing

19      mitigation beyond a pad.

20  Q  Then why was it placed on after the event?

21               MR. NEWMAN:  Objection.  Form,

22            foundation, subsequent remedial

23            measures.

24               MR. SMITH:  Join.

25               MR. RUKSAKIATI:  Join.

141

```
 1                    MR. KELLEY:  Join.
 2   A   Placement of the pads was a means of mitigating
 3       the potential of someone in the future also
 4       hitting that wall and maybe being injured,
 5       bumping their head, or more severely.
 6   BY MR. PFEIFER:
 7   Q   Okay.  Was placement of a lap lane -- excuse
 8       me -- a lap line from one end of the pool to the
 9       other end of the pool on the south side, from
10       Panzica Building's perspective, necessary for the
11       safety of swimmers?
12                    MR. SMITH:  Same objection.
13   A   It was another solution to further mitigate the
14       potential of somebody hitting the end of that
15       wall.
16   BY MR. PFEIFER:
17   Q   Was placement of a line from one end of the wall
18       to the other, to the -- the free wall, was that
19       necessary for the safety of swimmers?
20                    MR. SMITH:  Same objection.
21   A   Again, I'm gonna say no.  There's other options
22       that could be available.  The pool's a body of
23       water surrounded by concrete walls.
24           At what point do we stop putting -- at what
25       point do we do or not put pads in that pool?
```

142

1  BY MR. PFEIFER:

2  Q  What other safety options were there?

3  A  I can't answer that question right now.  I'm not

4     a pool expert.

5                         (Deposition Exhibit 2 marked

6                         for identification in a prior

7                         deposition.)

8  BY MR. PFEIFER:

9  Q  I'm gonna show to you from Exhibit 2, Tab C, Page

10    47, an e-mail that you sent to Sam Blake and ask

11    you to read it, please.

12                       MS. MACK:  What's the date of

13           it?  Sorry.

14                       MR. PFEIFER:  I don't know.

15 BY MR. PFEIFER:

16 Q  What's the date?

17 A  The date on the e-mail is December 15th, 2016.

18                       MS. MACK:  Thank you.

19 A  From my desk to Sam Blake, Alan Loyd, Mike

20    Blackford, who is our project manager.

21                       MR. SPALDING:  I'm sorry.  I

22           didn't hear the exhibit number.  I

23           apologize.  2?

24                       MR. SMITH:  Tab C.

25                       MR. PFEIFER:  Exhibit 2, Tab C,

143

1                    Page 47.

2    A   "Sam, glad to hear you've handled this and work

3        is underway.  Could you please advise the pad

4        manufacturer of the urgency of these two pads?

5        Our client as well as your and our firm have a

6        condition that exposes all to liability of

7        injury."  New sentence.  "Let's get these things

8        delivered and installed.  Maybe yesterday,"

9        question.  "Your help to expedite these pads is

10       greatly appreciated by end users.  Thanks, Sam.

11       Phil Panzica."

12   BY MR. PFEIFER:

13   Q   And that's an e-mail you sent to Sam Blake of --

14   A   The client was encouraging us to hurry up and get

15       the pads.

16   Q   Okay.

17   A   They wanted the pads ASAP.  We were trying to

18       encourage them to get the pads.

19   Q   You just read an e-mail that you sent to Sam

20       Blake of Spear Corporation, correct?

21   A   Yes, sir.

22   Q   When you said that there was a condition that

23       exposes all of us to liability for injury, tell

24       us what you meant by that.

25                    MR. SMITH:  Objection.

144

```
 1              Relevance.

 2                      MR. RUKSAKIATI:  Objection.

 3              Form.

 4    A  I was explaining to them that we have a situation

 5       where someone has bumped their head on the wall,

 6       and we don't want anyone else to hit their head

 7       on the wall and be hurt.  So, let's get this

 8       mitigated.  That's what we're saying.

 9    BY MR. PFEIFER:

10    Q  What was the aspect of liability that you were --

11    A  Engendering him to --

12    Q  -- concerned about?

13                      MR. SMITH:  Object to the form.

14                      MR. RUKSAKIATI:  Join.

15                      MR. SMITH:  Make sure -- are

16              you finished with your question, Dan?

17                      MR. PFEIFER:  Let me rephrase

18              the question.

19                      MR. SMITH:  Sure.

20    BY MR. PFEIFER:

21    Q  When you said, "Exposes all of us to liability,"

22       what did you mean by that on behalf of Panzica

23       Building?

24                      MR. SMITH:  Object to the form.

25    A  Trying to engender him to expedite the pads, that
```

145

1    there's a reason to expedite.  The client was

2    requesting we expedite the pads.  And we're

3    stating that, "Well, someone hit it.  Someone

4    else may hit it.  We don't want that to happen.

5    We don't want anybody injured in the building."

6  BY MR. PFEIFER:

7  Q  From your perspective, Panzica Building

8    Corporation, when you used the word "liability,"

9    what did you mean?

10                    MR. SMITH:  I'm gonna object to

11                 the form.  You can answer.

12                    MR. NEWMAN:  I'm gonna object

13                 to subsequent remedial measures.  Go

14                 ahead.

15  A  I think I've explained my position on that.

16  BY MR. PFEIFER:

17  Q  Well, I'm not trying to be difficult.  But you

18    have to tell me what you meant.  I'm allowed to

19    ask questions.

20  A  Again, I'm explaining that -- in different words,

21    that somebody had hit -- had bumped their head on

22    the wall and we don't want anyone else to bump

23    their head and be hurt.  So, let's get this fixed

24    before someone gets hurt.

25  Q  Okay.  And what is it about somebody bumping

146

1    their head on the wall in the condition that it

2    was in, without pads, that would expose Panzica

3    or Spear Corporation to liability, from your

4    perspective for Panzica Building, when you sent

5    that e-mail to Sam Blake?

6                MS. MACK:  Objection.  Lack of

7            foundation.

8                MR. RUKSAKIATI:  Objection to

9            form and foundation.

10               MR. KELLEY:  Join.

11               MR. SMITH:  Objection.  Form.

12  A  Let me just say this.  The entire building is a

13    liability for our company.  We take risks every

14    day when we build buildings that somebody walks

15    into the building and for some -- for some reason

16    unknown to us, they do something silly or they

17    don't pay attention and they walk into a wall or

18    whatever.

19        And for some reason, it becomes the

20    responsibility of the contractor and the

21    designers for somebody becoming injured within

22    that building.  We cannot foresee every and all

23    incidence of what people do or do do in a

24    building.

25                MR. PFEIFER:  Thank you.

147

1           MR. RUKSAKIATI:  I just have a

2       couple questions, Mr. Panzica.

3                RECROSS-EXAMINATION

4   BY MR. RUKSAKIATI:

5   Q   Do you remember when Counsel showed you the pool

6       design drawings and over the lap pool there are

7       those squiggly lines that you said represented

8       the flags above the pool?  Do you remember that?

9   A   Yes, sir.

10  Q   Do you know who specified the color of the flags?

11  A   There is in the package of submittals a sheet

12      that our firm developed.  We were submitted -- we

13      were given a packet of information from Spear

14      requesting us to finalize the color of the tile,

15      finalize the color of the plaster, the gutter

16      colors, the flags, the line ropes, and so forth.

17      So, that was a discussion with Beacon as to what

18      they wanted in their pool.

19          And Mr. Loyd and I had a phone conversation.

20      And, so, it was a discussion of, "What would you

21      like?  What do you want to see in your pool?

22      Lane lines, do you want to see them all white?

23      Do you want to see them all blue?  Do you want to

24      see two blue, a white?  Do you want to see three

25      blue, white, three blue?  What would you like?

148

1      What colors would you like?"

2           So, those discussions were made.  On the

3      flags, "What would you like to see on the flags?"

4      We're given a rainbow of colors.

5   Q  And who selected the color?  The owner?

6   A  The owner selected the color.

7   Q  And do you remember what color it was originally?

8   A  I believe it was the -- the overall scheme of the

9      room was using a blue, a gray, and a white tile.

10     So, we tried to blend everything.  So, obviously,

11     you're giving a rainbow of colors.  You go, "Pick

12     the blue."

13  Q  And in terms of who selected the size and the

14     shape of those flags above the pool, do you know

15     who did that?

16  A  That was submitted to us by Spear.  And I believe

17     it's a standard in the industry.

18                      MR. RUKSAKIATI:  That's it.

19                      MR. SMITH:  Anybody else?

20                      MR. CRANDELL:  I'm just gonna

21              make a note for the record that I

22              represent Citizens in connection with

23              a separate declaratory judgment

24              action.

25                      Panzica's coverage counsel and

149

1              I have discussed we're not gonna ask

2         any questions today, but he's agreed

3         to produce Mr. Panzica at a future

4         date in connection with that lawsuit.

5              Did I state that correctly?

6              MR. GARDNER:  Insomuch as you

7         got the joint venture agreement this

8         morning.

9              MR. CRANDELL:  This morning,

10        yes.  Thank you.

11             MR. SMITH:  Okay.  We're done.

12             THE COURT REPORTER:  Signature?

13             MR. SMITH:  Yes.

14              (Deposition concluded and

15               witness excused at 4:04 p.m.)

16               * * *

17

18

19

20

21

22

23

24

25

150

1                          CERTIFICATE

2          I, SHARON L. BRADY, a Notary Public in and for
   the County of Cass and State of Michigan, do hereby
3  certify:

4          That PHILIP E. PANZICA appeared before me on
   Thursday, October 17, 2019, and was duly sworn to
5  testify the truth, the whole truth, and nothing but
   the truth to questions propounded at the taking of
6  the foregoing deposition in a cause now pending and
   undetermined in said court;

7
         That I further certify that I then and there
8  reported stenographically the proceedings at the
   said time and place; that the proceedings were then
9  transcribed from my original shorthand notes; and
   that the foregoing transcript is a true and correct
10 record thereof;

11         That I am not a relative or employee or attorney
   or counsel, nor a relative or employee of such
12 attorney or counsel for any of the parties hereto,
   nor am I interested directly or indirectly in the
13 outcome of this action.

14         IN WITNESS WHEREOF, I have hereunto set my
   Notarial seal this 4th day of November, A.D., 2019.

15

16

17

18

19

20                          *Sharon L. Brady*

21        _____
          Sharon L. Brady
22        Notary Public, State of Michigan
          Residence:  Cass County
23        My commission expires:  6-29-19

24

25

151

1                    STATE OF INDIANA

2            IN THE ST. JOSEPH CIRCUIT COURT

3   JENNIFER PENNINGTON and        )
    JOSH PENNINGTON,               )
4                                  )
          Plaintiffs,              )
5                                  )
      -vs-                         )  Cause No.
6                                  )  71D06-1804-CT-000160
    MEMORIAL HOSPITAL OF SOUTH     )
7   BEND, INC., d/b/a BEACON       )
    HEALTH AND FITNESS,            )
8                                  )
          Defendant.               )
9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

10

11                    PHILIP E. PANZICA

12       I hereby acknowledge that I have read the

13   foregoing deposition transcript regarding the case

14   of Pennington vs. Memorial Hospital of South Bend

15   taken Thursday, October 17, 2019, and that the same

16   is a true and correct transcription of the answers

17   given by me to the questions propounded, except for

18   the additions or changes, if any, as noted on the

19   attached errata sheet.

20   _____
     PHILIP E. PANZICA
21
     Subscribed and sworn to me this
22   ____day of_____, 2019, A.D.

23   _____
     Notary Public or Witness
24   State of _____
     County of _____
25   Commission expires: _____

USDC IN/ND case 3:20-cv-00875-WCG     document 30-3 (6) of Pandza/Building Corp., Josh Philip Panzica
Clifford Pettinga, et al. v. Post-Construction Memorial Hospital of South Bend, Inc.     filed 03/26/22     page 153 of 171
October 17, 2019

**$**

**$200 (1)**
64:22

**A**

**abandon (1)**
17:24
**abilities (1)**
55:14
**ability (1)**
138:4
**able (1)**
49:12
**above (3)**
127:16;147:8;
148:14
**absolutely (1)**
52:19
**accept (2)**
111:12;126:5
**acceptable (1)**
126:6
**accepted (2)**
18:11;111:15
**accepting (1)**
79:8
**access (1)**
57:22
**accessible (2)**
51:4;55:20
**accident (1)**
85:19
**acclimate (1)**
56:23
**accommodate (1)**
126:18
**according (1)**
80:14
**accounting (1)**
18:9
**accurate (8)**
44:24;65:19;106:9;
113:21;119:4;133:7,
8,9
**accurately (4)**
100:3;112:7;
113:24;119:1
**acquired (1)**
68:1
**act (1)**
99:8
**action (1)**
148:24
**actual (2)**
78:7;125:19
**actually (11)**
63:21;75:25;87:20;
94:15;102:9;108:9;
110:16,23;125:25;
134:14;138:19

**Acupuncture (1)**
47:11
**acute (1)**
27:5
**ADA (1)**
56:15
**Add (2)**
62:3;69:19
**added (3)**
62:5;87:11;127:21
**adding (1)**
48:4
**additional (1)**
17:6
**address (1)**
116:7
**addressed (1)**
80:16
**addressing (2)**
91:14;92:2
**adequate (2)**
38:7;51:11
**adjust (1)**
70:9
**adjusted (1)**
126:17
**adjustment (2)**
125:4,5
**admin (2)**
19:2;22:21
**administrative (4)**
16:25;17:21;19:21,
23
**advice (1)**
29:5
**advise (1)**
143:3
**advised (2)**
85:20;86:19
**affected (1)**
101:1
**afternoon (1)**
95:20
**afterwards (1)**
87:12
**again (22)**
12:25;23:18;39:3;
41:5;48:13;53:22;
55:1;77:21;83:19,21,
24;84:6;85:7;87:23;
90:6;91:17,25;107:2;
115:1;126:1;141:21;
145:20
**agenda (4)**
77:14,25;78:3,20
**ago (3)**
15:9;105:13;115:23
**agree (3)**
126:10,11,23
**agreed (3)**
125:21;126:20;
149:2
**Agreement (9)**

**72:6,20,22;73:15;**
**76:18,19;136:24;**
**137:1;149:7**
**ahead (9)**
83:25;87:2;92:16;
93:23;95:10;133:24;
139:1,2;145:14
**AIA (3)**
63:8;72:5,19
**air (1)**
65:14
**airplane (1)**
46:1
**Akron (18)**
26:21;27:15,25;
28:2;29:16;30:6;
50:14,15;52:7,12;
53:14,15,24;58:3,8;
76:6,16,21
**Akron's (1)**
58:17
**Alan (3)**
116:7;118:12,20;
142:19
**allow (2)**
80:1,11
**allowed (2)**
50:19;145:18
**allowing (1)**
93:16
**allows (1)**
37:3
**almost (1)**
57:22
**alone (2)**
24:5,6
**along (2)**
75:11;136:21
**altered (1)**
43:20
**Although (1)**
46:7
**always (6)**
51:3;52:25;58:15;
84:7;88:10;124:23
**ambulatory (4)**
19:4,7;20:7;57:11
**among (2)**
11:21;23:8
**amount (2)**
60:2;124:13;125:12
**analyzing (1)**
88:14
**and/or (1)**
93:5
**Andy (1)**
136:20
**answered (3)**
24:14;72:16;91:24
**anticipate (1)**
42:1
**anticipated (1)**
78:12

**anymore (4)**
43:18,19;81:4;
111:1
**apologize (1)**
77:22;142:23
**apparently (1)**
58:4
**appear (1)**
45:10
**APPEARANCES (2)**
3:1,24
**appears (2)**
31:15;116:4
**appointment (1)**
93:21
**appreciate (2)**
91:23;117:20
**appreciated (1)**
143:10
**approach (8)**
56:6,12;57:21;
85:23,24,25;86:1,14
**approached (2)**
50:16;95:1
**appropriately (1)**
138:10
**approve (2)**
35:23;63:23
**approved (2)**
36:14;38:25
**approximate (2)**
64:14;76:13
**Approximately (4)**
15:16;16:20;75:4;
77:3
**April (7)**
26:7,14;27:23;
29:20;30:17,20;76:6
**aquatic (2)**
49:13;114:4
**architect (43)**
10:9;11,12,13;
31:19,20;32:5,13,16,
17,18;33:2;34:4,15;
35:11,16;36:24;37:1,
13;40:4;60:2;66:11;
69:16;72:7,21;73:1;
97:1,18;100:16,17;
104:21;105:7;126:2,
4,17;130:17,20,25;
131:2,7,10;137:13,17
**architects (6)**
32:2;47:16;60:8,14;
98:19;138:8
**architect's (5)**
33:25,25;38:1;
40:10;101:10
**architectural (26)**
10:1,15,16;11:18;
15:14,18;16:22;
23:24;24:12;32:6,20;
33:9;34:1;35:8;37:24;
38:20;39:8;63:8;97:7;

**114:18;116:24;**
**121:12;128:18;**
**133:10;136:2,11**
**architecture (5)**
21:12;32:9;98:23;
99:4,7
**area (21)**
11:6,6;24:4,4;
43:23;47:9,9;49:9;
58:16,23,24;62:2,3;
78:12;100:19;114:22;
116:9;17;117:1;
122:4,8
**areas (2)**
47:21;115:7
**argue (2)**
84:11;126:6
**around (3)**
45:2,17;57:13
**ASAP (1)**
143:17
**aside (1)**
22:25
**Asleson (1)**
29:8
**aspect (5)**
18:15;24:13;52:21;
62:11;144:10
**assemble (1)**
97:3
**assess (2)**
66:2;87:9
**assist (3)**
15:13;25:21,22
**assistance (1)**
23:23
**assume (9)**
9:2;12:7;51:19;
59:3,6;86:7;114:5;
132:21;134:7
**Assumes (1)**
90:11
**assurances (1)**
107:7
**assure (1)**
132:2
**athletic (1)**
55:17
**attached (4)**
54:1;109:12,15;
120:21
**attachment (2)**
115:21;116:11
**attend (1)**
61:17
**attendance (1)**
28:6
**attended (2)**
118:15,16
**attention (1)**
146:17
**attorney (13)**
12:8,12;13:1;14:12;

