UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| PANZICA BUILDING CORPORATION,<br>    Plaintiff,<br><br>v.<br><br>WESTFIELD INSURANCE COMPANY,<br>    Defendant.<br><br>WESTFIELD INSURANCE COMPANY,<br>    Third-Party Plaintiff,<br><br>v.<br><br>PANZICA BUILDING CORPORATION,<br><br>And<br><br>JENNIFER PENNINGTON AND JOSH PENNINGTON,<br>    Third-Party Defendants. | CASE NO. 3:20-CV-00875-MGG |

**OPINION AND ORDER**

Ripe before the Court in this declaratory judgment action is a motion for summary judgment filed by Defendant/Counterclaim-Plaintiff Westfield Insurance Company ("Westfield") wherein Westfield contends that it is not required to defend or indemnify Plaintiff/Counterclaim-Defendant Panzica Building Corporation ("PBC") in underlying litigation filed in Indiana state court. The undersigned issues the following opinion and order granting summary judgment to Westfield pursuant to the consent of the parties and 28 U.S.C. § 636(c). [DE 31].

I. **RELEVANT BACKGROUND**

In January 2015, Memorial Hospital of South Bend, d/b/a Beacon Health and Fitness ("Beacon"), contracted with PBC to design and construct a fitness center with a multi-lane lap pool (the "Beacon contract"). [DE 19, ¶ 13]. PBC and their partner in the project, Panzica Construction Company ("PCC"), formed a joint venture for the purpose of constructing the fitness center. This joint venture was called Panzica 2, a Joint Venture ("P2JV"). [DE 42-1]. P2JV hired a subcontractor to design and construct the pool due to its lack of expertise in designing and building fitness centers with pools. [DE 40 at 5, DE 40-3 at 2; DE 41 at 12]. Though P2JV engaged the subcontractor to design the pool, PBC retained responsibility for the pool's design under the Beacon contract, and, consequently, PBC did not assign its design obligations to P2JV. Specifically, PBC's Partial Assignment Agreement with P2JV stated that PBC

> does hereby assign to [P2JV]: (a) all of [PBC's] rights and obligations under the [Beacon contract], except [PBC] reserves to itself, and does not assign to [P2JV] all design obligations of [PBC] under the [Beacon contract], which design obligations include all design services that are required by law to be performed by a person or entity who is lawfully licensed to practice architecture . . . .

[*See* DE 42-2, at 1, Partial Assignment and Assumption of Design/Builder's Rights and Obligations under Standard Form of Agreement Between Owner and Design/Builder (emphasis in original)].

Pursuant to this joint venture agreement, the Panzica entities were obligated to take out insurance policies to cover different aspects of the project. [DE 1-5 at 10]. P2JV took out a commercial general liability ("CGL") policy from Westfield under policy

2

number TRA7972182 ("the Policy"). [DE 1-1]. P2JV is identified as the named insured on the Policy, which was in effect from October 30, 2015, to October 30, 2016. [DE 1-1]. The policy further provides that if the named insured is "a . . . joint venture, you are an insured. Your members, [] partners, and their spouses are also insured, but only with respect to the conduct of your business." [DE 1-1 at 19].

The Policy covers any "'bodily injury' or 'property damage'…caused by an 'occurrence'" taking place on the insured premises and further requires Westfield to "defend…against any 'suit' seeking" such damages. [DE 45-1 at 16]. The Policy's professional liability exclusion, however, excludes coverage for any bodily injury or property damage arising out of certain professional services. This exclusion states, in relevant part:

> **1.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
> **a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
> **b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above…
> **2.** . . . professional services include:
> **a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change order, or drawings and specifications; and

3

> **b.** Supervisor or inspection activities performed as part of any related architectural or engineering activities.

[*Id.* at 53]. The Policy also included a construction means exception to this professional liability exclusion, which states as follows:

> **3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

[*Id.*]. P2JV renewed the Policy on identical terms from October 30, 2016, to October 30, 2017. [DE 35-6; DE 45-1].