USDC IN/ND case 3:20-cv-00075-MGG     document 30-16 filed 03/08/22     page 1 of 17
Jennifer Pennington and Nick Pennington vs.     Hudgins Building Company through Philip Panzica
Memorial Hospital of South Bend, Inc.     October 17, 2019

58:19;89:6;95:21;
135:8;136:5;139:6,7,
18,19
**attorneys (2)**
8:22;94:5
**attorney's (1)**
7:15
**authorization (1)**
99:16
**authorize (1)**
67:24
**Authorized (1)**
12:21
**automatically (1)**
48:3
**available (3)**
52:25;82:6;141:22
**Avenue (1)**
3:3
**average (1)**
57:10
**avoid (1)**
82:7
**aware (15)**
30:25;33:10,12;
60:12;81:13,16;
84:22,23,24;112:1,5;
114:11;128:14;
135:23,25

**B**

**B143 (2)**
72:5,19
**back (44)**
22:2,2;25:24;31:9;
38:13,14;39:3;46:19;
47:18;50:14;53:11,
21;55:2,2;58:12,15;
61:22;64:6,7;74:19;
78:11;82:9;90:9;
107:3;111:13,16,22;
112:3,18,22,25;115:3,
5;118:24;121:4,8;
122:6,23;127:24;
128:4;130:18;131:11;
133:15,19
**backwards (1)**
57:14
**bank (1)**
66:4
**Bariatric (4)**
29:2,3,5;56:3
**barred (1)**
32:19
**based (6)**
13:23;47:15;66:1;
86:2;105:12;125:16
**bases (1)**
60:16
**basically (2)**
27:14;42:17
**basin (6)**

100:11;104:24;
106:14;111:24;
113:12;114:8
**Bates (1)**
25:16,23;43:7;
46:19;115:19
**Beacon (42)**
16:24;17:25;21:4;
23:22;26:16;27:14;
28:8,24;30:14;46:11;
50:24;52:15,22;54:6;
55:20;58:10;61:4,15;
62:16;73:2,3,5,15;
74:6;77:9;79:8;80:14,
22;89:9;92:4;94:8;
116:5;119:21;132:2;
136:21,23;137:4,4,12,
22,25;147:17
**Beacon's (3)**
28:15,16;62:12
**beam (3)**
38:9;67:3,6
**became (2)**
22:25;33:1
**become (7)**
32:21;56:7;63:6;
78:25;81:13,16;
133:14
**becomes (1)**
146:19
**becoming (2)**
94:14;146:21
**beeping (1)**
112:11
**begin (1)**
119:9
**beginning (4)**
11:25;13:15;18:16,
17
**behalf (7)**
3:5,21;12:21;15:24;
83:9,16;144:22
**behind (1)**
110:8
**belief (1)**
88:21
**believer (1)**
110:12
**below (1)**
107:13
**Bend (5)**
17:17;29:9;41:15;
90:22;135:23
**best (3)**
13:10;21:19;67:18
**better (3)**
17:5;65:20;124:16
**BEVERLY (3)**
3:7;139:6,18
**beyond (6)**
44:7;68:12,14;
91:18;109:8;140:19
**bid (3)**

40:6;67:10;68:11
**bidding (1)**
67:16
**bids (3)**
67:17,18,20
**big (3)**
27:17;43:18;100:11
**bigger (1)**
62:2
**biggest (1)**
55:24
**bike (1)**
54:13
**Bill (1)**
34:20
**binder (2)**
13:19;117:25
**bit (2)**
57:11;71:9
**Blackford (1)**
142:20
**bladders (1)**
71:11
**Blake (7)**
105:25;108:10,10,
16;109:12,20,25;
118:12,19;142:10,19;
143:13,20;146:5
**blanks (1)**
121:14
**blend (1)**
148:10
**blue (6)**
147:23,24,25,25;
148:9,12
**board (2)**
47:23;110:15
**Bob (1)**
118:16
**bodies (1)**
68:9
**body (1)**
141:22
**boils (1)**
67:20
**bollard (1)**
84:9
**book (9)**
59:25;60:5,10,17,
19,21,22;61:1,5
**books (4)**
60:8,12,15;61:7
**Bop (3)**
49:8,8,8
**borders (1)**
121:13
**borings (1)**
97:19
**bosun's (4)**
56:1,4,8;61:19
**both (2)**
69:14;106:7
**bottom (6)**

25:14;98:18;
102:24;108:15;
115:19;121:21
**box (3)**
44:25;45:16;121:7
**boxes (1)**
121:8
**break (9)**
8:16,19;71:12,13,
16;93:18;134:12,14;
135:4
**Brief (1)**
112:10
**bring (3)**
15:17;18:14;66:10
**bringing (1)**
11:17
**Brock (2)**
28:12,13
**brought (14)**
10:22;15:13;66:14,
16;68:6,7;74:13;
90:23;91:2;97:15,16,
17;100:15;102:25
**Brumleve (1)**
128:12
**bubble (2)**
64:10,24
**bubbles (2)**
64:12,13
**bucks (1)**
64:21
**budget (10)**
40:7,13;64:25;65:1;
68:22;69:5;94:20;
95:2;109:6,7
**budgeting (1)**
94:17
**Budgets (5)**
17:22;68:8;69:1;
70:18;109:5
**budget's (1)**
65:4
**build (9)**
17:1;27:9,17;63:25;
68:22;74:8;129:23;
130:10;146:14
**Builder (2)**
99:17;137:8
**Building (114)**
3:5,21;9:9,15,19;
10:6,21,25;11:20;
12:19,21;13:5;15:6,
21;16:4,10,14,17;
17:1,17,21;19:2;
20:15;22:3,21;23:20;
24:16;27:18;29:7;
33:21,23,24;34:16,18;
35:14,15;37:17;
40:18;41:4,9,15;
42:18;43:12,13;
45:23;47:3,16;54:1;
60:1,4,19;61:1;63:21;

64:3,5,19;65:14;
66:16,18;68:1,9;
72:23;73:2,16;74:9;
75:18,19;78:23;79:4,
6,7,8,18,24;80:2,5,6,
13;81:4;83:9,16;
88:17;90:21;91:13;
96:12,17,18;97:10,25;
98:13,14;99:20;
103:6,16,21;104:8,19;
106:19;111:10,20;
113:9;128:19;129:9;
136:23;137:7;140:7;
144:23;145:5,7;
146:4,12,15,22,24
**buildings (2)**
109:22;146:14
**Building's (5)**
37:1,17;66:12;81:6;
141:10
**builds (2)**
10:5;124:20
**built (4)**
64:19,20;75:15;
91:6
**bump (11)**
85:10,14;86:16,20;
87:21;88:1,22;89:1,
10;140:3;145:22
**bumped (7)**
85:2,20;86:2,6,8;
144:5;145:21
**bumping (1)**
141:5;145:25
**buoyant (1)**
49:15
**bus (1)**
64:6
**business (3)**
9:17;84:6;87:5;
99:9
**busy (1)**
13:9
**buy (1)**
56:18
**buying (2)**
124:12;125:11

**C**

**cable (1)**
56:9
**calculate (1)**
65:13
**calculating (1)**
66:17
**calendar (1)**
78:10
**California (1)**
64:20
**call (10)**
17:8,25;22:4;26:18;
32:16;46:15;69:20;

Jennifer Pennington and Josh Pennington, etc. vs.
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

USDC IN/ND case 3:20-cv-00075-MGG    document 42-4    filed 03/28/22    page 155 of 171

76:21;93:19;139:5
**called (5)**
7:2;18:19;40:14;
60:1;98:19
**calling (1)**
50:1
**calls (4)**
69:4;86:23;132:23;
139:16
**came (7)**
21:7;26:24;50:14;
53:16;71:17;75:1;
82:9
**can (68)**
13:10;16:12;18:6;
31:6;32:8;50:17;
52:19;54:19;55:21;
56:16,17,21;57:1,10,
23,24,24,25,25;58:20;
59:10;60:12;64:17;
65:13,13,18;66:3,3,
19,21,22;68:25;75:13,
17,22;76:12;79:14;
82:10;85:3,21;86:7,
24;87:2,10;90:3,5;
92:16;93:2,12;96:23;
108:25;110:1;112:22;
115:2;116:15;118:5;
119:24;120:23;
123:14;124:10;125:8;
134:11,14;139:1,3,17,
22;145:11
**cane (2)**
55:16;56:25
**capabilities (3)**
20:13;68:12,14
**capability (1)**
65:5
**capable (3)**
19:10;57:23;91:19
**capacity (1)**
12:18
**card (1)**
54:16
**cardio (4)**
24:4,18;49:8;
100:19
**care (3)**
19:4;59:2;91:1
**carpet (1)**
39:11
**case (12)**
10:17;11:9;16:8;
39:21;40:19;41:6;
42:10;62:16;79:8;
84:14;88:21;135:15
**categorically (1)**
133:2
**ceiling (1)**
99:24
**center (26)**
11:5;18:2,12;19:4,
15;21:3;23:3,12;

24:17;27:9,21;29:11;
46:3;52:5,5;53:12,17;
54:7,14,23;73:6;74:3,
7;75:20;98:25;127:6
**centers (5)**
11:5;18:4,6;19:9;
24:20
**Certain (7)**
47:24;48:2;60:2,4;
61:7,8;128:6
**certificate (1)**
79:22,23;80:4
**cetera (10)**
24:18;33:20;34:18;
66:6,25;91:9;97:2;
100:12;105:4;106:12
**chain (1)**
108:9
**chair (4)**
56:1,4,8;61:19
**challenged (1)**
57:12
**chance (2)**
14:20;17:5
**change (3)**
119:5;123:21;
125:20
**changed (1)**
125:23
**changes (5)**
104:25;114:11;
125:19,25;126:15
**characterization (1)**
120:13
**charge (1)**
27:5
**charged (1)**
27:4
**CHARLES (1)**
3:2
**Charlie (1)**
59:4
**check (1)**
61:12
**checked (1)**
121:19
**chemistry (1)**
105:4
**Chicago (2)**
3:14;17:15
**circle (2)**
44:18,20
**circuits (1)**
101:2
**circulation (2)**
48:23;115:8
**Citizens (1)**
148:22
**city (1)**
80:8
**city's (1)**
80:9
**civil (8)**

33:18;35:6,18;39:3,
6;80:8;100:2;104:14
**clarification (1)**
94:1
**clarify (4)**
100:8;130:4,6;
139:25
**clarifying (2)**
16:1;101:11
**class (1)**
24:24
**classmate (1)**
21:11
**clean (2)**
47:19;119:8
**cleaner (1)**
124:14
**clear (4)**
55:12;72:17;94:23;
101:11
**Cleveland (12)**
17:9,11,17,18;18:9;
20:9,18,22,22;41:14;
103:18;135:22
**client (21)**
23:10;45:24;47:14,
21;48:1,3,4,7,9,19;
49:2;61:24;64:23;
65:2;66:2,6;70:5;
87:6;143:5,14;145:1
**climb (5)**
57:4,12,14,19,19
**clinic (3)**
29:3;47:10,19
**close (1)**
121:18
**club (1)**
54:24
**clubs (1)**
50:17
**code (4)**
38:3;139:23;140:2,
16
**codes (2)**
36:4;80:10
**Coghill (5)**
121:23,25;122:1;
123:2;128:11
**collaborate (1)**
98:6
**collaboration (2)**
31:24;98:22
**collect (1)**
67:17
**collects (1)**
129:11
**collegiate (1)**
51:23
**color (6)**
147:10,14,15;
148:5,6,7
**colors (1)**
132:3;147:16;

148:1,4,11
**column (5)**
37:20;38:6,7,14,15
**columns (2)**
37:19;65:8
**comfortable (1)**
14:14
**coming (4)**
18:22;20:25;55:13;
68:7
**comment (4)**
20:21;111:16;
124:19;126:12
**comments (4)**
70:8;110:7;111:2;
117:4
**commercial (7)**
27:22;32:11;68:17;
70:25;71:3;91:3;
109:24
**committed (1)**
50:25
**communication (2)**
34:25;109:1
**communications (1)**
108:23
**community (8)**
27:6,7,8;50:20;
52:9,23;60:3;80:11
**companies (7)**
59:24,25;69:1,2;
70:15;105:18;109:21
**company (8)**
10:4;11:1;20:16,19,
23;68:13;99:8;146:13
**comparing (2)**
30:4;69:18
**competitive (2)**
51:24;69:5
**complete (8)**
8:13;10:2;80:19;
84:7;88:8;98:7;
120:14,21
**completed (8)**
9:24;62:15;74:15;
77:8;80:18,19,24;
97:3
**completely (4)**
45:24;68:22;
114:18;134:3
**completion (1)**
121:9
**compliance (1)**
134:2
**complicated (1)**
22:12
**Complying (3)**
26:4;44:20;73:12
**component (5)**
11:7;32:9,10;44:1;
53:13
**components (3)**
24:2;46:4;131:13

**concept (7)**
10:3;26:24;27:1,2;
78:23;95:2;137:25
**conceptually (1)**
75:7
**concerned (4)**
58:24;62:17;112:6;
144:12
**concerning (1)**
109:20
**concluded (2)**
76:9;149:14
**conclusion (1)**
113:3
**Concrete (7)**
67:11,12,14;
111:18;113:10,11;
141:23
**condition (6)**
53:21;79:9;87:9;
143:6,22;146:1
**conference (3)**
134:21;135:2;139:4
**confirm (1)**
13:23
**confused (1)**
63:11,13
**connected (2)**
105:3;106:18
**connecting (1)**
82:25
**connection (4)**
129:7,10;148:22;
149:4
**consensus (2)**
89:22,25
**considered (2)**
29:6;84:17
**considering (1)**
21:7
**consistently (2)**
60:5;121:10
**consisting (1)**
13:20
**constant (2)**
51:20;122:24
**construct (1)**
40:12
**constructability (6)**
119:7;124:9,11,18;
125:10,16
**constructed (3)**
53:8;63:21;75:25
**construction (62)**
9:25;17:9;20:15,19,
23;35:14,14;36:1;
40:16,22;41:9,14;
42:6;62:21;63:17,19,
20;64:4;65:12;66:8;
67:8,25,25;68:2;74:6;
76:20,25;77:1,2,7,8;
78:23;79:6;91:16;
92:4,11;94:20;96:15;

Jennifer Rennington and Josh Pennington vs.
Memorial Hospital of South Bend, Inc.

USDC IN/ND case 3:20-cv-00075-MGG    document 42-4    filed 03/28/22    page 156 of 171

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

97:14;99:11;103:12,
18;106:8;119:3,20,
22;120:1,24;121:5,6,
11,19;124:12,15;
125:13;128:7,14;
130:12;131:6;133:22;
135:15;136:1
**construction's (1)**
75:16
**consultant (7)**
10:13;34:5;36:21;
37:23;103:15,22;
104:9
**consultants (20)**
10:1,10;70:6,7;
92:18;97:2,6,9,23,23;
98:3,10;103:4,10,23;
109:3;110:3,6,7;
111:6
**consulting (1)**
27:16
**contact (1)**
105:25
**contacted (3)**
18:2;19:1;81:17
**context (1)**
103:5
**continue (2)**
50:12;135:10
**CONTINUED (2)**
3:1,24
**continues (1)**
99:17
**continuing (2)**
52:20;134:22
**continuous (1)**
82:14
**contract (17)**
21:1,17;32:1;41:22;
42:6;73:14;74:5;
95:25;96:3,6;97:25;
98:10;106:20,25;
107:7,12;135:20
**contracted (2)**
21:25;62:20
**contracting (1)**
9:21
**contractor (7)**
40:8;70:25;105:18;
130:14;131:8,9;
146:20
**contractors (2)**
9:20;103:4
**contracts (3)**
9:23,23;63:8
**control (2)**
17:3;99:22
**controls (1)**
34:25
**convening (1)**
81:21
**conversation (11)**
8:2,8;22:13;24:15,

22;81:24;83:12,15;
85:1,2;147:19
**conversations (4)**
22:7,15;24:8;25:2
**convey (1)**
127:9
**Conyers (2)**
29:1,1
**coordinate (2)**
80:21;100:14
**coordination (2)**
99:25;122:3
**copies (1)**
107:20
**copy (1)**
73:19
**copying (1)**
120:16
**corner (4)**
25:18;115:20;
119:9;124:24
**corners (2)**
119:9;124:22
**Corp (4)**
16:4;17:17;98:13;
137:7
**corporate (1)**
16:25
**Corporation (54)**
3:5,21;9:9,15,19;
12:19,22;13:5;15:6,
22;16:14,17;20:15;
22:3;36:20;39:22;
40:18;41:4,15;62:20;
72:23;73:17;74:13;
83:9;84:2;90:21;92:8,
20;93:5;96:12,17,18;
97:10,16;98:1,14;
103:6,12,16,21;104:8;
106:20;108:7,13,14;
109:16;111:10;112:8;
114:12;124:20;
136:23;143:20;145:8;
146:3
**Corporation's (1)**
140:7
**correctly (3)**
63:3;106:5;149:5
**correspondence (1)**
106:22
**corridor (1)**
88:11
**corridors (1)**
99:22
**cost (9)**
17:3;18:9;64:16;
65:25;67:19,21;
68:22;103:11,19
**Costello (1)**
18:19
**costs (2)**
65:14;119:9
**counsel (5)**