The pool opened in November 2016. [DE 42-3 ¶ 13]. On November 16, 2016, Dr. Jennifer Pennington was swimming backstroke in the lap pool and struck her head on the entrance ramp to the pool, sustaining a serious head injury. *Id.* at ¶¶ 17–18. Litigation in Indiana state court and this Court ensued. First, Dr. Pennington and her husband, Mr. Josh Pennington (collectively, "the Penningtons") filed claims on April 10, 2018, against Beacon, PBC, P2JV, and their subcontractors in Indiana state court in an action captioned *Jennifer Pennington, Josh Pennington v. Memorial Hospital of South Bend, Inc. d/b/a Beacon Health and Fitness, Panzica Building Corporation, Spear Corporation et al.*, case number 71D06-1804-CT-000160 ("the underlying litigation"). Through their operative fourth amended complaint filed on July 15, 2020, the Penningtons alleged six claims, four of which pertain to PBC. [DE 19-4]. The first count alleges negligent and defective design of the pool. [*Id.* at 5, ¶¶ 19–24]. Count two alleges negligent failure to warn and instruct patrons regarding safe use of the pool. [*Id.* at 5, ¶¶ 25-29]. The fourth count, brought for the first time in this fourth amended complaint, alleges negligent

4

construction against PBC and a subcontractor. [*Id.* at 6-7, ¶¶ 34–39; DE 46 at 3, ¶15]. Count five is a derivative claim by Mr. Pennington for loss of consortium. Counts three and six do not pertain to PBC.

PBC contacted Westfield on August 12, 2020—about a month after the fourth amended complaint was filed—and indicated that, considering the allegations in the fourth amended complaint, it was PBC's position that Westfield had a duty to defend and indemnify PBC in the underlying litigation. Westfield, however found that PBC was not entitled to a defense. Accordingly, PBC filed this action on October 20, 2020,[1] seeking a declaratory judgment that Westfield is obligated under the CGL policy to defend PBC against the Penningtons' claims. [DE 1 ¶ 15]. Westfield has moved for summary judgment contending that it is not obligated to defend or indemnify PBC. The motion is fully briefed and ripe for resolution.

## II. ANALYSIS

### A. Relevant Legal Standards

The Declaratory Judgment Act grants federal courts the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). To warrant a declaratory judgment, there must be a "substantial controversy, having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil*

---

[1] On May 20, 2019, Citizens Insurance Co. of America and Hanover Insurance Co. also filed an action against PBC and the Penningtons in this Court under cause number 3:19-cv-387-DRL, seeking a declaratory judgment that they were not required to defend or indemnify PBC in the underlying state litigation.

5

*Co.*, 312 U.S. 270, 273 (1941). As the instant action involves parties with adverse legal interests involving an asserted duty to defend that would have immediate effects on currently pending litigation, such a controversy exists here. *See NUCOR Corp. v. Aceros Y Macquilas de Occidente*, 28 F.3d 572, 579 (7th Cir. 1994).

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

Here, the parties' briefs both seek to apply Indiana substantive law. When there is no dispute between the parties over which state's laws apply in an action in federal court, the court should apply the law of the state in which it sits. *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 341 (7th Cir. 2013). Accordingly, this Court will apply Indiana law. Under Indiana law, "[t]he interpretation of an insurance policy is primarily a question of law for the court, and it is therefore a question [that] is particularly suited for summary judgment." *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind.

2009). The party seeking coverage under an insurance contract bears the burden of proving their claims fall within the coverage provision of the insurance contract. *Allstate Ins. Co. v. McColly Realtors, Inc.*, 296 F. Supp. 3d 947, 954 (N.D. Ind. 2017) (quotation omitted). Conversely, if an insured meets its burden in showing that a policy applies, the burden then shifts to the insurer to show the applicability of any exclusions, limitations, or conditions that restrict coverage. *Id.*

Here, Westfield seeks a declaratory judgment that it is not obligated to defend or indemnify PBC in the underlying litigation in state court. An insurer's duty to defend is broader than its duty to indemnify. *Newnam Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). If an insurer has no duty to defend, then it likewise has no duty to indemnify. *Westfield Ins. Co. v. William B. Burford Printing Co., Inc.*, 467 F. Supp. 3d 632, 638 (S.D. Ind. 2020) (citing *City of Gary v. Auto-Owners Ins. Co.*, 116 N.E.3d 1116, 1121 (Ind. Ct. App. 2018)). "Typically, an insurer has a duty to defend its insured against suits alleging facts that might fall within the coverage." *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997) (applying Indiana law). An insurer must still defend "even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy." *Shelter Mutual Ins. Co. v. Djuro Djankovich*, No. 2:19-cv-22-PPS-JEM, 2020 WL 4430576, at *2 (N.D. Ind. July 31, 2020) (internal citation omitted). But "[i]f the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required." *Newnam Mfg., Inc.*, 871 N.E.2d at 401.