13:24;102:17;
117:23;147:5;148:25
**counseling (1)**
29:4
**counters (1)**
99:23
**country (1)**
59:17
**couple (6)**
15:9;71:23;94:1;
134:22;138:20;147:2
**court (7)**
7:20;25:22;90:9;
112:25;115:5;130:4;
149:12
**cousins (1)**
17:8
**cover (3)**
35:17,19;73:4
**coverage (1)**
148:25
**covered (3)**
7:15;60:16;61:12
**CRANDELL (2)**
148:20;149:9
**create (3)**
64:9,10;91:22
**created (1)**
57:7
**creating (1)**
65:10
**cross (1)**
44:3
**CROSS-EXAMINATION (4)**
94:2;95:18;135:11;
136:18
csmith@schultzpoguelawcom (1)
3:4
**curbing (1)**
67:15
**current (2)**
48:16;51:9
**cursory (1)**
13:6
**customer (3)**
56:11;57:20;62:16
**customers (1)**
57:20

---

# D

**Dan (9)**
7:10;24:15;29:9;
30:22;52:1;87:5;
130:6;135:13;144:16
**Daniel (2)**
135:8;136:5
**date (8)**
46:22;107:15;
108:20;121:9;142:12,
16,17;149:4
**dated (3)**
108:16;116:4;118:4

**dates (4)**
76:4;77:17;78:7,8
**Davis (1)**
118:16
**day (6)**
50:21;78:9,16;
110:19;126:9;146:14
**days (2)**
54:18;118:10
**deal (2)**
27:20;133:23
**deals (3)**
34:11;53:18,20
**dealt (3)**
21:10,15;47:12
**December (1)**
142:17
**decide (4)**
64:2,4;80:1;100:18
**decided (5)**
17:23;44:7;50:24;
51:8;95:4
**deciding (1)**
106:11
**decision (9)**
15:16;16:20;18:14,
15;23:13;70:11;
125:16,17;126:10
**decisions (1)**
63:23
**deck (2)**
117:9;122:8
**declaratory (1)**
148:23
**dedicated (1)**
51:3
**deep (2)**
104:19;106:11
**deeper (2)**
33:13,14
**defendant (1)**
16:8
**deferred (4)**
22:25;42:2,13;
107:14
**define (4)**
63:9;67:16;99:13;
100:5
**defined (1)**
66:11
**definitely (1)**
122:25
**delay (1)**
80:22
**deliver (2)**
9:24;70:5
**delivered (1)**
143:8
**delivery (10)**
35:1;39:23,25;40:4,
14;97:17;106:4,5;
107:9;109:10
**Department (2)**

53:25;80:8
**depending (1)**
30:7
**depict (1)**
124:3
**depicts (1)**
119:1
**deposition (18)**
7:13;11:23,25;
13:13,16;69:13;
71:25;72:1;73:8;
95:23;106:2;107:21;
115:12;119:13;135:6;
142:5,7;149:14
**deprived (1)**
134:24
**depths (1)**
117:8
**describe (2)**
113:25;124:10
**described (7)**
96:14;101:23;
106:1,2;123:24,25;
124:1
**describes (1)**
112:7
**Design (153)**
10:18,19;11:17;
15:13,17;16:21;
17:13,19,22;18:10,14;
21:6,15,22,24;22:2,6,
15;23:14,16,23;24:8;
25:3;30:13,19,20;
31:4;37:13,16,17;
38:3,17;40:15;43:10,
22,22;51:23;59:19;
61:3;62:9;63:14,15,
17;64:2,9;65:21;68:6;
69:6;71:4,6;72:23,25;
74:8;75:24;76:2,22;
81:22,25;82:18;84:5;
91:11,13;92:1,3,7,20;
93:5;94:9,16,23;
95:11,14,21,25;96:19;
97:9,13;98:3,5,7,8,23,
24;99:17,17,18;100:2,
6,11,24;101:12,13,18,
19,20,22,24;102:9,20,
20;103:23;104:3,6,9,
10,14,15,22;105:14,
16,17,20;106:8,10;
109:7,13,22,22,23,23;
110:13;111:4,18,24;
113:2,12,12,20,22;
114:1,13;115:18,20;
118:13;123:22;
125:21;126:2;128:16,
23;131:17,19;132:14,
20;133:10;134:2;
136:2,11,14,15;137:7,
21;138:7,10;147:6
**Design/Builder (2)**
73:16;137:2

Daniel Flanagan 30-day-Permit MCG    document 3(B)(6) of Re: 2.3/26/20g Corp through Phillip Panzica
USDC IN/ND case 3:20-cv-00075-MCG    document 3023/20 filed 03/26/20 page 5 of 10
Memorial Hospital of South Bend, Inc.    October 17, 2019

**design-build (6)**
9:20,21;10:3;15:11;
67:9;111:4
**design-builder (9)**
10:14;18:12;72:7,
21;89:13;96:13;
103:3,7;139:11
**design-builders (1)**
16:25
**designed (10)**
61:15;89:14;90:22;
94:18;100:23;101:22;
102:9;110:6;114:6;
137:21
**designer (6)**
74:9;104:17;105:6;
107:12;118:13;
137:17
**designers (2)**
138:8;146:21
**designing (3)**
51:23;101:4;105:22
**designs (1)**
10:4
**desk (1)**
142:19
**detail (4)**
52:16;105:4;
117:12;131:24
**detailed (2)**
101:19;105:2
**detailing (1)**
114:9
**details (10)**
39:9;45:24;91:1,21,
22;114:16;117:9;
126:21;127:21;
135:21
**determine (1)**
70:20
**Determined (1)**
104:3
**develop (2)**
45:22;99:18
**developed (2)**
46:23;147:12
**developing (2)**
65:7;114:7
**development (20)**
17:22;43:10,22;
63:16,16;65:21;68:6;
69:6;76:2,23;94:9,16,
23;95:12;101:18;
105:14,16,17,20;
109:7
**develops (1)**
129:1
**diagram (2)**
64:10,24
**diagrams (2)**
40:11;60:23
**dial (1)**
54:11

**dialogue (1)**
30:12
**Dice (1)**
69:20
**died (1)**
42:3
**difference (1)**
32:8
**different (17)**
32:18;51:24;55:13;
59:21;64:6;69:1;
70:15;71:4,5,6;85:1;
86:14;105:18;112:2;
125:1;133:12;145:20
**differently (4)**
85:13,16;86:21;
87:3
**difficult (3)**
8:11;13:10;145:17
**difficulty (1)**
58:1
**digital (1)**
43:19
**dimension (3)**
114:7,8;133:21
**Dimensions (3)**
114:5,13,17
**DIRECT (2)**
7:5;22:12
**directed (2)**
82:4;111:9
**direction (4)**
22:10;32:25;92:17;
125:22
**directives (2)**
117:2;137:19
**directly (12)**
30:22;31:2;58:16;
78:10;97:10,25;98:7;
99:14;106:20,22;
125:8;132:2
**director (1)**
29:9
**directs (1)**
47:15
**discovery (4)**
102:2,14;108:6;
115:18
**discussed (4)**
57:3;61:23;140:3;
149:1
**discusses (1)**
108:17
**discussing (1)**
30:15
**discussion (43)**
22:16;23:5;27:20;
29:10;30:18,19;
31:23;32:1;43:4;46:6;
50:14;52:20;53:11;
55:10,19,24;56:1;
61:2,18;70:22,24;
82:1,9,18,23;83:2,5,

14;84:2,15;85:4,18;
86:8;94:10;109:25;
111:19,22;112:19;
117:13;124:21;128:8;
147:17,20
**discussions (15)**
22:23,25;31:25;
49:9;62:2;83:22;
104:6;105:21,24;
109:4,19;117:7,11;
123:2;148:2
**displaced (1)**
122:21
**displacing (1)**
122:18
**distinct (1)**
63:9
**distinction (1)**
31:22
**distributed (1)**
105:17
**dividers (2)**
127:1,9
**diving (1)**
57:17
**division (1)**
128:18
**divisions (1)**
63:22
**doc (2)**
67:25;116:18
**docs (1)**
121:20
**doctor (4)**
53:18;54:4,4;84:24
**document (21)**
12:5,8;13:7;33:3;
71:24;72:5,19;74:25;
75:1,2;76:25;77:2;
78:2;95:12;97:14;
108:6;109:15;115:17;
116:23;120:11;
129:21
**documents (47)**
12:13;13:6,8,11,25,
25;14:16;15:3;31:11;
32:24;33:7,16;34:7;
36:17;62:7;63:18,19,
24;64:4;66:8;67:8,10;
74:19;76:20;101:18;
102:11,15,18;105:17;
113:18;116:19,20;
119:3,21;120:1,24;
121:6,6,11,19;127:25;
128:4,15,17;131:21;
132:13;135:20
**done (33)**
18:5,5,6;19:8,8;
24:19,19,20;27:15;
39:12,21;42:12;45:2;
54:22;61:9;70:24;
85:16;86:20;87:3,20;
88:20;91:9;107:8,25;

110:5,20;111:5;
114:12;132:7;133:6;
135:24;139:4;149:11
**door (4)**
34:25;39:9;65:22;
99:24
**doors (3)**
65:8;78:18;122:12
**DO's (3)**
34:6;36:23;69:24
**dot (1)**
46:2
**Douglas (1)**
29:15
**down (24)**
7:21,24;46:1;49:3;
51:18;56:6,16,22;
57:6,10,13,14,19,24,
24,25;67:20;88:11;
98:18;104:2;105:10,
13;108:19;117:11
**Dr (8)**
28:7,9;81:13;85:10;
86:2,9;89:1,10
**draftsman (1)**
32:10
**draftsmen (1)**
32:3
**drainage (1)**
33:19
**drawing (5)**
43:11,21;45:19;
70:1;122:6
**drawings (53)**
32:23;34:1,2,3,8,11,
16,23;35:4,9;36:6,12,
18;38:2,16,20;39:8,
15;61:23;68:21;
125:20,23;126:16,18;
128:23,25;129:3;
130:13;131:4,6,8,9,
10,14,18,19;132:6,7,
15,16,19,22;133:4,6,
15,17,19,19,24;134:6,
8;137:24;147:6
**Drive (1)**
3:13
**driving (1)**
30:7
**drug (1)**
84:25
**duct (3)**
65:25;67:4,5
**duly (1)**
7:3
**dumps (1)**
129:9
**during (4)**
30:2;74:14;76:13;
94:8
**duties (1)**
96:25

110:5,20;111:5;
114:12;132:7;133:6;
135:24;139:4;149:11

**E**

**earlier (6)**
18:3;24:14;30:12;
45:23;88:8;128:5
**early (3)**
43:10,21,22;46:5;
106:1;108:22
**easier (3)**
50:6;124:15,16
**easily (1)**
8:4
**east (1)**
99:19
**edge (1)**
49:19
**edit (1)**
69:22
**editing (1)**
62:6
**edition (2)**
72:5,19
**edits (2)**
61:22;62:7
**Edwards (1)**
29:15
**effect (1)**
23:15
**eight (2)**
54:17,22
**either (6)**
62:19;92:7;98:13;
117:3;124:19;126:4
**Electric (2)**
35:1;100:1
**electrical (13)**
34:24;35:2;39:17;
40:5,8,11;80:7;
100:22,23;104:13;
110:13;129:3,4
**electrician (1)**
66:22
**element (2)**
29:7;53:20
**elements (6)**
23:11;27:18;47:8;
87:10;96:16;114:4
**elevation (1)**
54:11
**elevations (5)**
39:9;65:10,22;
99:19,21
**elicit (1)**
16:21
**else (7)**
62:18;91:8;113:23;
144:6;145:4,22;
148:19
**e-mail (17)**
108:8,9,16;109:11;
113:8;115:21,23,25;
116:11,12;118:11;

120:22;142:10,17;
143:13,19;146:5
**e-mails (1)**
69:4
**Emergency (2)**
53:25;55:7
**Emily (1)**
118:12
**employed (2)**
9:6,14
**employment (1)**
9:16
**enclose (2)**
116:8,25
**encompassing (1)**
9:25
**encourage (1)**
143:18
**encouraging (1)**
143:14
**end (26)**
48:10;58:9;61:13;
63:23;65:21;67:7;
82:15,15,24,25;84:8;
92:10,22;93:7;96:6;
108:11;113:2;122:7,
10;126:9;127:14;
141:8,9,14,17;143:10
**end-all (1)**
61:10
**ended (2)**
45:20;50:18
**ends (8)**
82:16,17;83:6;
89:14;92:9,21;
139:13;140:8
**engage (1)**
107:10
**engaged (4)**
10:21;21:17;72:25;
91:17
**engender (1)**
144:25
**Engendering (1)**
144:11
**engineer (31)**
34:5,6,8,13,19;35:2,
10,18,19;36:20,23;
37:22,25;38:17;
39:14,20;40:5;80:8;
91:3;97:11,19;
100:18,22;105:6,8;
106:14;110:18;
111:17;113:9,9;
121:22
**engineered (2)**
101:1,2
**engineering (33)**
10:1;33:19;34:20;
36:18,19;39:21;40:5,
21;42:3,4,12,14;
63:18;66:15;97:13,
16;100:15,16;101:7,

9;104:13,14,15,16,22;
106:10,21,25;107:11;
109:20;110:15;
111:21;124:15
**engineers (4)**
60:14;97:12;107:5;
111:20
**engineer's (5)**
37:25;38:6,16;
66:14,16
**enjoyed (1)**
54:23
**enough (14)**
7:18;8:14;12:15;
14:3,4;24:22;25:9;
26:1;31:4;32:5;50:7;
66:3;86:11;107:20
**enter (4)**
9:23;59:21;80:12;
104:20
**entered (2)**
76:19;136:24
**entering (2)**
31:25;76:25
**entire (7)**
82:19;83:11,17;
84:3;93:6;96:13;
146:12
**entities (6)**
16:7;41:6,13;91:10;
96:20,25
**entity (3)**
21:2;41:18,19
**entry (21)**
52:17,18;55:3;
56:14,14;57:21;
59:20;60:17,24;61:2,
14,20;62:10;70:21;
71:3;74:15;75:24;
81:9;95:3;114:22;
117:9
**environmental (1)**
66:18
**equipment (8)**
54:15;94:19;105:3;
106:15,18;110:25;
117:10;129:5
**error (1)**
120:16
**essentials (3)**
47:24;48:2,8
**establish (1)**
137:10
**established (3)**
76:1;95:15;130:19
**esthetic (2)**
131:25;132:1
**estimate (4)**
64:16,17;65:13,25
**estimating (5)**
18:10;65:18;
103:11,20;104:11
**et (10)**

24:18;33:20;34:18;
66:6,25;91:9;97:2;
100:12;105:4;106:12
**even (3)**
48:4;53:24;80:13
**event (6)**
79:15;81:17;82:2,7;
140:2,20
**events (1)**
81:6
**everybody (5)**
55:21;57:4,22,25;
87:13
**everybody's (1)**
67:2
**everyday (2)**
8:2,8
**everyone (3)**
11:13;107:20;126:8
**evidence (1)**
90:12,13
**evolved (1)**
48:15
**evolves (1)**
43:16
**evolving (2)**
48:14;62:9
**exact (2)**
60:21;114:7
**exactly (1)**
52:1;122:13
**EXAMINATION (2)**
7:5;139:9
**examined (1)**
7:3
**example (3)**
38:15;103:15;
114:21
**examples (1)**
25:7
**exception (1)**
135:8
**excess (1)**
122:20
**Excuse (4)**
87:13;92:9;95:7;
141:7
**excused (1)**
149:15
**execute (1)**
110:16
**executed (1)**
72:22
**exer (1)**
54:9
**exercise (1)**
49:19
**exercises (3)**
49:14,16,21
**exercising (1)**
55:22
**Exhibit (85)**
11:23;12:3,15,23;

13:4,19,22,22;14:2;
15:7;25:12;31:9,10;
42:20;43:7;71:24;
72:4,18,19;73:10,13;
74:5,22,23;75:2,3,5,6;
76:17;77:13;95:24;
96:9;98:17;102:23;
107:19,21;108:4;
109:17;112:7;115:12,
16;117:24;118:3,7,
24;119:1,13,19,25;
120:4;122:6,9;
123:10,19,20,21;
124:3;125:1,1,2,6,6;
126:16,16,21,22;
127:2,2,4,5,6,10,11,
13,18,19,22,23;
129:18;130:2;136:24;
142:5,9,22,25
**Exhibits (4)**
13:13;14:6,20;15:2
**exist (2)**
91:15;127:23
**existed (1)**
101:14
**exit (1)**
104:20
**ex-number (1)**
51:20
**expect (3)**
90:25;91:4;132:15
**expected (2)**
91:19;137:20
**expedite (5)**
134:1;143:9;
144:25;145:1,2
**expended (1)**
107:15
**experience (26)**
10:22;11:2,4,8,19;
15:12;17:2,14;18:4,
11;19:5,7;24:3,7,11,
16;25:3,6;34:21;
70:20;90:22,24,25;
91:5;130:17;131:3
**experienced (1)**
10:23
**expert (2)**
139:16;142:4
**expertise (3)**
91:18;122:5,25
**explained (1)**
145:15
**explaining (3)**
24:15;144:4;145:20
**explanation (1)**
110:4
**expose (1)**
146:2
**exposes (3)**
143:6,23;144:21
**extended (2)**
123:23,24

**extent (5)**
25:1;86:23;89:3;
120:4,11
**exterior (5)**
65:10,16;99:19
**extra (1)**
73:19
**extremely (1)**
13:8

**F**

**face (1)**
82:13
**facilities (5)**
26:22;27:19;34:22;
44:3;64:19
**facility (11)**
19:4;21:8;51:9,10;
55:13;58:14,17;78:4;
80:12;94:8;95:5
**fact (5)**
18:17;22:17;77:12;
104:7;115:25
**facts (1)**
90:11
**failed (1)**
36:16
**Fair (21)**
7:18,19;8:14;9:4;
12:15;14:2,4;16:15;
26:1;31:4;32:4;50:7;
75:13;80:16;86:11;
95:12;96:10,21;
120:20;121:2;132:20
**fall (1)**
56:10
**familiar (1)**
96:8
**family (1)**
9:17
**far (6)**
53:24;69:13;75:18;
80:10;95:23;112:6
**fashion (1)**
137:18
**fat (1)**
52:3
**February (3)**
74:25;77:4
**federal (1)**
84:14
**fees (3)**
18:20,21,23
**feet (5)**
45:25;51:21;65:16,
17,17
**felt (4)**
17:2,5;19:9;51:10
**fenestration (1)**
65:9
**ferreting (1)**
23:10