Put another way, "there is essentially only one standard – that the allegations of the complaint, including the facts alleged, give rise to a duty to defend whenever, if

7

proved true, coverage would attach." *Fed. Ins. Co.*, 127 F.3d at 566. Courts determine an insurer's duty to defend based on the allegations in the underlying complaint and "those facts known or ascertainable by the insurer after reasonable investigation." *Fed. Ins. Co.*, 127 F.3d at 566. Thus, "where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may properly refuse to defend." *Id.* Extrinsic evidence may also be considered. *Continental Ins. Co. v. George J. Beemsterboer, Inc.*, 148 F.Supp.3d 770, 781-82 (N.D. Ind. 2015). "Only if there is no possible factual or legal basis on which the insurer might be obligated to indemnify will the insurer be excused from defending its insured." *Shelter Mutual Ins. Co.*, 2020 WL 4430576, at *2 (internal citation omitted).

### B. Discussion

Here, Westfield offers four overall arguments that it is not required to defend or indemnify PBC in the underlying litigation and that they are entitled to summary judgment. Westfield first contends that the Policy under which PBC alleges entitlement to a defense had expired at the time of the accident. Next, Westfield argues that there is no duty to defend against Counts I and II of the underlying complaint because PBC was not insured under the Policy for its design work, the negligent design alleged in these counts is not an "occurrence" as defined in the Policy, and, even if it was an "occurrence," the professional services exclusion of the Policy applies. As to Count IV, negligent construction, Westfield maintains that the allegations remain fundamentally one of negligent design, and as such, are excluded from coverage for the same reasons

8

as Counts I and II. With no obligation to defend PBC as to Counts I, II, and IV, Westfield contends that it has no obligation to defend PBC as to the derivative claim in Count V.

PBC does not appear to dispute Westfield's arguments regarding coverage of the design claims alleged in Counts I and II. [*See* DE 41 at 2]. However, PBC does contend that, because Count IV alleges a claim of negligent construction, Count IV constitutes an "occurrence" and the construction means exception negates application of professional liability exclusion to warrant coverage. As such, PBC contends that it is entitled to a defense in the underlying litigation.

Neither party disputes the underlying facts of Dr. Pennington's injury or the circumstances surrounding the construction of the pool. [*See* DE 40; DE 41]. Indeed, the issue here is one of interpretation of an insurance policy, which is "particularly suited for summary judgment" because it is a question of law. *Wagner*, 912 N.E.2d at 808. Accordingly, the Court addresses each of Westfield's arguments in turn.

> 1. *Westfield's claim that PBC is not entitled to a defense because PBC initially referred to, attached, and relied upon the original policy and not the renewal when making its claims is without merit.*

Westfield first argues that PBC's complaint is defective because PBC alleged it was entitled to a defense and indemnity under the Policy attached as Exhibit A to its complaint. Westfield contends that this attached Policy was for the period of October 30, 2015, to October 30, 2016, which ended more than two weeks before Dr. Pennington's injury on November 16, 2016. While this is true, the Policy attached as Exhibit A to PBC's complaint and the Policy in effect at the time of Dr. Pennington's injury were identical with the same policy number. [*Compare* DE 1-1 *with* DE 45-1].

9

Further, the insurance policy in effect at the time of Dr. Pennington's injury was merely a renewal of the originally docketed policy, with the same policy number, such that it was clearly in effect on the date of the accident. PBC subsequently filed the renewal policy that was in effect at the time of the injury. [*See* DE 45-1]. Thus, PBC is correct that any error regarding which policy was in effect is a harmless error that "do[es] not affect any party's substantial rights" such that it should be disregarded. Fed. R. Civ. P. 61.