Jennifer Pennington and Josh Pennington as GG
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

few (1)
135:15
field (6)
78:15;79:6;110:17,
24;118:17,18
fighting (1)
87:17
figure (1)
110:25
figured (1)
44:23
figuring (1)
66:23
file (1)
101:21
filed (2)
35:9;89:8
fill (1)
121:13
filled (1)
35:12
filtration (4)
105:1;106:15;
110:10;129:12
final (19)
48:21;59:19;61:3;
62:10;67:19;75:23;
79:23;91:3;95:11;
97:13;101:2;114:17;
119:2;120:25;121:4,
19,20;123:22;132:3
finalize (2)
147:14,15
Finally (1)
8:21
financier (1)
66:4
find (2)
86:18;111:14
fine (4)
70:10;111:7;
114:19;120:18
fingers (1)
84:11
finish (5)
8:12;39:10;99:24;
117:10;128:19
finished (1)
144:16
finishes (3)
117:9;131:22;132:3
fire (1)
80:7
firm (20)
10:22;17:1;35:5,6;
40:7;43:13;45:23;
68:17,19;69:24;
90:23;91:2;97:15;
101:6;111:3;131:20;
132:2;133:10;143:5;
147:12
firms (8)
20:25;41:17;68:16;

91:17;94:21;109:5,5,
21
first (17)
7:3,14;12:5;21:25;
24:24;26:11;49:10;
69:8;75:1;81:13;87:4,
5;98:22;103:11;
119:24;121:21;131:8
fit (1)
55:16
fitness (26)
11:4,5;18:1,4,6,12;
19:3,8;23:3,12;24:17,
20;27:9,21;29:11;
46:2;47:7,8;53:12,17;
54:7,14,23;78:4;92:5;
98:25
five (3)
118:10;121:7,7
fix (1)
110:9
fixed (2)
110:5;145:23
fixture (1)
101:2
flags (7)
127:15;147:8,10,
16;148:3,3,14
flange (2)
37:20;38:11
flipped (1)
15:1
floor (14)
39:9;56:10;64:11;
65:8,18,22;88:12,13,
15,16;99:19;117:9;
122:14;128:19
flows (1)
122:23
flush (1)
120:18
focus (4)
45:14;81:5;83:14,
21
focusing (2)
61:25;110:19
followed (4)
75:3;78:8;92:23;
93:8
following (4)
73:5;80:21;94:13;
103:3
follows (1)
7:4
Followup (1)
88:6
follow-up (4)
84:16;88:18;
110:24;134:23
foot (5)
33:24;38:10;64:22;
98:25;99:1
foresee (1)

146:22
Form (29)
15:19;35:12;62:24;
72:6,20;73:14;76:18;
79:12;89:16,19;
92:13,25;93:10;95:8;
96:23;98:12;114:25;
123:25;124:8;137:1,
18;139:16;140:21;
144:3,13,24;145:11;
146:9,11
formation (1)
135:18
forth (19)
12:23;14:2;15:7;
30:5;36:4;42:12;
53:19;60:7;66:13;
71:7;101:6;110:11;
112:3;114:9;128:20;
129:6;132:4;133:25;
147:16
forward (1)
19:17
foun (1)
113:11
found (1)
68:19
foundation (9)
65:17;89:19;
104:23;111:24;114:3;
123:3;140:22;146:7,9
foundations (5)
67:13;68:23;101:4;
123:5,7
four (15)
51:8,9;54:18;63:9,
11,22;69:10;71:18;
75:22;76:12,14;
113:17;115:23;
119:25;121:7
four-lane (4)
51:10,12,18;53:2
fourth (2)
63:20;121:7
frame (6)
34:9;38:17;66:15;
99:25;108:25;124:14
framing (1)
38:3
free (10)
65:14;82:17;83:6;
89:14;92:8,9,21;
139:12;140:8;141:18
front (6)
33:4;48:19;95:24;
108:8,11;136:25
front-end (1)
107:11
Frost (3)
97:12,15;111:21
full (2)
82:12;119:20
fully (2)

113:21;133:8
function (9)
47:13;62:3,4;
104:13,14,15,16;
105:8;110:10
functional (1)
47:2
functions (3)
47:14,15;50:8
further (9)
46:18;75:11;114:6;
121:8;126:21;129:1;
134:16;136:16;
141:13
future (6)
25:24;85:7;87:11;
140:5;141:3;149:3

## G

gaining (1)
124:23
Gardner (2)
3:18;149:6
gas (1)
84:10
gave (2)
117:6;137:25
general (31)
14:17;22:7;26:21;
27:15;28:2;29:17;
46:6;52:7,12;53:14,
24;61:5,11;76:6;
78:12;83:15;84:15;
95:13;100:6,9,25;
117:7,12;118:18;
119:4,10;124:21;
126:12;128:5;131:8,9
generally (10)
32:12;49:2;59:25;
76:11;79:10,21;
120:24;121:12;128:8;
133:12
gentleman (1)
24:24
gentlemen (1)
19:3
gently (1)
56:23
gets (1)
145:24
ginger (1)
56:25
gingerly (1)
55:15
given (4)
50:5;126:9;147:13;
148:4
gives (1)
61:11
giving (3)
79:25;98:8;148:11
glad (1)

143:2
glass (1)
65:16
goes (6)
33:12;53:24;56:16;
61:22;82:14;109:16
gonna (44)
12:2;22:4;25:11,25;
37:18;43:23;44:1,15;
46:7;49:4;54:13,15;
56:9,10,57:16;61:18,
19;64:3;65:1;66:12,
13,23,24;67:12;76:3;
84:14;86:22;93:17,
18,24;96:22;102:17;
104:20;107:24;
133:23;134:18;135:1;
139:15;141:21;142:9;
145:10,12;148:20;
149:1
good (11)
13:11;24:22;25:9;
35:24;56:6,6;67:23;
68:13;70:4;95:20;
130:24
grade (1)
56:15
grand (1)
80:25
gray (1)
148:9
grease (1)
56:20
great (1)
27:20
greatly (1)
143:10
green (1)
43:23
ground (1)
7:16
grounding (1)
129:5
group (7)
47:3,12;98:23;99:5,
7,11;128:25
groups (4)
49:12;97:23;99:13;
101:8
guess (3)
37:5;71:23;125:9
guide (1)
32:24
guideline (1)
61:11
Guidelines (3)
52:1;61:8;137:19
guise (1)
42:7
gutter (3)
106:17;114:8;
147:15
guttered (1)

USDC IN/ND case 3:20-cv-00075-MGG   document 30-3 (6) filed 03/26/21 page 160 of 171
Daniel Hennessy and Orah Dunning MGG   document 342(6) of Feed 23/Building Coag #1060 Phill Panzica
Memorial Hospital of South Bend, Inc.   October 17, 2019

122:16
gutters (1)
117:8
guys (1)
134:17
gym (2)
27:22;54:18

**H**

half (1)
30:7
hand (2)
37:24;130:1
handed (3)
115:15;119:18;
123:19
handicap (1)
56:15
handle (2)
32:5;111:23
handled (5)
59:21;84:16;85:12;
91:21;143:2
handles (2)
121:16;122:20
handling (1)
19:11
handrail (1)
57:1
handwriting (1)
118:21
Hang (3)
112:14,14;127:15
happen (7)
44:4;82:7;83:24;
85:6;87:10;133:12;
145:4
happened (1)
55:17
happening (3)
82:5;83:21;85:22
happens (1)
42:2
Haut (1)
28:12
head (28)
7:24;22:5;29:22;
59:12;81:12;84:18,
19,20;85:3,10,14,20;
86:2,6,8,16,20;87:22;
88:1,22;89:2,11;
141:5;144:5,6;
145:21,23;146:1
header (1)
47:6
heading (2)
77:1,2
heads (3)
28:13;71:10;129:12
health (23)
19:15;21:3,8;23:20;
26:16;27:2,10;29:11;

53:13;54:6;73:2,3,5;
74:2,6;75:19;78:3;
92:4;94:8;98:25;
116:5;132:2;137:4
healthy (1)
27:9
hear (3)
25:16;142:22;143:2
heard (1)
15:20
hearing (1)
86:1
heavily (1)
110:14
heed (1)
54:19
held (4)
9:12;96:19;98:9;
112:19
help (14)
8:5;20:14;26:5;
27:6;30:11;32:8;43:6;
53:5,21;54:19,21;
110:1;129:23;143:9
helps (2)
24:7;49:16
Here's (14)
25:7;64:23,24,25;
65:24,24;66:5;67:19,
19,20,20;79:3;94:18,
18
Hey (3)
67:3;69:20;88:10
high (1)
50:17
higher (1)
91:20
hips (1)
49:17
hire (6)
70:11;96:25;97:10;
104:8;107:5;110:2
hired (16)
10:14,16;17:20;
36:21;39:22;40:21,
23,24;69:16;97:6,12,
18,19;98:5;103:16;
107:12
hiring (5)
10:1,19;41:19;
103:23,24
hit (8)
13:8;84:18,19,20;
144:6;145:3,4,21
hitting (2)
141:4,14
hoist (1)
56:1
hold (4)
57:1,6;76:3;127:4
holding (2)
104:23;133:17
hone (1)

36:7
honing (1)
22:13
Hopefully (1)
29:24
horizontal (1)
122:13
hospital (13)
17:23;19:8;23:1;
26:21;27:12,16;28:2;
29:17;44:7;52:7,13;
76:6;84:23
hospital-based (2)
27:2,21
hospitals (2)
27:4;59:16
hour (2)
93:23;104:25
hours (1)
30:7
house (3)
75:15,18;133:11
housekeeping (1)
71:23
Hromada (1)
34:20
hub (1)
56:21
Huh (1)
19:22
huh-uh (1)
8:3
hundreds (1)
91:6
hung (2)
63:10,13
hurry (1)
143:14
hurt (6)
84:21;85:4,22;
144:7;145:23,24
HVAC (1)
34:17

**I**

idea (1)
61:6
ideas (2)
43:14;64:1
identification (7)
11:24;12:3;13:14;
107:22;115:13;
119:14;142:6
identified (3)
41:7;68:16;97:24
identify (4)
72:3;118:5;119:25;
120:23
identifying (3)
35:13;47:2;103:22
idiosyncrasies (1)
24:6

II (10)
20:16,19;40:25;
41:3,7,12,17;62:19;
135:14;136:10
Illinois (1)
3:14
Imagine (2)
43:12;64:11
impact (1)
23:15
impacting (2)
123:6,7
impacts (1)
50:23
importance (1)
17:3
imposed (1)
38:2
improve (2)
27:10;124:12
inaccurate (1)
113:5
Inc (1)
15:17
incidence (1)
146:23
include (9)
23:6,14,22;34:24;
36:16;79:7;113:14;
132:10,20
included (18)
22:17;23:12;29:25;
42:21;52:9,14;60:7;
62:10;81:20,21;
83:11,18;84:4;92:11;
113:19;114:21;119:3;
136:8
includes (1)
73:7
including (2)
23:16;117:8
incorporating (1)
30:13
incorrect (2)
37:9,9
increments (1)
38:11
in-depth (1)
11:6
index (1)
120:5
Indiana (9)
3:3,9;10:18;32:15;
33:8;34:21;111:21;
130:20;131:3
Indianapolis (1)
68:20
indicate (2)
88:25;113:14
indicates (1)
133:5
indicating (1)
132:7

individual (1)
123:8
individually (1)
99:10
individuals (2)
29:14,16
industry (3)
59:23;64:18;148:17
infancy (1)
45:6
infant (1)
45:19
information (9)
66:3;86:14;88:25;
116:20,21;128:21;
130:10;137:23;
147:13
initial (16)
7:8;17:22;22:15,20;
26:16,18;27:15;43:3;
49:9;51:13;65:10;
68:21;76:17;94:10;
116:8,25
Initially (4)
16:24;21:7;58:5;
114:6
injured (5)
54:3;87:4;141:4;
145:5;146:21
injuries (2)
53:18;140:5
injury (5)
54:8;81:14;85:13;
86:15,19;87:22;88:2,
4,21,25;89:10;143:7,
23
inner (1)
119:9
input (5)
116:8,15,25;117:4;
123:1
inside (3)
82:13;124:22,24
Insomuch (1)
149:6
inspector (1)
80:6
inspectors (1)
80:7
install (1)
106:16
installed (1)
143:8
instance (1)
122:4
instead (3)
40:4;53:2;57:13
instructor (1)
49:18
integrated (9)
35:1;39:22,25;40:3,
14;67:1;97:17;106:3;
109:10

Jennifer Remington and Josh Pennington CG vs.
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

**intended (2)**
10:5;100:5
**interest (1)**
93:15
**interested (2)**
18:23;69:3
**interior (4)**
67:13,14;99:21;
118:13
**internally (1)**
10:20
**interrupt (1)**
49:22
**Interruption (1)**
112:10
**interview (3)**
16:24;18:17,18
**interviews (1)**
17:20
**into (49)**
9:23;21:17;23:12;
30:14;31:24;32:1;
46:13;55:2,4,13;56:4,
10,12,16,23,24;57:2,
5,12,15,17,21;58:1;
59:22;60:13,18,24;
62:9;63:9;67:24,25;
70:16;71:17;76:19,
25;77:2;80:12;102:1;
105:10;109:6;117:11;
122:23;125:17;129:9;
136:24;137:24;140:3;
146:15,17
**introduction (1)**
69:8
**investigation (1)**
70:19
**invited (2)**
17:2;23:21
**involved (14)**
18:1;19:2,3;23:2;
63:6;64:8;69:14;
71:19;94:14;96:2;
106:10;131:5;133:14;
135:18
**involvement (1)**
94:7
**involving (2)**
21:8;85:9
**issue (15)**
24:5;53:12;83:13;
84:8;87:7,25;100:22;
124:4,9,11,18;125:3,
10,17;133:22
**issued (5)**
41:2,10,21;42:5;
107:4
**issues (8)**
22:23;57:17;91:15;
92:3;123:5;126:24;
131:25;132:1
**item (2)**
78:3;84:9

**items (6)**
80:15;84:16;
104:11;113:16;122:3;
133:16

**J**

**January (3)**
74:18,21;76:22
**Jeff (13)**
21:10,11;25:5,7;
30:13;31:15,19;33:9;
62:11;69:20;118:12,
19;128:15
**Jeffrey (2)**
21:9,11
**job (4)**
7:21;8:11;38:16;
124:16
**jobs (2)**
48:10;133:12
**Johan (1)**
28:17
**John (1)**
35:2
**Johnson (1)**
3:8
**join (16)**
54:24;63:1;89:20,
23;90:14,15,16;
92:14;93:1,11;
132:25;140:24,25;
141:1;144:14;146:10
**joined (1)**
41:17
**Joint (15)**
20:16,20,25;40:24;
41:3,7,10,12;53:22;
98:14;135:14,19,19;
136:10;149:7
**judgment (1)**
148:23
**July (3)**
116:4;118:4,8
**jump (1)**
122:17
**jumping (1)**
57:18
**junk (1)**
111:1
**JV (2)**
40:24;41:17

**K**

**keep (1)**
27:8
**KELLEY (33)**
89:20;90:15;92:14;
93:1,11;95:19,21;
97:5;98:16;102:7;
107:18,23;112:13,21;
113:1;114:10;115:2,

10,14;117:20,22;
118:2;119:12,16,17;
120:15,19;123:18;
130:11;133:3;134:13;
141:1;146:10
**Kentucky (1)**
64:20
**key (2)**
63:15,16
**keys (1)**
79:3
**killed (2)**
42:2;107:14
**kind (8)**
14:15;48:21,22;
65:3;105:1,13;
108:25;112:15
**knee (2)**
55:1;56:25
**knees (1)**
49:17
**knives (1)**
87:17
**knowing (1)**
25:7
**knowledge (6)**
18:8;44:8;45:15;
81:6;91:5,18
**known (3)**
24:9;25:8;88:3
**Kuitse (1)**
28:17

**L**

**labeled (1)**
121:11
**lack (3)**
11:19;84:8;146:6
**lacks (2)**
89:19;114:3
**ladder (1)**
57:15
**ladders (2)**
57:3;81:4
**laid (2)**
65:23;101:19
**landscape (1)**
97:18
**landscaping (1)**
33:20
**lane (21)**
51:9,19;52:2,3,6;
68:23;82:11,20;
83:17;84:4;127:1,5,6,
7,7,8,9,10;131:23;
141:7;147:22
**lanes (3)**
51:9;81:8;106:11
**lap (33)**
11:10,14;36:8,22;
40:19;44:12,18;
45:11,19;46:8;50:2,6,

8;61:3;62:9,17,18;
73:7;81:8;82:11,11,
19;83:10,16;84:3;
92:4;93:6;106:11;
114:22,23;141:7,8;
147:6
**LaPorte (1)**
3:9
**large (6)**
32:5,12;59:22;
116:12;122:8;129:10
**larger (1)**
60:3
**last (5)**
34:23;69:11;96:5;
112:24;115:4
**later (5)**
31:25;46:13;55:1;
75:4;118:10
**laundered (1)**
47:20
**laundry (1)**
47:20
**Lavalee (3)**
28:7,9,10
**law (2)**
43:18;45:23
**lawsuit (1)**
149:4
**lawyers (1)**
32:19
**lay (2)**
40:10;104:18
**layer (1)**
129:2
**layers (1)**
129:22
**laying (3)**
66:20,21;114:20
**layout (19)**
95:14;100:9,25;
101:13,22;102:10,20;
114:12;117:8;118:25;
119:2,4,10;120:25;
125:2,4,6,19;127:22
**Layouts (1)**
114:4
**Lead (1)**
31:19
**leader (3)**
26:21;32:12,21
**leads (1)**
11:1
**lean (1)**
110:13
**least (7)**
40:17;42:20;58:4;
68:16;77:8;79:22;
84:1
**leave (1)**
31:2
**left (4)**
7:25;122:11;138:6;