> 2. *PBC is not entitled to a defense by Westfield as Counts I and II because the Policy only covered PBC with respect to the conduct of P2JV business, these counts do not allege that Dr. Pennington's injury resulted from an "occurrence," and, even if it did, the professional liability exclusion restricts coverage.*

Westfield puts forth three arguments as to why it is not obligated to defend or indemnify PBC as to Counts I and II of the underlying complaint. First, Westfield contends that PBC was not covered by the Policy with respect to its obligations as a corporation, and PBC specifically retained for itself the design work at issue in Counts I and II. Next, Westfield contends that the negligence alleged in these counts is not an "occurrence" as defined in the Policy. Finally, Westfield contends that, even if Dr. Pennington's injuries resulted from an "occurrence," the professional services exclusion restricts coverage.

> a. *PBC was not covered for its design work.*

Westfield first contends that it is not obligated to defend PBC as to Counts I and II in the underlying litigation because the named insured, P2JV, did not have any responsibility for the design of the pool, and PBC was not covered with respect to its obligations as a corporation. Notably, the Policy named P2JV as the Named Insured and

provided that, as a joint venturer, P2JV's "members . . . are also insured, but only with respect to the conduct of [P2JV's] business." [DE 45-1 at 24]. Here, PBC's assignment agreement with P2JV specifically provided that PBC was not assigning its design obligations to P2JV and was reserving those obligations to itself. [DE 42-2 at 1].

"In Indiana, the clear and unambiguous language of an insurance policy must be given its plain and ordinary meaning." *Fed. Ins. Co.*, 127 F.3d at 567. Here, PBC was only covered by the Policy as a member of P2JV and with respect to obligations for the joint venture. A reasonable investigation would reveal that PBC did not contract away its design obligations to the joint venture and accordingly, these obligations were part of its conduct as a corporation rather than as a joint venturer. *See Newnam Mfg., Inc.*, 871 N.E.2d at 401. Accordingly, PBC is not entitled to a defense as to Counts I and II.

> b.  *The underlying injury did not result from an "occurrence" as defined by the Policy.*

Westfield next argues that it is not obligated to defend PBC in the underlying action because Dr. Pennington's injuries did not arise from an "occurrence" under the Policy. [DE 40 at 19–20]. Westfield contends that Counts I and II allege negligent design and failure to warn of the inherent dangers of this design, which constitute a professional error and omission rather than an "occurrence" under the Policy.

PBC's policy with Westfield covers "bodily injury" that is caused by an "occurrence." [DE 45-2, at 11]. The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 25. Under Indiana law, an "accident" in insurance policies means "an

11

unexpected happening without an intention or design." *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1002 (Ind. 2009) (quotation omitted). Indiana law further distinguishes between an "occurrence" in CGL policies and claims based on performance of commercial or professional services. *Id.*

This distinction, and its application to the negligent design claims alleged in Counts I and II of the underlying litigation, was previously addressed by this Court in *Citizens Ins. Co. of Am. v. Panzica Bldg. Corp.*, 507 F. Supp. 3d 1047, 1052-54 (N.D. Ind. 2020) (Leichty, J). In addition to its policy with Westfield, PBC purchased policies from two other insurers—a business liability policy from Citizens Insurance Company ("Citizens") and a commercial umbrella policy from Hanover Insurance Company ("Hanover"). *Id.* at 1050. After the Penningtons filed their claims, Citizens and Hanover filed an action seeking a declaratory judgment that they owed no defense to PBC in the underlying litigation. [DE 40-23, at 2].

Like Westfield's policy, PBC's policies with Citizens and Hanover both covered damages from "bodily injury" caused by an "occurrence," and defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 1052. The Court found that Counts I and II did not allege injuries caused by an "occurrence." As explained by this Court in *Citizens Ins. Co.*, claims based on professional conduct are "typically exclude[d]" from CGL policies because such policies do not "guarantee the quality of work or products of its insureds." *Id.*, quoting *Tri-Etch, Inc.*, 909 N.E.2d at 1002. Instead, "[c]laims based on negligent performance of . . . professional services are ordinarily insured under 'errors

12

and omissions' or malpractice policies." *Westfield Ins. Co. v. Orthopedic & Sports Med. Ctr. of N. Indiana, Inc.*, 247 F. Supp. 3d 958, 970 (N.D. Ind. 2017) (quoting *Tri-Etch, Inc.*, 909 N.E.2d at 1002); *see also Allstate Ins. Co. v. Preferred Fin. Sols.*, Inc., 8 F. Supp. 3d 1039, 1050 (S.D. Ind. 2014) (citing *Tri-Etch, Inc.*, 909 N.E.2d at 1001). Moreover, CGL policies do not typically cover contractual obligations. *Tri-Etch, Inc.*, 909 N.E.2d at 1002. Accordingly, failure to perform contractual duties or meet the standard of care of an assumed duty is not considered an "accident" covered by a CGL policy; rather, it is a professional error or omission. *Citizens Ins. Co.*, 507 F.Supp.3d at 1054. *See also Westfield Ins. Co.*, 247 F.Supp.3d at 972.