139:7
**Leighton (1)**
55:25
**length (6)**
82:12,19;83:11,17;
84:3;93:6
**less (3)**
75:12;133:14,14
**letterhead (1)**
109:16
**level (3)**
64:1;91:20;122:24
**liability (7)**
143:6,23;144:10,
21;145:8;146:3,13
**library (1)**
43:19
**license (1)**
128:22
**licensed (1)**
32:13
**life (1)**
7:11
**Lifestyle (1)**
73:6;74:2,7;75:20
**light (2)**
66:23;110:19
**lighting (4)**
40:10;100:24,25;
129:5
**likely (1)**
111:15
**likes (1)**
57:4
**line (21)**
43:12;52:5,6;65:23;
82:11,11,14,19,24;
83:10,16;84:3;92:21;
93:6;106:17;113:16;
127:6;129:8;141:8,
17;147:16
**lineal (1)**
65:17
**lined (2)**
49:20;67:18
**lines (8)**
66:22;68:24;127:5,
7,13;131:23;147:7,22
**lineup (1)**
105:3
**list (9)**
28:6;47:12;79:19;
80:15,18,24;103:9;
104:2;117:7
**listed (1)**
101:8
**listening (1)**
100:10
**lists (1)**
73:5
**literally (2)**
66:4;91:21
**literature (1)**

Jennifer Pennington and Josh Pennington vs.
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

60:24
**litigation (2)**
  36:9;61:8
**little (7)**
  29:22;33:12;44:23;
  56:8,24;57:11;71:9
**load (3)**
  49:14;66:18,19
**loads (3)**
  38:2;66:17,19
**loan (1)**
  66:5
**local (4)**
  36:2;50:17,19;
  68:10
**locate (1)**
  59:11
**locker (3)**
  11:6;24:5;99:22
**lockers (2)**
  24:5,18
**logo (1)**
  132:11
**long (5)**
  9:12,14;21:14;68:5;
  130:22
**longer (3)**
  79:2;133:15,15
**look (35)**
  13:18;14:4,6;26:9;
  38:1,2;43:23;44:9;
  48:21;51:22;54:8;
  58:15;64:18;65:11;
  70:3,8;73:10;74:19;
  76:16;77:12;82:4;
  83:19;84:13;96:5;
  98:18;104:2;106:13;
  107:10;108:15;
  117:15;122:5,6,10;
  124:3,23
**looked (7)**
  13:10;14:22,22;
  33:7;48:20;59:16;
  70:15
**looking (13)**
  25:20,25;45:9;46:1;
  78:11;91:7;118:24;
  123:9,20;127:25;
  128:4;133:18,19
**looks (5)**
  29:15;65:2,3;
  100:20;122:12
**lot (6)**
  48:24;65:19;110:5,
  6;117:12;122:18
**lots (1)**
  105:4
**lower (3)**
  25:17;46:3;122:11
**lowering (1)**
  56:5
**lowest (1)**
  67:17

**Loyd (5)**
  116:7;118:12,20;
  142:19;147:19
**lubricates (1)**
  56:21
**lumber (1)**
  57:24

## M

**MACK (14)**
  3:7;87:15;89:17,23;
  90:1,11;112:17;
  138:22;139:2,6,18;
  142:12,18;146:6
**magic (1)**
  15:20
**main (1)**
  99:22
**maintain (2)**
  40:13;122:24
**major (2)**
  11:7;84:18
**makes (4)**
  8:10;124:15,15,16
**making (2)**
  91:7;133:20
**man (1)**
  24:24
**management (1)**
  96:24
**manager (3)**
  96:15;118:18;
  142:20
**managing (1)**
  96:15
**mandated (3)**
  139:23;140:2,16
**manner (1)**
  36:13
**manufacturer (1)**
  143:4
**many (22)**
  11:3;21:16;24:23;
  25:8,8;38:11;41:24;
  54:12;59:21,23;60:7;
  62:7;65:13,16,16,17;
  91:5;104:24;106:11;
  107:8;133:11,16
**Mar (1)**
  97:12
**March (2)**
  108:16,21
**mark (3)**
  107:18;115:10;
  135:22
**marked (10)**
  11:23;12:2;13:14;
  25:14;107:21;115:12,
  16;119:13,19;142:5
**marker (2)**
  48:18;82:12
**markers (1)**

46:15
**market (2)**
  17:15;99:9
**Mart (1)**
  97:12
**Martell (4)**
  35:1,2;97:14;
  100:23
**Masini (1)**
  3:12
**material (1)**
  99:24
**materials (1)**
  79:20
**Matt (1)**
  29:15
**matter (1)**
  136:21
**matters (1)**
  71:23
**may (34)**
  8:22;14:4;24:17;
  29:7;31:12;33:4,4;
  34:3,4,6,24,24;37:19;
  38:5,13,14;42:25;
  43:4,5;46:22;51:24;
  65:11;75:8;79:15,15,
  17;83:24;112:2;
  114:12,17;120:21;
  124:19;140:18;145:4
**Maybe (8)**
  20:3;21:19;79:19;
  93:23;139:4;140:4;
  141:4;143:8
**Mayfield (1)**
  17:10
**mean (7)**
  8:3;10:4;40:2;
  87:13;124:10;144:22;
  145:9
**meaning (2)**
  23:18;38:8
**means (8)**
  7:24;9:22;40:3,4;
  78:24,25;82:4;141:2
**meant (3)**
  128:6;143:24;
  145:18
**measures (2)**
  140:23;145:13
**mechanical (16)**
  34:17,17,19;35:8,
  19;39:18;48:9,10;
  65:24;66:16;68:25;
  80:6;100:1,15;
  104:12;110:13
**Mechanicals (1)**
  65:23
**medical (4)**
  29:5;47:19;53:25;
  55:4
**medicine (6)**
  28:11;47:10;53:17;

54:4;55:2;99:1
**meet (4)**
  27:15;62:12;
  114:20;138:11
**meeting (36)**
  26:6,14,16,18,19,
  19;27:13,24;28:4;
  29:20,23;30:17;31:1,
  12,15;42:24;43:3;
  49:4;77:14,15,24;
  78:13,15,20;80:17;
  117:5,17;118:3,5,6,8,
  9,10,15,16,23
**meetings (13)**
  23:9;49:2,7;53:10;
  61:16,17;62:1;85:17;
  100:10;101:24;102:1;
  118:21;126:1
**meets (2)**
  36:4;80:9
**member-oriented (1)**
  56:11
**members (6)**
  51:4;52:24,25;
  57:20;77:17;78:5
**members' (1)**
  52:9
**membership (2)**
  50:23;54:16
**memory (2)**
  52:16;113:17
**mentioned (2)**
  15:9;55:6
**met (2)**
  7:11;97:3
**meter (1)**
  84:10
**mgardner@gardnerandranscom (1)**
  3:20
**middle (3)**
  7:8;100:19;108:24
**might (9)**
  52:2,2;61:10;64:15;
  78:16;87:10;91:15;
  97:21;124:20
**Mike (1)**
  142:19
**miles (1)**
  30:6
**Millies (1)**
  34:20
**mine (2)**
  7:11;88:19
**minor (1)**
  97:22
**minute (2)**
  13:18;105:13
**minutes (9)**
  15:9;42:24;69:12;
  77:14;117:17;118:4,
  6,21,23
**mischaracterize (1)**
  108:19

**Mishawaka (1)**
  111:21
**missed (2)**
  69:19;120:8
**missing (4)**
  60:15;63:3;120:9,
  12
**misunderstood (1)**
  8:4
**mitigate (8)**
  82:7;83:20;84:19;
  85:21;87:11,25;
  140:5;141:13
**mitigated (1)**
  144:8
**mitigating (2)**
  82:5;141:2
**mitigation (1)**
  140:19
**mobilities (1)**
  55:21
**mobility (1)**
  57:17
**model (4)**
  53:15;58:3,8;59:15
**modification (2)**
  75:16;124:25
**modifications (3)**
  75:8,12;112:1
**modifying (1)**
  62:12
**moment (2)**
  112:5;118:25
**money (2)**
  107:6;119:10
**month (1)**
  75:4
**mop (1)**
  88:16
**mopped (1)**
  88:15
**more (12)**
  44:23;64:12;75:18;
  85:14;86:15,19;88:4;
  89:1,10;117:12;
  125:14;141:5
**morning (3)**
  18:19;149:8,9
**most (6)**
  32:15;69:2,3;
  104:10;111:14;
  131:25
**move (10)**
  67:5,6;70:9;84:13;
  102:23,24;103:9;
  124:13;125:12;126:5
**moved (3)**
  48:24;119:6,7
**movement (2)**
  115:8;124:5
**Much (3)**
  29:22;65:15;106:14
**multi-functional (5)**

49:11,25;52:21;
59:17;95:3
**multi-functioning (1)**
46:9
**multiple (8)**
18:22;33:15;35:20;
51:22;59:24;62:1;
129:22;131:16
**multi-use (2)**
46:7,8
**municipality (1)**
80:5
**Munster (1)**
34:21
**muscle (1)**
55:18
**muscles (2)**
53:19,21
**myriad (1)**
33:6
**myself (2)**
32:8;118:20

**N**

**name (8)**
7:7;60:19,21;
115:25;121:22;
132:10;135:13;
136:20
**name's (2)**
94:4;95:20
**narrow (1)**
52:2
**narrowed (1)**
105:13
**necessarily (2)**
52:22;53:1
**necessary (10)**
10:2;33:23;39:10;
47:13;97:1;104:25;
139:13;140:9;141:10,
19
**need (24)**
8:16,18;27:9;38:8,
10,12,13,15;43:17,18;
47:19,20,23;53:1;
54:5;56:25;57:18;
59:1;83:13;84:9;
88:10;93:17;108:3;
116:21
**needed (2)**
80:15;118:7
**needs (4)**
43:17;91:8;114:20;
138:11
**negotiated (1)**
9:23
**neither (1)**
20:20
**new (7)**
17:12;27:7;43:12;
45:23;60:4;74:2;

143:7
**NEWMAN (13)**
15:19,25;16:5;
132:25;134:19;135:1,
10,12,13;136:7,15;
140:21;145:12
**next (8)**
8:14;18:18;31:10;
51:17;54:17;63:25;
64:1;99:15
**nice (1)**
65:3
**nod (1)**
7:24
**nodding (1)**
71:10
**Nods (4)**
22:5;29:22;59:12;
81:12
**non-architectural (1)**
32:7
**noncritical (1)**
133:16
**normal (3)**
56:3;57:8,9
**normally (1)**
132:6
**north (5)**
99:20;119:6;
123:25;124:6;127:14
**notation (1)**
31:18
**note (2)**
80:17;148:21
**noted (1)**
120:15
**notes (11)**
26:6,11,12,13,15,
15;27:23;29:19;
69:18;70:8;117:16
**notice (4)**
89:7;100:13;
104:10;111:16
**November (7)**
76:9;77:10,15,25;
78:4,5,13
**nuance (2)**
71:1,3
**null (1)**
31:3
**Number (12)**
11:4,5;25:16,23;
69:5;76:17;115:16;
117:24;118:7;119:19;
122:6;142:22
**numbered (1)**
115:19
**numbers (2)**
25:14,17
**numerous (1)**
47:8

**O**

**object (11)**
86:22;89:16;96:22;
98:11;120:4,12;
139:15;144:13,24;
145:10,12
**Objection (24)**
15:19;62:23;63:1;
79:11;89:17,18;
90:13;92:12,24;93:9;
95:8;114:2,24;
120:21;132:23;
140:10,21;141:12,20;
143:25;144:2;146:6,
8,11
**obligations (2)**
136:2,12
**observed (1)**
123:21
**Obviously (9)**
21:16;28:4;55:24;
80:14;117:5;118:9;
124:25;136:8;148:10
**occupancy (3)**
79:23,24;80:4
**occur (2)**
30:20;85:19
**occurred (3)**
75:25;94:8;109:1
**o'clock (2)**
50:22,22
**of/with (1)**
98:23
**off (11)**
39:2;49:14;62:16;
66:1,7;67:12;78:8;
79:25;80:9;112:15,19
**office (21)**
17:1,3,21;20:8;
28:14,16;34:6;37:23;
39:4;43:13;53:25;
69:17,24;99:6,13;
110:18;117:2,3;
121:16;124:21;
125:11
**offices (1)**
17:14
**officially (1)**
79:2
**Ohio (4)**
17:10;26:21;27:25;
68:19
**older (1)**
57:16
**on-board (2)**
111:17;113:10
**once (4)**
42:16;62:15;83:25;
125:15
**one (44)**
7:8;11:4;41:6;

44:17;49:22;50:8,10;
53:10;58:7;59:23;
60:11;62:7;64:7,19,
20;65:23;68:17;70:7,
16,16,17;73:18;94:4;
96:1;97:6;103:11,19;
105:19;110:2;112:14;
118:17;120:7;121:7;
122:4;123:21;128:1;
130:8;131:20;133:25;
135:19;138:22,23;
141:8,17
**ones (2)**
26:24;97:21
**one-story (1)**
64:3
**only (10)**
38:13;42:23;51:5,6;
52:24;67:13;119:5;
127:5;129:21;137:9
**open (3)**
52:22;78:4;80:1
**opening (7)**
76:9;77:16,17,17;
78:3;79:24;80:25
**openings (1)**
78:18
**operation (3)**
44:2;100:15,16
**operations (4)**
29:12,13;78:15;
118:14
**opinion (1)**
36:3
**opinions (1)**
90:12
**opportunity (1)**
134:25
**opposed (2)**
10:20;33:10
**opposite (1)**
8:3
**option (1)**
82:16
**options (5)**
56:13;82:6;140:18;
141:21;142:2
**order (8)**
41:2,10,21;42:17;
87:5;107:2,4;120:7
**Org (11)**
18:14;22:16;23:17,
23;24:8;81:25;82:18;
92:20;93:5;102:20;
115:20
**Organization (52)**
10:18;11:18;15:13,
17;16:22;17:13,19;
18:10;21:6,15,22,24;
22:6;23:14;30:13,19,
20;31:5;37:13;72:24,
25;81:22;91:11,14;
92:2,7;95:22,25;98:4,

6,8,24;99:17;100:7;
101:12,19,20,22,24;
102:9;103:24;104:6;
115:18;118:14;
125:21;128:16,24;
131:20;132:14;
133:10;134:2;137:21
**organizations (1)**
16:16
**Organization's (1)**
132:20
**Org's (1)**
25:3
**orientation (2)**
48:22;64:25
**original (4)**
82:20;83:1,7;84:4
**originally (1)**
148:7
**others (3)**
55:16;93:16;100:2
**otherwise (1)**
24:25
**ought (1)**
140:4
**out (52)**
8:5;17:9,9;23:10,
23;26:5;34:21;35:13;
40:6,10;42:11;43:13;
54:14,19,21,25;56:5;
62:3;64:17;65:23;
66:20,21,23;69:21,21;
81:3;84:25;86:18;
87:12,17;93:18;
96:25;101:19;103:2;
104:18;107:5;109:2,
21;110:25;111:21;
114:9,16,20;117:24;
120:7,18;122:22;
124:13;126:24;
129:12;138:4,23
**outline (1)**
99:25
**outreaches (1)**
27:10
**outside (7)**
33:20,24;37:23;
51:1;52:9;105:5;
125:13
**outwash (1)**
129:11
**over (52)**
21:16;54:20;56:5;
61:25;77:9;79:16;
80:13;96:24;102:24;
147:6
**overall (6)**
13:11;73:14;98:8;
100:11;117:7;148:8
**overfill (1)**
122:19
**overly-filled (1)**
71:11

Jennifer Pennington and Rose Pennington vs. document 30-8(6) of Reed Road Storage Corporation d/b/a Philip
Memorial Hospital of South Bend, Inc.