Like PBC's policy from Hanover, the policy at issue is a CGL policy, and defines an "occurrence" with identical language as both policies analyzed by the Court in *Citizens Ins. Co.* As Counts I and II allege breach of a professional contractual duty to design the pool, and consistent with the Court's finding in *Citizens Ins. Co.*, this Court cannot find that Dr. Pennington's injury was caused by an "occurrence" such that coverage would attach. Thus, Westfield is not obligated to defend or indemnify PBC as to Counts I and II in the underlying action.

     c. *The Professional Services exclusion further restricts coverage.*

Westfield also argues that, even if Dr. Pennington's injury did result from an "occurrence," the professional services exclusion would further exclude this incident from coverage because the Penningtons allege that Dr. Pennington's injuries arose from professional services provided by PBC. [DE 40, at 20–22]. Here, the Policy states that it does not cover any bodily injury "arising out of the rendering of or failure to render any

13

professional services" by or on behalf of the insured parties. [DE 45-1, at 53]. The Policy further defines "professional services" as "[p]roviding engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor" and hiring independent professionals to provide those services "in connection with construction work." *Id.*

"In Indiana, the clear and unambiguous language of an insurance policy must be given its plain and ordinary meaning." *Fed. Ins. Co.*, 127 F.3d at 567. Here, Counts I and II of the underlying complaint allege defective design and failure to warn of defective design. [DE 1-4, at 4–6]. PBC contracted with Beacon to design and build the fitness center and lap pool and formed P2JV for that purpose. Though PBC retained "all design obligations" when it assigned its other obligations to P2JV, [DE 42-2], PBC retained a subcontractor through P2JV to design the pool. [DE 41 at 12]. The subcontractor provided architectural services for the project, designing the pool. *Id.* This series of arrangements falls squarely within the plain language of the Policy's professional services exclusion, regardless of whether it is true in fact that PBC, despite their obligations under the contract, did not design the pool itself. The plain language of the Policy at issue here excludes from coverage the professional services which give rise to the claims alleged in Counts I and II of the Penningtons' complaint. This is also consistent with the Court's ruling in *Citizens Ins. Co. See* 507 F.Supp.3d at 1056 (finding that Counts I and II "directly implicate the professional design services of architecture and engineering" and the negligence alleged in these counts "is the very essence of these professional services")

> 3. *PBC is not entitled to a defense by Westfield as to Count IV because this claim sounds in defective design, and there is no factual or legal basis under which Westfield would be required to indemnify PBC for negligent construction.*

Count IV of the Penningtons' operative complaint in the underlying litigation is titled "Negligence in Construction of Project." Westfield argues that, after a reasonable investigation, it is not required to defend PBC as to Count IV because, although Count IV states a claim for negligent construction on its face, the nature of this claim is a negligent design claim akin to Counts I and II. Moreover, Westfield further contends that its reasonable investigation shows that all evidence presented in the underlying litigation challenge the pool's design rather than the pool's construction. [DE 40, at 24-25]. As such, Westfield maintains that Count IV also falls outside of the coverage provided by PBC's CGL policy for the same reasons as Counts I and II.

In response, PBC argues that, because the Penningtons have included an allegation of negligent construction, it alleges conduct by PBC through the joint venture. Moreover, PBC contends that this count alleges that Dr. Pennington's injuries were allegedly caused by an "occurrence" as defined in the Policy, and the construction means exception negates the professional liability exclusion. Based on this, PBC contends that it is "possible" that PBC could be found liable for negligent construction, and, as a member of the insured P2JV, PBC is entitled to a defense regardless of whether Counts I and II fall outside of coverage. [DE 41 at 15, 18].