303 filed 03/26/20 Coonrad through Philip Panzica
October 17, 2019

**oversight (2)**
136:14,15
**overview (1)**
117:13
**own (4)**
24:6;44:2;99:9;
123:8
**owner (13)**
67:18;73:15;79:7,
17,25;95:4;96:18;
99:16;137:1,5,12;
148:5,6
**owners (2)**
9:24;35:13

## P

**package (2)**
66:5;147:11
**packages (1)**
130:9
**packet (6)**
129:2,15,25;
131:20;132:1;147:13
**pad (4)**
82:16;89:15;
140:19;143:3
**padding (3)**
83:5;92:8,10
**pads (12)**
139:12;140:8;
141:2,25;143:4,9,15,
17,18;144:25;145:2;
146:2
**page (42)**
7:18;25:14,18,20,
25;26:3;28:5,6;29:19;
31:20;43:7;44:9,15,
19;46:20;51:13;73:4;
77:12,24;78:20;
80:14;96:5;98:18;
102:24;103:9;108:8,
15;109:11;117:15;
118:3;119:6,7;
121:22;122:7,9;
123:3,23,25;124:5,6;
142:9;143:1
**pages (10)**
13:20;26:5,13;
31:11;42:19;113:17;
115:19;121:5,10,14
**paid (2)**
42:3,14
**panels (1)**
66:24
**Panzica (123)**
3:5,21;7:1,8;9:9,14,
19;11:20;12:18,21;
13:5;15:5,17,20,21;
16:4,5,7,10,12,12,13,
16,17,21;17:9,16,17,
17,18;18:8;20:14,15,
16,18,19,19,22,22,23;

22:3,4;31:18;33:10;
34:14;37:1;40:17,23,
24;41:3,4,7,12,14,15,
17;59:15;60:25;
62:19;69:14;72:23;
73:16;74:5;81:5;83:9,
16;90:21;91:13;92:1;
94:4;95:20;96:12,17,
18;97:9,25;98:13,14,
23;99:4,11;103:6,12,
15,18,21;104:8;
106:19;107:24;108:5;
111:9;112:3;115:15;
117:23;119:18;
130:12;132:5,10;
133:4,6;134:6,7;
135:13,14,14,22,22,
23;136:1,10,20,23;
137:7;139:12;140:7;
141:10;143:11;
144:22;145:7;146:2,
4;147:2;149:3
**P-a-n-z-i-c-a (1)**
7:9
**Panzica's (4)**
39:4;40:17;84:1;
148:25
**paper (5)**
46:24;65:7;69:25;
101:15,17
**paradigm (1)**
27:7
**Paragraph (3)**
77:16;78:2,20
**parking (1)**
33:20
**part (17)**
11:18;21:20;22:9;
28:18;40:15;44:12;
45:12;55:6;59:19;
76:18;82:20;83:1,6;
101:12;106:7;114:13;
126:1
**partially (1)**
10:7
**participate (1)**
23:21
**particular (11)**
15:11;25:20;34:13;
41:6;46:5;50:15;
51:14;95:5;96:3;
132:22;135:25
**parties (3)**
16:7;41:12;135:7
**partnered (2)**
17:11;21:22
**parts (1)**
11:21
**party (1)**
111:25
**pass (3)**
93:14,24;134:15
**passing (2)**

116:16,22
**patients (1)**
29:5
**Paul (1)**
128:12
**pay (2)**
107:14;146:17
**paying (1)**
79:3
**PC (1)**
3:18
**pen (2)**
44:15,16
**Pennington (5)**
85:10;86:2,9;89:1,
10
**Pennington's (1)**
81:14
**Pennsylvania (1)**
68:19
**people (23)**
8:8;35:20;49:13,13,
20;54:2;55:13,14,15,
17;57:16,16,17;
63:10;66:18;88:17;
110:16,23;118:11;
122:17,21,22;146:23
**people's (2)**
27:10;49:14
**percent (2)**
65:19;121:9
**perfect (3)**
124:1,8;125:18
**perform (1)**
113:7
**performance (3)**
24:4;47:6;66:6
**performed (2)**
112:9;114:1
**period (1)**
108:21
**permits (1)**
68:1
**permitting (1)**
36:2
**person (5)**
32:7;56:3,3;57:10;
118:17
**personally (1)**
135:18
**perspective (10)**
25:9;40:17;65:11;
84:1;89:13;139:11;
140:7;141:10;145:7;
146:4
**pertain (1)**
26:6
**pertained (1)**
131:21
**pertaining (3)**
15:6;61:7;92:3
**pertains (2)**
31:12;33:18

**perusal (1)**
113:13
**peruse (1)**
14:9
**perusing (1)**
14:15
**PFEIFER (70)**
7:6,10;12:1;13:17;
15:23;16:3,11;20:2;
37:7;59:3,6,9,14;
63:2;71:8,15;72:15;
73:22,25;74:4;77:23;
79:13;87:1,18;89:4,
21,24;90:2,7,19;
92:15;93:4,14,22;
117:14,21;118:1;
119:15;120:9;123:9,
13;129:14,17,24;
130:7;133:1;134:17,
20;135:3,9;136:5;
139:1,3,10,21;140:12;
141:6,16;142:1,8,14,
15,25;143:12;144:9,
17,20;145:6,16;
146:25
**phase (31)**
17:22;63:15,17,20,
20,24,25;65:5;66:10;
68:3,4,6;69:6,13,15;
70:12;74:14;75:9;
76:2;77:1,2;94:9,15,
15,16,23,24;97:14;
105:10,14,20
**phases (8)**
63:10,12;69:10;
71:18;75:22;76:12,
15,23
**Phil (1)**
33:10;34:14;143:11
**PHILIP (3)**
7:1,8;31:18
**phone (5)**
17:25;69:20;
112:18;134:21;
147:19
**photographs (2)**
58:14,17
**photos (4)**
58:15,19,22;59:1
**phrase (3)**
25:16;31:6;88:19
**phrases (1)**
8:2
**physical (8)**
28:13,16;47:11;
53:20;54:5,6;55:3;
99:2
**physician (2)**
28:7,11
**Pick (1)**
148:11
**piece (8)**
38:9;46:23;65:7;

69:25;101:15,17;
110:25;111:1
**pin (2)**
105:9;108:19
**pipe (1)**
129:10
**piping (5)**
34:12;66:21;68:24;
101:5;106:14
**pit (1)**
129:11
**place (9)**
25:2;26:7;27:24;
32:22;46:15;48:18;
75:9,17;77:7
**placed (3)**
105:2;128:23;
140:20
**placement (5)**
139:12;140:8;
141:2,7,17
**Plaintiffs (1)**
7:2
**Plaintiffs' (1)**
117:23
**Plaintiff's (3)**
13:19,22,22
**plan (29)**
35:12,12;46:5,6;
48:16,21,21;51:13,14;
61:25;62:5;64:11,11;
65:8,22;69:24;70:1,3;
82:11,21;83:1,7;
99:24,24;100:21;
101:16;120:14;
128:14;134:2
**plane (1)**
46:3
**planning (4)**
46:16;51:17;63:25;
65:4
**plans (31)**
33:7,9;36:7,12,22;
37:2,24;38:24;39:2,9;
40:10;44:12,19;45:5,
10;53:7;62:11,12,15,
17,21;74:15;75:23;
99:19;100:20;102:1;
116:24;128:7,10,19,
20
**plaster (2)**
131:23;147:15
**plastic (1)**
56:20
**plates (1)**
122:14
**players (1)**
97:22
**playing (1)**
47:23
**please (8)**
7:7;8:23;90:6,20;
109:12;115:1;142:11;

143:3
**plenty (1)**
  25:6
**plumb (1)**
  100:20
**plumbing (11)**
  34:11,15;35:7;
  39:17;66:21;80:7;
  100:1,17,18;104:12;
  111:5
**pm (2)**
  29:21;149:15
**point (21)**
  7:10;13:9;18:25;
  22:19;23:3;55:4;66:7;
  68:8;69:23;77:8;79:1,
  21;83:19;84:11;
  95:15;105:25;109:9;
  120:23;126:24;
  141:24,25
**pointed (1)**
  117:24
**pointing (3)**
  123:10,15,17
**pool (218)**
  11:6,10,10,14,14;
  18:14;22:14;24:13;
  36:8,11,12,18,19,23;
  39:20,20,21,24;40:19,
  20,22;42:18;44:13,
  18;45:2,11,19;46:7,8,
  9,10,12;49:5,9,10,11,
  18,25;50:2,6,15,16,
  18,20,25;51:3,10,12,
  15,18,22,24,25;52:8,
  10,13,15,21;53:2,3,6,
  8,11;55:10,20,22;
  56:12,16;57:2,12,15,
  18,21,23;58:1,16,22,
  24;59:19;61:3,14,25;
  62:6,9,17,18,22;
  68:10,11,23;70:25;
  71:1,3,3;73:7;74:15;
  75:24;81:8;82:12,13;
  84:25;90:23;91:4,7,
  16,22;92:4,10,22;
  93:7;94:17,18,18;
  95:3,14;99:23;100:2,
  9,11;101:3,5,5,14,23;
  102:10,21;104:3,9,10,
  15,17,18,20,22,25;
  105:6,7,8,18,22;
  106:11,12,21,25;
  107:4,12;109:3,13,22;
  111:18;113:2,10;
  114:4,13,23;116:8,9,
  16,17;117:1,1;
  118:25;119:10;120:1,
  14,25;122:7,10,16,17,
  19,22,23,24;123:4,7;
  124:13;125:2,4,6,13,
  19;126:21;127:16,21;
  128:10,14,20,21;

129:4,22,23;130:10,
  13,14,15;131:13,21,
  22;133:18;136:8;
  137:15,18,20;138:2,
  11,12,12;141:8,9,25;
  142:4;147:5,6,8,18,
  21;148:14
**pools (42)**
  11:9,11,12,20;
  15:12;18:4,6,11;19:9;
  22:8,17;23:8,15,22;
  24:10,13,18,20;25:4;
  35:11;38:21;50:10;
  59:17,20;60:18,24;
  61:2;68:17;70:21;
  90:24;91:3,5,6;94:20;
  109:23,24;110:5,6,9;
  124:20;127:14;129:6
**pool's (4)**
  50:21;71:4,5;
  141:22
**portion (10)**
  34:1,7,15;35:21;
  36:17;39:23;90:8;
  98:19;114:23;116:23
**portions (3)**
  11:3;35:3;130:15
**position (4)**
  9:10,12;18:11;
  145:15
**positively (1)**
  52:19
**possibility (1)**
  83:20
**possibly (5)**
  29:23;30:25;31:1;
  113:15;125:10
**potential (2)**
  141:3,14
**pounds (1)**
  38:9
**power (1)**
  66:24
**practice (1)**
  63:8
**preparation (4)**
  12:9;63:19;96:2;
  99:18
**prepare (4)**
  13:3;67:10;94:22;
  98:24
**prepared (2)**
  69:16;130:13
**Present (3)**
  28:4;31:16;135:7
**presented (4)**
  18:21;82:10;
  106:13;131:12
**president (2)**
  9:11,13
**Presuming (1)**
  59:10
**pretty (5)**

11:6;51:19;55:15;
  121:18;125:9
**previously (1)**
  125:7
**primarily (1)**
  132:1
**primary (5)**
  13:8;48:23;97:21;
  103:19;105:25
**principals (1)**
  17:13
**printed (1)**
  35:20
**prior (5)**
  11:24;13:15;31:25;
  76:20;80:20;142:6
**probable (1)**
  64:16
**probably (8)**
  21:19;51:18;71:11;
  80:20;91:6;125:9;
  128:19;129:2
**problem (6)**
  83:22,25;84:18;
  87:11;134:21;137:23
**problems (2)**
  27:5;111:6
**process (17)**
  15:11;18:16;40:15,
  16;48:11;50:13;62:9;
  67:9;74:12,14,20;
  75:8,12;106:8,8;
  114:14;131:6
**produce (3)**
  58:19,20;149:3
**produced (6)**
  102:2,13,16,18;
  108:6;115:17
**produces (1)**
  61:22
**producing (2)**
  61:3;62:11
**product (5)**
  10:5;58:5,10;61:13;
  62:10
**production (1)**
  133:11
**professional (1)**
  128:22
**program (8)**
  23:11;46:17,19,25;
  47:1;64:9,24;69:17
**progresses (1)**
  133:13
**project (111)**
  9:25;10:5,12;11:1,
  3,7;15:12;16:23;17:4,
  6,20,24;18:7;19:14;
  20:11;21:8,23,23,25;
  22:2,7,9,17,24;23:4,5,
  14,16,17;24:3,10,13;
  26:17;33:2,15;34:14;
  35:13,16;37:4,14,

39:23,25;40:9;42:2,
  13,15,16;43:3,4,16,
  20;45:6,12,22;49:3;
  60:14;63:7,9,11;64:6;
  67:21;69:9,21;71:18,
  19;73:1,2,5,17;74:8;
  75:19;76:5;77:9;79:1;
  84:7,17;90:23;94:8;
  96:9,13,16,20;97:3;
  98:1,19;100:7;
  101:14,21;103:17,25;
  105:11;106:3;107:13;
  108:12;119:21;120:2;
  121:1;122:2,3;123:1;
  126:3,13,17;128:17;
  131:15;133:13;136:1,
  3,13;137:13;142:20
**projects (21)**
  10:9,10;17:12;
  18:22,24;19:11,12,17,
  25;20:4;21:3;22:11;
  30:14;32:11,12,12;
  43:11;59:22,22;88:9;
  107:9
**project's (2)**
  23:6;32:4
**properly (1)**
  110:10
**proposal (8)**
  108:17;111:8,9,12;
  112:2,7;113:6,24
**proposals (1)**
  67:22
**proposed (3)**
  38:18;74:2;112:4
**proposing (1)**
  124:17
**protect (2)**
  84:10;85:3
**protection (1)**
  140:4
**provide (2)**
  29:4;128:21
**provided (13)**
  12:13;14:10;70:18;
  80:4;84:9;86:15;
  88:24;100:25;113:11;
  116:22;129:4;130:9;
  137:19
**provides (1)**
  57:22
**providing (3)**
  24:12;100:10;
  140:18
**PT (2)**
  28:19,22
**public (1)**
  80:2
**pump (1)**
  117:10
**pumping (1)**
  68:24
**pumps (3)**

101:6;104:24;105:1
**pun (1)**
  87:13
**punch (4)**
  79:18;80:15,18,24
**Punchlist (1)**
  80:17
**purchase (7)**
  41:2,10,21;42:17;
  60:8;107:2,3
**purposes (9)**
  8:5;12:3;14:1;15:4;
  16:22;61:2;71:25;
  91:14;92:2
**put (18)**
  17:16,23;22:24;
  29:7;37:2;44:22,25;
  45:16;47:22;48:18;
  69:25;82:16;100:18;
  102:1;109:6;114:17;
  137:24;141:25
**putting (2)**
  40:6;141:24

---

## Q

**question's (1)**
  8:17
**quick (3)**
  14:9;113:13;138:24
**quickly (1)**
  69:4
**quite (3)**
  22:10;23:18;116:24
**quotation (1)**
  94:22

---

## R

**rail (1)**
  133:19
**railings (3)**
  57:9;133:18,25
**rainbow (2)**
  148:4,11
**raising (1)**
  124:18
**ramp (15)**
  45:10,20;52:13;
  53:6,8;56:15;58:8;
  59:18;81:9;82:15,25;
  114:22;119:6;123:22;
  124:5
**ramps (1)**
  60:24
**Rans (1)**
  3:18
**re (1)**
  78:25
**reached (2)**
  23:23;109:2
**read (11)**
  25:24;60:15;90:9;

100:2;112:22,24;
  113:16;115:2,4;
  142:11;143:19
**reading (1)**
  77:22
**reads (1)**
  99:16
**ready (2)**
  42:16;134:15
**real (1)**
  14:9
**realistic (1)**
  68:8
**realizing (1)**
  43:17
**really (4)**
  18:3;26:23;36:7;
  138:24
**re-ask (1)**
  112:22
**reason (11)**
  8:16;10:19;11:17;
  31:22;113:23;126:7,
  7,7;145:1;146:15,19
**reasonable (2)**
  90:25;94:19
**reasons (1)**
  44:7
**re-assessing (1)**
  18:23
**recall (21)**
  28:18;30:23;33:3,6;
  41:24;52:1;60:16;
  78:7;83:12;109:17,
  19,25;111:19;113:17;
  118:19;123:2;125:7,
  18;128:7;131:14,17
**receive (2)**
  42:15,17
**received (3)**
  17:25;89:7;116:15
**receiving (2)**
  17:6;109:18
**recessed (1)**
  57:5
**recollect (1)**
  58:11
**recollection (7)**
  30:23;82:22;83:4,8;
  84:6;124:4;126:15
**recommendation (6)**
  92:23;93:7;125:8,
  22;126:5,18
**recommendations (3)**
  60:6;91:8;126:3
**recommended (3)**
  92:8,20;93:6
**reconnaissance (1)**
  26:19
**record (9)**
  7:17;34:15;72:3,17;
  90:8;112:20;123:16;
  126:4;148:21

**records (3)**
  101:21;107:3;
  111:14
**recreational (1)**
  51:25
RECROSS-EXAMINATION (1)
  147:3
**rectangle (7)**
  44:21;119:8;
  122:11,12;124:1,8;
  125:18
**rectangular (3)**
  44:25;45:16;53:6
**red (2)**
  44:15,16
**REDIRECT (1)**
  139:9
**reduced (2)**
  20:11;51:18
**refer (4)**
  16:12;17:18;20:21;
  25:23
**reference (6)**
  60:9,10,11;61:5;
  116:25;122:9
**referenced (2)**
  118:6;123:20
**references (1)**
  47:16
**referred (7)**
  31:4;72:6;94:14;
  95:22;129:14;137:4,5
**referring (9)**
  16:9;20:18,23;
  60:20;99:5;102:19;
  117:18;129:20;130:1
**refers (3)**
  11:13;99:4,6
**refined (3)**
  99:18;114:15,16
**reflect (2)**
  102:11;125:23
**reflected (1)**
  99:23
**reflects (1)**
  123:16
**regarding (2)**
  91:16;116:17
**regardless (1)**
  87:20
**registered (6)**
  32:13,16;130:20,
  22,24;131:2
**regularly (1)**
  54:25
**related (2)**
  64:15;138:12
**relates (10)**
  11:20;12:22;23:13;
  25:2;36:6,11;38:21;
  40:19;81:7;96:9
**relating (2)**
  34:12;106:21

**relation (2)**
  17:12;130:12
**relationship (2)**
  21:14;64:14
**release (6)**
  35:23;36:1,2,5;
  37:3;132:12
**released (2)**
  36:15;38:25
**releasing (1)**
  35:25
**Relevance (1)**
  144:1
**relevant (2)**
  138:11,12
**reliable (1)**
  125:14
**reliance (1)**
  42:13
**relied (3)**
  60:25;71:24;138:10
**rely (3)**
  91:13;92:1;109:8
**relying (2)**
  14:1;15:4
**remain (1)**
  130:24
**remainder (1)**
  109:17
**remedial (2)**
  140:22;145:13
**remember (5)**
  58:7;110:7;147:5,8;
  148:7
**render (1)**
  36:3
**renderings (1)**
  65:22
**rephrase (4)**
  8:23;21:20;23:20;
  144:17
**reporter (7)**
  7:20;25:22;90:10;
  112:25;115:5;130:4;
  149:12
**represent (8)**
  24:11;108:5;
  115:16;119:19;
  127:15;135:13;
  136:21;148:22
**representation (3)**
  13:24;14:13;121:3
**representative (3)**
  12:18;15:5;108:11
**representatives (2)**
  27:12,14
**represented (2)**
  136:24;147:7
**representing (1)**
  94:5
**represents (1)**
  122:14
**reps (1)**