There appears to be no dispute that PBC contracted its construction obligations to P2JV, and accordingly, PBC is insured for such obligations as a member of P2JV

15

under the Policy. The parties also do not appear to dispute that negligent construction is the type of claim that would be covered by the Policy. As contended by PBC, Indiana courts have found that faulty workmanship of a subcontractor that is done unintentionally has been found to constitute an "occurrence" in CGL policies. *See Sheehan Construction Co., Inc. v. Continental Cas. Co.*, 935 N.E.2d 160, 171-72 (Ind. 2010). *See also American Ins. Co. v. Crown Packing Intern*, 813 F.Supp.2d 1027, 1045 (N.D. Ind. 2011); and *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653 (7th Cir. 2010).[2] As such, with no allegation or evidence of intentional misconduct by the subcontractor, these claims constitute an occurrence under the policy, and the construction means exception negates the professional services exclusion such that coverage would attach.

Accordingly, the parties' dispute regarding Count IV centers on whether this allegation is one of negligent construction, as titled, or whether the claim remains one of defective design. The Court looks to the allegations in the complaint and the facts known or ascertainable to the insurer after a reasonable investigation when determining a duty to defend. *Fed. Ins. Co.*, 127 F.3d at 566. The Court must look beyond the

---

[2] In *Sheehan*, homeowners sued a general contractor for negligent construction of their homes after water leaks from windows caused damage to their home. 935 N.E.2d at 163. The general contractor had hired a subcontractor to install these windows. *See id.* The general contractor's insurer filed an action seeking a declaration that it had no duty to indemnify the general contractor. *Id.* The Indiana Supreme Court held that while "faulty workmanship that is intentional" cannot be considered an occurrence, "faulty workmanship" that is "'unexpected' and 'without intention or design' and thus not foreseeable from the viewpoint of the insured" is an accident constituting an occurrence under a CGL policy. *Id.* at 170. Like *Sheehan*, *Trinity Homes* involved a homebuilder who was sued for water damage caused by faulty subcontractor work. The court similarly held that, unless the subcontractor's work was intentionally faulty, it would be covered by a CGL policy. 629 F.3d at 657. Finally, *American Insurance Co.* addressed a dispute stemming from damages caused by defective containers that an insured plastic manufacturer sold to a third party, and the court found that there was no undisputed evidence that manufacturing problems were unexpected. 813 F.Supp.2d at 1045.

16

complaint's labels because factual allegations, rather than legal theories, determine whether coverage exists. *Liberty Mut. Ins. Co. v. Dometic Corp.*, 371 F. Supp. 3d 472, 478 (N.D. Ind. 2019). *See also Dave's Detailing, Inc. v. Catlin Ins. Co.*, 13 F. Supp. 3d 935, 940 (S.D. Ind. 2014) (citing *Indiana Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1271 (Ind.Ct.App.2009) ("A complaint's legal labels are immaterial.")). Accordingly, the Court will consider the facts alleged in the complaint and what a reasonable investigation would reveal to Westfield to determine coverage. *See Liberty Mut. Ins. Co.*, 371 F.Supp.3d at 478.

Here, the underlying complaint alleges that, as Dr. Pennington was swimming the backstroke, "she drifted slightly into the opening between the wing walls and slammed the crown of her head into the corner of the concrete stairwell wing wall." [DE 1-4 at 4, ¶ 17]. The complaint further alleges that the pool's "[w]ing walls are adjacent to the stairwell and entrance ramp with a lengthy break in between that contained no padding over the exposed concrete corners and contained no lane separating lines." [*Id.* ¶ 16]. Moreover, the Pennington's negligent design claims allege several design failures including "swimming lanes that are narrower than applicable standard;" "a wing wall design and structure that creates an unreasonable risk of serious injury;" "a wing wall design that permits the wing wall to be submerged in violation of applicable regulations and building standards;" and "failing to include adequate guidance aids and safety measures." [DE 1-4 at 4, ¶ 23]. In Count IV, the Penningtons further allege that PBC had direct charge of all matters necessary to complete the pool, and accordingly, failed to "adequately supervise" a subcontractor in the construction of the

17

pool, "failed to give adequate consideration to safety," "failed to recognize and address conditions that could cause injury to the swimmer," and failed to complete the pool "in conformance with industry standards and regulations." [DE 1-4 at 7].