**request (2)**
  102:17;108:17
**requested (5)**
  81:18;94:21;117:6;
  118:8;132:4
**requesting (4)**
  18:1;105:7;145:2;
  147:14
**require (1)**
  11:5
**requirement (1)**
  47:21
**requirements (1)**
  97:4
**research (1)**
  26:19
**researched (1)**
  68:15
**resolution (2)**
  85:5,21
**resolve (3)**
  83:13;84:12;85:6
**resolved (2)**
  84:12;135:21
**resources (2)**
  59:23,24
**respect (4)**
  36:22;43:6;92:19;
  136:12
**respectively (1)**
  124:6
**responding (2)**
  14:1;69:3
**response (2)**
  128:5;140:6
**responsibilities (2)**
  136:3,12
**responsibility (8)**
  35:21;38:1,6;74:11;
  79:5;96:19;106:16;
  146:20
**responsible (18)**
  32:22;33:1;34:8;
  35:3,5,6,7;40:9,12;
  41:18,19;70:4;78:25;
  96:24;100:9;101:4;
  106:16;124:17
**responsive (3)**
  12:14;69:3;134:4
**rest (1)**
  138:6
**restricting (1)**
  104:23
**restrooms (1)**
  99:22
**resumed (1)**
  135:6
**retain (1)**
  103:3
**returned (3)**
  131:11;136:6;
  139:20

**review (20)**
  13:6,7;14:20;35:12,
  12,22;69:18;81:18,19,
  21;95:6,11;115:6;
  131:7;132:5,8,21;
  133:6,18,24
**reviewed (6)**
  13:25;15:3;131:17;
  132:13,15;134:7
**reviewing (3)**
  14:6;107:25;108:4
**reviews (3)**
  131:5,9,10
**Ribley (1)**
  29:15
**riding (1)**
  46:1
**right (35)**
  7:20,25;14:17,19;
  20:7;22:22;36:7,25;
  39:7,13,19;41:23;
  42:19;47:25;48:11,
  17;70:18;71:16;
  72:16;73:21;76:8;
  77:24;90:1;93:15;
  96:14;98:1;103:25;
  109:14;111:5;116:2,
  5;127:3,19;129:12;
  142:3
**right-hand (2)**
  25:17;115:20
**rinsing (1)**
  129:12
**riser (1)**
  40:11
**risks (1)**
  146:13
**Road (1)**
  3:8
**Robert (3)**
  121:22,25;128:11
**role (8)**
  28:18;40:18;96:14;
  105:22;106:1,12;
  114:19;126:12
**roles (1)**
  103:19
**roll (2)**
  56:22;57:24
**rolling (1)**
  23:2;49:7
**room (12)**
  24:5;48:9,10;55:7;
  93:19;94:19;117:10;
  123:4,8,8;139:8;
  148:9
**rooms (2)**
  99:22,23
**ropes (4)**
  127:7,8,10;147:16
**Ruksakiati (30)**
  3:12;62:25;73:20,
  23;89:18;90:16;

Jennifer Pennington and Josh Pennington v. document 30(B)(6) of Panzica Building Corp. through Philip Panzica
USF Holland, Inc. and Lost Dauphin, LLC case 3:18-cv-00919-CAN filed 05/26/22 page 167 of 171
Memorial Hospital of South Bend, Inc.
October 17, 2019

**92**:12,24;**93**:9,25;
**94**:3,4;**95**:9,16;**98**:11;
**114**:2,24;**120**:3,10;
**138**:19,25;**139**:7,19;
**140**:25;**144**:2,14;
**146**:8;**147**:1,4;**148**:18
**rules (1)**
  **7**:16
**run (3)**
  **65**:25;**82**:11;**119**:23
**running (3)**
  **64**:21,21;**82**:19

**S**

**safe (2)**
  **80**:11;**134**:7
**safety (8)**
  **91**:15;**92**:3;**138**:11;
**139**:13;**140**:9;**141**:11,
19;**142**:2
**sake (1)**
  **86**:7
**Sam (14)**
  **105**:25;**108**:10,10;
**109**:20;**117**:3;**118**:12,
19;**142**:10,19;**143**:2,
10,13,19;**146**:5
**same (14)**
  **7**:18;**20**:3,7;**48**:23;
**49**:23;**54**:15;**92**:19;
**100**:22;**110**:20;
**125**:12;**127**:8;**140**:10;
**141**:12,20
**Sarah (1)**
  **28**:22
**sat (1)**
  **101**:24
**satis (1)**
  **57**:20
**satisfactions (1)**
  **62**:13
**saw (1)**
  **115**:23
**saying (15)**
  **11**:17;**18**:13;**25**:5;
**35**:24;**45**:5;**62**:8;
**65**:24;**70**:14;**85**:24;
**87**:16,19;**102**:8;
**110**:1;**113**:20;**144**:8
**schedule (2)**
  **39**:11;**99**:25
**schedules (2)**
  **39**:10;**65**:23
**schematic (9)**
  **43**:21;**63**:14;**64**:2,9;
**69**:24;**70**:1;**76**:22;
**98**:24;**101**:16
**Scheme (4)**
  **63**:14,15;**69**:13;
**148**:8
**school (1)**
  **21**:12

**schools (1)**
  **50**:17
**scope (9)**
  **49**:3;**100**:5;**101**:13;
**105**:5;**108**:18;**109**:12;
**112**:8;**113**:6,24
**scopes (2)**
  **67**:10;**88**:9
**Scott (3)**
  **94**:4;**139**:7,19
**seal (7)**
  **32**:22;**34**:6;**35**:18;
**40**:12;**128**:22;**133**:5;
**134**:6
**sealed (8)**
  **34**:4,13;**35**:3,16;
**36**:19;**39**:3,14;**128**:22
**seated (1)**
  **7**:20
**second (9)**
  **49**:22;**63**:15;**73**:18;
**82**:5,8;**112**:14,14;
**138**:23,23
**Secondly (1)**
  **91**:2
**section (8)**
  **34**:10,23;**98**:18,20;
**99**:15,15;**102**:24;
**104**:7
**sections (5)**
  **33**:15;**39**:9;**99**:20,
21;**128**:19
**securing (1)**
  **79**:4
**seeing (2)**
  **14**:16;**71**:9
**seem (2)**
  **33**:3,6
**sees (1)**
  **110**:19
**segregated (1)**
  **99**:8
**selected (4)**
  **101**:1;**148**:5,6,13
**send (3)**
  **54**:5;**61**:25;**68**:21
**sense (1)**
  **114**:15
**sent (6)**
  **69**:17;**84**:22;
**142**:10;**143**:13,19;
**146**:4
**sentence (2)**
  **98**:22;**143**:7
**separate (2)**
  **63**:10;**148**:23
**separates (1)**
  **81**:8
**Sergio's (1)**
  **68**:10
**series (6)**
  **31**:10;**34**:3;**36**:17;
**49**:7;**64**:12;**79**:16

**serious (6)**
  **85**:14;**86**:15,19;
**87**:22;**88**:2,3
**serve (3)**
  **52**:16;**137**:12,17
**service (1)**
  **56**:12
**services (26)**
  **9**:25;**10**:15,16;
**11**:18;**15**:18;**16**:21;
**23**:24;**24**:12;**40**:11;
**42**:4,5;**97**:7;**101**:9;
**106**:21;**107**:1,15;
**108**:18;**109**:13,20;
**112**:4,8;**113**:6,25;
**129**:4;**136**:2,11
**set (20)**
  **12**:23;**14**:2;**15**:7;
**33**:18;**35**:9;**39**:3;
**46**:25;**52**:13;**54**:10;
**55**:5;**63**:9;**67**:8;**117**:6;
**118**:3;**119**:20,22;
**120**:21;**121**:4,12,19
**setting (1)**
  **54**:11
**several (6)**
  **46**:4;**60**:11;**69**:11;
**105**:9;**107**:24;**128**:11
**severely (3)**
  **85**:23;**87**:4;**141**:5
**sewer (3)**
  **34**:11;**66**:22;**129**:13
**shall (2)**
  **37**:19;**64**:13
**shape (1)**
  **148**:14
**shared (2)**
  **52**:8;**61**:24
**Sheahen (1)**
  **118**:13
**sheet (5)**
  **35**:17,20;**116**:12;
**120**:5;**147**:11
**sheets (4)**
  **119**:21;**128**:10,11,
13
**shoestring (1)**
  **17**:8
**shop (2)**
  **130**:13;**131**:3,5,7,9,
10,14,18,19;**132**:5,6,
15,16,19,22;**133**:4,6,
15,17,24;**134**:5,8
**short (1)**
  **134**:11
**shorter (1)**
  **29**:22
**show (9)**
  **12**:2;**37**:19;**61**:23;
**64**:13;**101**:22;**102**:19;
**126**:22;**128**:20;**142**:9
**showed (2)**
  **51**:14;**147**:5

**showing (6)**
  **46**:17;**49**:19;**64**:24;
**65**:8;**120**:25;**122**:25
**shown (10)**
  **100**:21;**114**:18;
**119**:1;**125**:2;**126**:22;
**127**:1,2,10,11,22
**shows (6)**
  **38**:5;**120**:5;**127**:5,6,
7,18
**Sic (1)**
  **72**:5
**side (4)**
  **15**:14;**108**:22;
**131**:17;**141**:9
**sign (1)**
  **80**:9
**signature (2)**
  **96**:6;**149**:12
**signed (5)**
  **34**:3;**39**:2;**74**:20,21;
**135**:19
**significant (2)**
  **75**:12;**84**:17
**signs (2)**
  **62**:16;**66**:7
**silly (1)**
  **146**:16
**similar (3)**
  **48**:22,23;**58**:9;
**59**:18
**similarly (2)**
  **132**:14;**136**:10
**simple (1)**
  **75**:19
**simpler (1)**
  **125**:13
**simultaneous (1)**
  **117**:3
**single (4)**
  **21**:1;**47**:12;**79**:15;
**129**:10
**Single-source (1)**
  **74**:11
**sit (4)**
  **49**:3;**56**:22;**84**:11;
**128**:1
**site (3)**
  **33**:19;**67**:15,15
**Sitescapes (1)**
  **97**:18
**sits (1)**
  **110**:18
**sitting (1)**
  **56**:7
**situation (7)**
  **81**:18,19,21;**83**:20;
**85**:9,12;**144**:4
**Six (1)**
  **58**:12
**six-lane (3)**
  **50**:16;**51**:15;**53**:1
**size (8)**

**20**:11;**35**:13;**64**:14;
**68**:11;**88**:9;**101**:5;
**104**:24;**148**:13
**sizing (1)**
  **66**:19
**slab (2)**
  **65**:18;**67**:14
**slabs (1)**
  **67**:15
**slash (1)**
  **137**:7
**slightly (1)**
  **71**:5
**slippery (3)**
  **88**:11,13,15
**slowly (1)**
  **57**:1
**small (1)**
  **82**:10
**smaller (1)**
  **62**:3
**SMITH (42)**
  **3**:2;**19**:21,23;**37**:5;
**59**:5,8,10,13;**72**:8,12;
**77**:20;**86**:22;**89**:3,16;
**90**:5,14,18;**93**:2,12,
20;**96**:22;**102**:3,5;
**130**:3;**132**:23;**134**:11;
**139**:15;**140**:10,24;
**141**:12,20;**142**:24;
**143**:25;**144**:13,15,19,
24;**145**:10;**146**:11;
**148**:19;**149**:11,13
**snap (1)**
  **56**:9
**soft (3)**
  **77**:17;**78**:3,18
**soil (2)**
  **97**:19,19
**soiled (1)**
  **47**:20
**solution (1)**
  **141**:13
**solve (1)**
  **83**:22
**solved (2)**
  **84**:1;**137**:23
**somebody (16)**
  **32**:20;**56**:2,3;**57**:11;
**84**:18;**85**:2,3,20;**86**:6,
8;**140**:3;**141**:14;
**145**:21,25;**146**:14,21
**someone (12)**
  **34**:5;**56**:18;**84**:20;
**85**:22;**87**:3;**88**:10;
**131**:4;**141**:3;**144**:5;
**145**:3,3,24
**sometimes (2)**
  **60**:5;**99**:12
**somewhere (3)**
  **105**:14;**108**:24;
**122**:19
**sorry**

Jennifer Pennington and Josh Pennington vs. 
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

USDC IN/ND CASE 3:20-cv-00875-MGG    document 42-4    filed 03/28/22    page 168 of 171

59:5;72:8,13,14;
75:3;77:21;90:7,13;
102:4;112:16;138:24,
25;140:1;142:13,21
**sort (2)**
52:17;87:12
**sought (1)**
109:21
**South (23)**
3:13;17:16;29:9;
41:15;82:13,20;
83:17;84:4;90:21;
92:10,22;93:7;99:20;
119:7;122:7,10;
123:3,4,23;124:6;
127:14;135:23;141:9
**southern (1)**
81:7
**SP (1)**
128:10
**SP0.0 (1)**
119:22
**SP1.1 (1)**
120:6
**SP4.2 (1)**
119:23
**Spa (1)**
68:11
**space (9)**
23:11;46:17,19,25;
47:1;48:22;64:9,23;
69:17
**spaces (4)**
47:2,13;64:25;65:3
**SPALDING (8)**
62:23;79:11;95:7;
136:19,20;138:14,17;
142:21
**spans (1)**
66:12
**speak (3)**
8:8;12:21;21:7
**Spear (79)**
36:20;39:22;40:18;
41:11,20,21;42:8;
62:20;63:6;64:8;68:4,
5,19;69:2;70:11,16,
20;71:17;74:13;
81:23,25;82:9,18;
83:10;84:2;87:14;
88:5,18;91:11,14;
92:1,7,19;93:5;94:5,
14,16;95:1;97:16;
105:10,19,21,24;
106:7,21,25;107:4;
108:7,13,14,18,23;
109:2,6,8,9,16;
111:23;112:3,8;
113:7,11,25;114:11;
116:8,16,21;117:1,2,
4;118:18;122:4;
123:1;124:19;125:10;
143:20;146:3;147:13;
148:16
**spearing (1)**
87:12
**Spear's (4)**
36:23;69:5;94:7;
106:1
**spec (1)**
99:25
**special (2)**
56:18;104:11
**specialist (1)**
91:3
**specialize (1)**
109:21
**specialty (2)**
79:19;104:12
**specific (5)**
36:18;49:4;83:12;
126:14;131:13
**specifically (6)**
33:18;60:17;113:5;
126:24;131:21;
137:15
**specifics (2)**
41:24;76:3
**specified (1)**
147:10
**spectacle (2)**
56:7;58:2
**speculating (1)**
125:24
**speculation (2)**
86:23;132:24
**speeds (1)**
117:18
**spend (1)**
107:6
**spent (1)**
42:15
**spinning (1)**
54:13
**spiral-bound (2)**
60:22;61:1
**spoke (1)**
22:6
**spoken (1)**
7:22
**sports (9)**
24:4;28:11;47:6,10;
53:17,18;54:3;55:2;
99:1
**sprained (1)**
53:22
**square (5)**
65:16,17;98:25;
99:1;124:14
**squiggly (2)**
127:13;147:7
**stack (1)**
67:19
**staff (5)**
28:19;78:15;80:22;
110:15;133:13
**stagnant (1)**
115:9
**stainless (1)**
133:20
**stair (3)**
57:8;61:21;82:15
**stairs (16)**
45:11,21;52:14;
53:9;57:7,8,13,19,25;
58:9;59:18;81:9;
100:12;119:5;123:24;
124:5
**stairway (2)**
53:7;83:1
**stamp (12)**
33:9;37:2;121:21;
128:6;132:6,10,11,16,
17,20;133:5;134:5
**stamped (4)**
35:10;128:11,12,15
**stamps (1)**
133:4
**Standard (7)**
72:6,20;73:14;
76:18;132:12;136:25;
148:17
**standards (3)**
51:22;64:18;80:10
**standing (2)**
32:25;130:24
**stands (1)**
126:8
**stapled (1)**
116:12
**start (29)**
8:12;23:3,10;25:11;
43:4,13,16;45:25;
46:16,17;48:19;65:4,
6,7,9,18;66:14,17,19,
21,22;68:1;76:17;
87:12,16,17;88:14;
119:6,22
**started (8)**
9:16;22:20;42:19;
46:23;70:1;76:5;
101:15,16
**starting (3)**
69:23;76:20;94:10
**starts (5)**
23:4;46:3,16;47:1;
103:2
**state (15)**
31:3;32:15;33:8;
35:10,22;36:13,15,15;
37:3,3;38:24;113:8;
130:20;131:2;149:5
**stated (4)**
45:22;88:8;105:16;
125:7
**statement (2)**
75:13;96:21
**states (2)**
32:15;79:18
**stating (3)**
32:23;34:7;145:3
**steel (4)**
38:9;56:8;66:15;
133:20
**steep (1)**
57:9
**Stefling (1)**
28:22
**step (4)**
57:9,9;88:18;93:18
**steps (4)**
57:5;61:9;79:16;
87:24
**still (4)**
71:6;79:17;80:15;
93:24
**stop (2)**
73:18;141:24
**stopped (1)**
107:14
**storage (1)**
47:19
**storm (1)**
33:19
**straight (2)**
43:12;57:6
**straighter (1)**
125:14
**strain (2)**
55:1,17
**strained (1)**
53:19
**Strength (1)**
47:7
**Strike (1)**
130:18
**strong (2)**
18:9;110:12
**strongest (1)**
18:21
**structural (22)**
34:2,6,9;35:8,19;
37:22,24,25;38:3;
39:14;97:11;100:1,
14;111:17;113:8,9,12,
20,22;119:8;123:4;
124:14
**structure (2)**
38:18;113:10
**structures (2)**
109:23;111:18
**studied (1)**
115:6
**studies (4)**
47:17;60:1,19;61:1
**studio (1)**
99:23
**study (2)**
38:16;67:21
**studying (1)**
48:20
**sub (1)**
131:11
**subcontractors (2)**
97:2;110:14
**subject (1)**
36:8
**submittals (1)**
147:11
**submitted (13)**
13:6;33:8;35:17,22,
24;36:13;37:2;38:24;
109:5;131:14,24;
147:12;148:16
**subs (1)**
10:6
**subsequent (2)**
140:22;145:13
**substantial (1)**
17:14
**substantial-size (1)**
17:4
**suburb (1)**
17:10
**successful (2)**
17:19;18:18
**suffice (1)**
96:8
**suggest (1)**
24:25
**suggestion (1)**
92:17
**suit (1)**
89:7
**Suite (3)**
3:19;99:1,2
**sump (1)**
129:11
**supplemented (1)**
102:18
**supplier (1)**
131:4
**suppliers (1)**
130:14
**supply (1)**
34:12
**support (11)**
17:7;18:7;29:4;
33:23;38:3,17;66:15;
98:5;99:10;100:24;
101:9
**supporting (1)**
100:16
**supports (1)**
100:17
**supposed (1)**
120:6
**sure (34)**
7:15,16;14:5,13;
15:2;22:10;23:18;
28:21;30:3;49:23;
50:9;60:13,16;61:7,9;
71:4;72:17;75:18;
91:24;97:19;102:15;
111:22;115:6,7;

Jennifer Pennington and Josh Robinson -vs-
Memorial Hospital of South Bend, Inc.