Despite its title, the negligent construction claim contains no further factual allegations of how the pool was negligently constructed. For instance, as contended by Westfield, the fourth amended complaint contains no allegation that a subcontractor diverged from PBC's designs plans to create a safety issue, or that the plans complied with industry standards but that, through a deviation to the plans, the subcontractor constructed a pool that violated industry standards. The facts as whole allege that Dr. Pennington's injuries resulted from the pool being built as designed, such that the overall nature of the underlying complaint against PBC sounds in negligent design. *See Westfield Ins. Co. v. S&L Builders, LLC*, 558 F. Supp. 3d 711, 717 (N.D. Ind. 2021) (reviewing the allegation of complaint at issue in the context of others and "considering the allegations as whole") (citing *Transamerica Ins. Servs. v. Kopko*, 570 N.E.2d 1283, 1285 (Ind. 1991) (finding that overall complaint sounded in intentional torts and the use of the word "neglecting" did not show complaint signaled negligence). Here, if the factual allegations in the complaint were proved true, it would show negligent design rather than negligent construction. As such, the factual allegations of the complaint are unlike the faulty workmanship or manufacture claims raised by *Sheehan*, *Trinity Homes*, and *American Insurance Co.*, which are relied upon by PBC.

Therefore, the failure to conform to industry standards alleged Count IV would also not be an "occurrence" because it is based on the design of the pool rather than

faulty workmanship by the subcontractor. *See Allstate Ins. Co.*, 296 F. Supp. 3d at 957 (holding that failure to comply with the "standard of care for [their] profession" was an error or omission, not an occurrence). Nor does the failure to allege intentional wrongdoing provide coverage, as "a lack of intentional wrongdoing does not convert every business error into an 'accident.'" *Tri-Etch, Inc.*, 909 N.E.2d at 1001.

Finally, Westfield also contends that its investigation of evidence presented in the underlying litigation further demonstrates that no negligent construction claim is being pursued. Specifically, Westfield contends that, at the time PBC sought a defense from Westfield, the deadline to notice expert witnesses in the underlying litigation had already passed. [*See* DE 40-20]. The Penningtons noticed only one expert witness in the underlying state court action, and this witness' expert report opined that Dr. Pennington's injury resulted from defective design of the pool. The report did not otherwise discuss any negligence in construction of the pool. [*See* DE 40-13]. With no expert to opine on negligent construction, Westfield contends that the Penningtons are precluded from further proceeding with this claim.[3] Moreover, the Penningtons did not object to a Motion for Summary Judgement filed by PCC and P2JV in January 2020, and consequently, did not object to their dismissal from the underlying litigation on March 9, 2020. [*See* DE 40-7]. Thus, the underlying proceeding discloses no evidence, other than the caption for Count IV, that a negligent construction claim is being pursued. Accordingly, the "facts known or ascertainable" by Westfield also show that there is no

---

[3] In addition, in November 2021, PBC filed a motion for summary judgment on Count IV contending that no evidence has been produced in support of negligent construction.

19

factual or legal basis to require Westfield to defend or indemnify PBC on Count IV. Accordingly, Count IV is also "clearly excluded" under the policy and Westfield is thus not obligated to defend. *Newnam Mfg., Inc.*, 871 N.E.2d at 401.

> 6. *Westfield is not required to defend PBC as to Counts I, II, and IV, so Westfield has no obligation to defend PBC as to the derivative claim stated in Count V.*

The Penningtons' final remaining claim against PBC is for loss of consortium. Such a claim is considered "derivative of [Dr. Pennington's] personal injury claim[s]." *Durham ex rel. Estate of Wade v. U-Haul Int'l*, 745 N.E.2d 755, 764 (Ind. 2001). As the Court has found that Westfield has no duty to defend PBC as to Counts I, II, and IV, Westfield also has no derivative duty to defend PBC as to Mr. Pennington's claim for loss of consortium.

### III. CONCLUSION

For the foregoing reasons, Westfield's Motion for Summary Judgment is **GRANTED** [DE 38], and the Court declares that Westfield owes no duty to defend or indemnify PBC in the underlying litigation. The Clerk is **INSTRUCTED** to enter judgment in favor of Westfield.

**SO ORDERED** this 13th day of December 2022.

s/Michael G. Gotsch, Sr.  
Michael G. Gotsch, Sr.  
United States Magistrate Judge