30(B)(6) of Panzica Building Corp. through Philip Panzica
October 17, 2019

116:24;120:16;
123:16;127:1;130:19;
131:19;133:20;134:1;
144:15,19
**surface (1)**
65:15
**surge (4)**
122:15,20;123:6,7
**surrounded (1)**
141:23
**surveying (1)**
97:20
**swim (5)**
50:17,17,19,20,22
**swimmers (4)**
139:14;140:9;
141:11,19
**swimming (1)**
50:8
**swinging (2)**
56:5,8
**switches (1)**
66:24
**sworn (1)**
7:3
**synergies (1)**
44:3
**synergy (4)**
29:13;54:1;55:3,6
**synonymous (1)**
50:1
**system (8)**
40:5;55:4;94:17,22;
100:23;111:5;129:9;
137:4
**systems (3)**
66:20;100:24;
110:10

**T**

**Tab (3)**
142:9,24,25
**table (4)**
17:23;50:15;69:25;
122:5
**talented (3)**
10:23;24:24;40:6
**talk (4)**
13:4;22:20;49:7,8
**talked (12)**
12:12;13:2;21:16,
24;53:14;60:17;
70:14;75:23;77:16;
78:14;101:25;105:9
**talking (26)**
15:10,21;16:13;
21:4;22:13;25:21;
30:2,4;31:7;35:25;
42:19;49:23;50:10;
58:3;60:6;67:3;69:11;
71:17;73:8;74:22;
81:22;91:10;97:13;

102:15;126:25;
129:17
**talks (1)**
78:21
**tall (2)**
37:18;66:12
**tank (5)**
122:15,20,23;
123:6,7
**Tavan (1)**
29:1
**team (12)**
17:16;19:10;20:8;
32:20;43:4;50:19,20,
23;65:12;67:1;99:11;
126:2
**teams (1)**
50:17
**technically (1)**
17:10
**technology (1)**
110:8
**Telephone (1)**
112:11
**tells (1)**
48:1
**template (1)**
46:24
**temporary (2)**
54:16;79:22
**tend (1)**
30:25
**term (4)**
50:5;106:5;127:8;
136:14
**terminologies (1)**
99:12
**terms (9)**
12:8;24:12;51:20;
71:18;76:4;96:8;
100:6;108:25;148:13
**testified (4)**
7:4;36:14;94:7;
128:5
**testifying (1)**
123:14
**testimony (6)**
15:4;88:20;101:12;
105:12;106:2;139:17
**Thanks (1)**
143:10
**therapy (15)**
11:10,14;28:13,16;
46:9,11;47:11;53:20;
54:5,6,9;55:3,22,23;
99:2
**thinking (1)**
91:20
**third (4)**
63:17;70:12,17;
111:25
**Thomas (1)**
135:21

**though (4)**
48:4;80:13;106:24
**thought (3)**
16:3;29:3;38:23
**thoughts (1)**
30:5
**thousands (1)**
91:22
**three (28)**
11:11,12;16:2,6;
18:24;19:11,17,25;
20:4;22:17;23:8;
24:10;30:6;50:11;
54:18;68:9,16;69:1,1,
2;70:15;105:18,19;
109:5,5;121:7;
147:24,25
**three-story (1)**
64:5
**throughout (3)**
59:17;73:8;95:23
**throwing (2)**
88:5,18
**tied (1)**
50:21
**tile (5)**
39:11;68:23;71:6;
147:14;148:9
**tiles (1)**
131:22
**timeline (1)**
76:13
**times (8)**
21:16;35:20;41:24;
60:7;105:9;107:8;
133:14,16
**today (11)**
8:5;12:9;15:5;
16:12,18;19:14;49:4;
72:1;128:2;130:25;
149:2
**together (6)**
17:16;21:1;41:17;
54:2;67:2,3
**toilet (1)**
100:19
**told (4)**
85:13;86:13;87:21;
89:6
**Tom (1)**
135:22
**took (9)**
25:2;26:7,11,15;
27:24;71:16;86:1;
101:25;137:23
**top (6)**
8:9;29:20;89:15;
109:11;115:25;
127:16
**topic (2)**
82:1;94:14
**topics (6)**
12:14,22;13:4;14:2;

15:6;81:24
**total (2)**
74:8;99:10
**totally (2)**
64:5;85:1
**toured (1)**
27:19
**toward (1)**
77:1
**towards (1)**
87:14
**trade (3)**
67:11,14;131:11
**trades (1)**
80:18
**trailed (1)**
112:15
**training (1)**
80:23
**transcript (1)**
25:24
**transpired (1)**
81:7
**travel (3)**
29:25;30:2;76:16,
21
**traveled (2)**
27:12,14
**treadmill (1)**
54:10
**treating (1)**
27:4
**trend (1)**
56:14
**trickles (1)**
121:14
**tried (2)**
13:7;148:10
**trilogy (2)**
19:12;21:3
**trip (2)**
76:6;120:20
**true (1)**
94:9
**try (1)**
63:13
**trying (16)**
24:25;25:1;37:10;
45:9;57:14;86:18;
105:9;108:18,19;
120:20;127:8;130:3,
5;143:17;144:25;
145:17
**tuning (1)**
114:19
**turned (2)**
77:9;80:13
**turning (1)**
57:13
**Turnover (1)**
79:15
**turn-over (8)**
78:21,24,25;79:1,7,

15,17;133:14
**two (17)**
11:9;20:25;29:12,
14;41:17;55:1;56:19;
78:9,16;94:20,21;
109:3;115:18;121:7;
122:12;143:4;147:24
**type (13)**
10:21,23,25;22:16;
24:16;35:14;47:13,
16;60:1,4,19;61:1;
68:15
**types (6)**
26:22;32:11;34:22;
61:7;85:17;107:9
**typical (2)**
99:19,21
**typically (3)**
121:15;131:5,7

**U**

**ultimate (1)**
62:12
**ultimately (10)**
19:18;20:3,4;44:4;
45:11,20;52:14;53:2,
7;58:9
**umbrella (1)**
99:7
**uncommon (1)**
59:20
**unconscious (1)**
84:25
**under (8)**
32:24,24;33:25;
42:6;99:7,15;114:4;
128:18
**Understood (5)**
8:20;9:2;26:2;
38:23;85:9
**undertaken (3)**
20:1,6;70:19
**underway (1)**
143:3
**unit (1)**
65:24
**unknown (1)**
146:16
**unless (1)**
120:7
**unlock (1)**
78:18
**unregistered (1)**
32:18
**up (30)**
7:24;26:24;28:13;
46:25;48:10;49:20;
50:18,21;52:23;
53:16,16;55:5;57:8;
62:21;63:9,10,13;
64:6;67:18;68:18;
85:5;117:6,19;

120:20;121:8,12;
126:22;127:18;
130:18;143:14
**upon (15)**
13:23;14:1;15:4;
30:7;47:15;60:25;
63:25;66:1;71:24;
86:2;91:13;92:1;
99:16;109:8;138:10
**urgency (1)**
143:4
**usage (1)**
52:8
**use (18)**
8:2;31:6;35:15,15;
44:3;47:16;50:18,20,
24;52:9,23;55:21;
56:17;60:8;99:12;
106:5;111:1;136:14
**used (3)**
61:5;69:5;145:8
**users (2)**
51:1;143:10
**uses (1)**
47:4
**using (2)**
88:19;148:9
**utilities (3)**
33:19,23;79:3

## V

**vague (2)**
63:5;114:25
**Valparaiso (1)**
10:18
**value (1)**
107:13
**varied (1)**
78:16
**various (3)**
12:14;13:4;122:3
**Vendor (3)**
41:25,25;107:10
**ventilation (2)**
34:18;66:19
**Venture (14)**
20:16,20,25;40:24;
41:3,8,10,13;98:15;
135:14,19,20;136:10;
149:7
**verify (5)**
38:7,8;52:18;61:12;
70:6
**versed (1)**
19:10
**version (3)**
51:17;62:6;119:2
**versions (1)**
112:2
**versus (1)**
110:18
**vertical (2)**

57:3,4
**vertically (1)**
57:14
**Vickers (1)**
3:12
**view (1)**
58:5
**views (1)**
65:11

## W

**W12 (1)**
38:8
**W6 (1)**
38:12
**W64 (1)**
38:10
**Wacker (1)**
3:13
**waiting (1)**
79:19
**walk (10)**
54:20;56:16;57:2,
10,12,13,18,23,25;
146:17
**walking (4)**
55:15;57:8;80:5;
88:11
**walks (1)**
146:14
**wall (31)**
57:4,5;65:15;81:7;
82:13,15,15,17,24,25;
83:6;89:15;92:9,22;
99:21;117:9;123:4;
124:13;125:12,12;
140:3,8;141:4,15,17,
18;144:5,7;145:22;
146:1,17
**walls (7)**
37:18;65:8;68:23;
92:9;104:23;139:13;
141:23
**wall-to-wall (2)**
82:24;92:21
**Walsh (1)**
136:22
**wander (1)**
78:19
**wants (1)**
48:3
**warranty (1)**
110:24
**water (23)**
34:12;49:15,21;
56:5,10,20,23,24;
68:9;71:6;104:24,25;
115:8,8;122:18,20,22,
24;129:7,7,8,9;141:23
**water's (1)**
122:18
**way (10)**

58:7;63:8;64:7;
67:3;68:5;110:21,21;
120:17;128:1;137:13
**ways (1)**
59:21
**Wednesday (2)**
80:20;118:8
**weeds (1)**
117:12
**week (1)**
54:18
**weeks (2)**
54:17,22
**weighs (2)**
38:9,10
**weight (2)**
38:9;49:15
**welcome (2)**
18:24;117:21
**wellness (1)**
27:6
**Wendell (1)**
136:22
**West (2)**
3:8;99:20
**what's (15)**
12:2;14:18;31:22;
46:11,11;85:19;87:9;
88:6;100:20;105:3;
110:17;115:15;
119:18;142:12,16
**wheel (2)**
56:19,21
**wheelchair (4)**
55:14;56:4,18,22
**wheelchairs (1)**
56:19
**Whenever (1)**
124:22
**Where's (1)**
9:8
**whirlpool (2)**
11:15;46:14
**white (9)**
46:23;65:6;69:25;
101:15,17;147:22,24,
25;148:9
**whole (1)**
25:4
**who's (2)**
100:23;137:10
**wide (1)**
38:11
**width (2)**
51:19,20
**window (1)**
76:14
**windows (1)**
65:9
**Wisconsin (2)**
68:18;70:17
**wish (7)**
37:18;47:2;61:19,

20;65:3;80:19;139:25
**wished (2)**
16:24;17:1;18:20;
50:25
**within (6)**
20:13;47:8;65:4;
99:7;102:23;146:21
**without (10)**
20:8,8;44:17;58:1,
1;78:10;107:6;
127:24;128:3;146:2
**witness (7)**
7:2;14:6;19:22,24;
26:4;44:20;59:12;
72:10,13;73:12;74:1;
90:17;93:15;108:4;
123:12;129:16,19;
130:5,8;134:15;
138:16;149:15
**Wolf (18)**
21:9,10,11;24:23;
25:6,7;27:13;30:13;
31:15,19;32:1;33:10;
61:16;62:11;118:12,
19;128:15,23
**wondering (1)**
56:9
**word (6)**
7:21;15:20;45:6;
63:15,16;145:8
**words (3)**
48:13;104:17;
145:20
**work (43)**
7:25;10:2,6,24;
18:20;19:8;21:1;32:6,
23;35:21;37:16,21;
39:6,23;42:1,6;44:8;
54:2,19,24;67:12;
68:15;70:8;79:19;
80:19,22;98:6,7;
100:6,13;101:10,13;
105:5;107:4,6,11;
111:1,3,6;114:18;
129:1;134:1;143:2
**worked (4)**
42:10;49:1;114:16;
132:2
**working (4)**
53:22;67:2;99:14;
122:2
**world (1)**
121:12
**write (1)**
60:5
**written (2)**
60:23;94:22
**wrong (1)**
68:13

## X

**X-million-dollar (1)**

20;65:3;80:19;139:25

65:1

## Y

**years (11)**
9:13,16;21:17;
24:23;25:8;55:1;
58:12;110:8,21;
115:23;131:3
**Yep (1)**
138:16
**yesterday (1)**
143:8
**YMCA (6)**
29:8,9,12;43:24;
44:7;69:21
**YMCAs (3)**
18:15;19:9;24:19
**York (1)**
60:4
**young (1)**
55:16

## Z

**zero (17)**
11:8;52:17;56:13,
14;59:20;60:17,24;
61:2,14,20;62:10;
70:20;71:3;74:15;
75:24;81:9;114:22
**zero-depth (1)**
95:3

## 0

**08 (1)**
28:6

## 1

**1 (5)**
69:13,15;75:9;
108:15;109:11
**1.1's (1)**
120:9
**1.3 (2)**
98:18;99:15
**1.5.2 (2)**
102:25;104:7
**10 (19)**
115:11,12,16;
118:7,24;119:1;
122:6;123:20,21;
125:1,6;126:16,22;
127:2,4,5,11,19,23
**100 (2)**
65:19;121:8
**105 (5)**
13:20;77:12,24;
78:21;80:14
**10-inch (1)**
38:14

**10th (1)**
78:5
**11 (25)**
31:11;42:23,24;
119:13,15,16,19,25;
122:9;123:11,19;
124:3;125:1,2,6;
126:16,21;127:2,6,10,
13,18,22;129:18;
130:2
**11th (5)**
26:7,14;29:20;
30:17,20
**12 (8)**
42:20,21,21;43:7;
44:10,16,19;51:13
**12-by-64 (1)**
38:12
**12-inch (2)**
38:5,7
**12-inch-wide (1)**
37:20
**13 (4)**
27:23;30:21;58:12;
76:7
**14 (3)**
72:9,13,14
**14-inch (1)**
38:15
**15 (2)**
9:13;110:7
**150 (1)**
3:13
**15th (1)**
142:17
**16 (3)**
46:20;76:10;77:10
**17 (1)**
72:11
**180 (1)**
64:21
**1977 (1)**
9:16
**1979 (1)**
130:23
**1st (2)**
31:12;42:25

---

## 2

**2 (12)**
11:5;65:5;75:9;
76:18;94:15,24;
98:18;105:14;142:5,
9,23,25
**20 (4)**
9:13;49:13,20;
110:20
**2013 (6)**
26:7,14;29:20;
30:18;31:13;42:25
**2014 (1)**
72:19
**2015 (5)**
77:6;108:17,21;
116:4;118:4
**2016 (3)**
77:15,25;142:17
**2017 (2)**
72:5,8
**20th (2)**
108:16,21
**21st (1)**
76:22
**22nd (3)**
74:21;116:4;118:8
**27th (2)**
118:4,9
**280 (1)**
30:6
**286 (1)**
3:8

---

## 3

**3 (9)**
26:3,5,13;50:22;
66:9,10;74:14;75:9;
94:15
**30 (3)**
49:13,20;110:20
**30B6 (2)**
7:2;71:25
**31st (1)**
46:22
**3rd (3)**
77:15,25;78:13

---

## 4

**4 (4)**
68:3,4;75:10;
102:24
**4,300 (2)**
99:1,1
**4:04 (1)**
149:15
**40 (3)**
38:8,9;131:3
**42 (1)**
9:16
**46350 (1)**
3:9
**47 (2)**
142:10;143:1

---

## 5

**5 (18)**
13:13,19;14:20,22,
22;15:2;25:12;31:10;
33:24;42:20;43:7;
50:22;77:13,16;78:2;
103:9;117:24;118:3
**50 (2)**
122:17,21

---

**50,000 (1)**
45:25
**520 (1)**
3:3
**55,000 (1)**
98:25
**58 (2)**
117:15;118:3

---

## 6

**6 (8)**
11:23;12:3,15,23;
13:4;14:2;15:7;78:20
**60606 (1)**
3:14
**646 (1)**
115:20
**647 (1)**
115:20
**6th (1)**
77:4

---

## 7

**7 (15)**
13:13,22;14:21,22;
15:2;71:24;72:4,18,
19;75:5,6;95:24;96:9;
98:17;102:23
**7:00 (1)**
29:21
**7-foot (1)**
52:2
**7-foot-6 (1)**
52:5

---

## 8

**8 (18)**
13:14,22;14:21,22;
15:3;26:5,13;29:19;
52:3;73:11,13,20;
74:5,23;75:2,3;76:17;
136:25
**801 (1)**
3:19
**8-and-a-half-foot (1)**
52:3

---

## 9

**9 (6)**
31:11,20;42:20,24;
107:21;112:7
**9:30 (1)**
29:21
**9th (1)**
78:4